## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| YUEH-LAN WANG,<br>*by and through her attorney-in-fact*,<br>Winston Wen-Young Wong,<br>No. 107, Songqin Street, Neighborhood<br>34, Sanzhang Village, Xinyi District,<br>Taipei City, Taiwan<br><br>                Plaintiff,<br>        v.<br><br>NEW MIGHTY U.S. TRUST<br>c/o Clearbridge, LLC<br>1666 K Street, NW<br>Washington, D.C. 20006<br><br>        and<br><br>NEW MIGHTY FOUNDATION<br>c/o Stephen K. Vetter<br>1666 K Street, NW<br>Washington, D.C. 20006<br><br>        and<br><br>CLEARBRIDGE, LLC<br>1666 K Street, NW, Suite 400<br>Washington, D.C. 20006<br><br>        and<br><br>JOHN DOES 1 THROUGH 10 and ABC<br>CORPORATIONS 1 THROUGH 10,<br><br>                Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Yueh-Lan Wang ("Yueh-Lan"), a citizen of Taiwan, by and through her

attorney-in-fact, Dr. Winston Wen-Young Wong ("Dr. Wong"), residing at No. 107,

Songqin Street, Neighborhood 34, Sanzhang Village, Xinyi District, Taipei City, Taiwan,

Republic of China, by and through her undersigned counsel, Gibbons P.C., by way of Complaint states:

## **RELIEF SOUGHT BY PLAINTIFF**

1.      This action is brought by Plaintiff against Defendants New Mighty U.S. Trust, New Mighty Foundation and Clearbridge, LLC (collectively "Defendants" or "New Mighty Trust") pursuant to Articles 1030-1, 1030-3 and 1146 of the Civil Code of Taiwan and all other applicable laws for an Order:

(A)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly owned, held, controlled, or maintained by Yung-Ching Wang ("Y.C." or "Decedent") before his death or for the benefit of Y.C. or his estate;

(B)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan;

(C)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly held, controlled, maintained or otherwise made an asset of the testamentary instruments, offshore accounts, corporations or financial accounts set forth below;

2

(D)    Imposing a constructive trust over the assets, monies and property directly

or indirectly (i) owned, held, controlled, or maintained by Y.C. or for the benefit

of Y.C. or his estate; (ii) received by Defendants from Y.C. during the period of

October 15, 2003 through October 15, 2008, without the consent of Plaintiff

Yueh-Lan; and (iii) held, controlled, maintained or otherwise made an asset of the

testamentary instruments, offshore accounts, corporations or financial accounts

set forth below;

(E)    Restoring all parties to the status quo that existed prior to the execution of

any and all testamentary instruments, creation of offshore accounts, and/or

distributions, dispositions or conveyances of assets, monies and property directly

or indirectly owned, held, controlled, maintained by Y.C. before his death or for

the benefit of Y.C. since October 15, 2003;

(F)    Modifying, amending and/or voiding any testamentary instrument and/or

transfer of the assets, monies and property directly or indirectly owned, held,

controlled, maintained by Y.C. before his death or for the benefit of Y.C. since

October 15, 2003;

(G)    Compelling Defendants to return the assets, monies and property directly

or indirectly received by Defendants from Y.C. during the period of October 15,

2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan, and

to produce any information related to said property;

(H)    Compelling a complete, auditable and accurate accounting of the assets,

monies and property directly or indirectly (i) owned, held, controlled, or

maintained by Y.C. before his death or for the benefit of Y.C.; (ii) received by

#1571247 v1
108901-65396

Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan; and (iii) held, controlled, maintained or otherwise made an asset of the testamentary instructions, other offshore accounts, corporations or financial accounts set forth below;

(I)     Compelling a complete, auditable and accurate accounting of the assets, monies and property that are contained in or were directly or indirectly used, disposed of, transferred or otherwise conveyed from the testamentary instruments, offshore accounts, corporations or financial accounts set forth above;

(J)     Compelling Defendants to provide compensatory, incidental, consequential, exemplary and punitive damages in an undetermined amount to Plaintiff as a result of Defendants' improper, wrongful and unlawful acquisition, transfer, diversion and misuse of the assets, monies and property directly or indirectly owned, held, or maintained by Y.C. before his death or for the benefit of Y.C., received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan, and held, controlled, maintained or otherwise made an asset of the testamentary instructions, other offshore accounts, corporations or financial accounts set forth above, all upon which Yueh-Lan is entitled to her fifty-percent share;

(K)     Compelling Defendants to provide restitution to Plaintiff for her share of the Marital Estate (defined below) under Articles 1030-1 and 1030-3 of the Civil Code of Taiwan;

(L)     Awarding Plaintiff damages under Article 1146 of the of the Civil Code of Taiwan;

#1571247 v1
108901-65396

(M)     Awarding fees and costs, including attorneys' fees, as a result of

Defendants' improper, wrongful and unlawful acquisition, transfer, diversion and

misuse of the assets, monies and property directly or indirectly owned, held,

controlled, or maintained by Y.C. before his death  or for the benefit of Y.C. upon

which Yueh-Lan is entitled to her fifty-percent share; and

(N)     For such other and further relief, in law or in equity, as this Court may

deem just and proper.

2.      Plaintiff Yueh-Lan brings this action to account for and recover her

portion of the property acquired by Y.C. and Yueh-Lan during their 72-year marriage (the

"Marital Estate") before his death on October 15, 2008.  Under Taiwan law, upon his

death, Plaintiff became entitled to fifty-percent of the Marital Estate.  The value of the

Marital Estate is unknown, but is more than double the value of the property to be paid to

Yueh-Lan pursuant to the Taiwan Estate Tax Filing, as discussed below.

3.      Defendants, their agents, servants and employees, directly or indirectly,

hold, control or manage substantial assets, monies and property owned, held, maintained

by Y.C. before his death or for the benefit of Y.C. and his estate, worth billions of dollars,

which are located in the United States and elsewhere in the world.  Upon information and

belief, Defendants, their agents, servants and employees also received distributions of real

and personal property from Y.C. during the period of October 15, 2003 to October 15,

2008, without the consent of Yueh-Lan and for the purpose of reducing Yueh-Lan's share

of the Marital Estate.

#1571247 v1
108901-65396

## THE PARTIES

4.      Plaintiff, Yueh-Lan Wang (née Kuo), is a citizen and domiciliary of Taiwan.  Yueh-Lan married Y.C. on December  20, 1935, and was Y.C.'s wife for over 72 years, until the day he died.  Y.C. and Yueh-Lan never divorced.  Yueh-Lan was at all times during Y.C.'s lifetime his only legal wife.

5.      Y.C.  was a citizen of Taiwan and died intestate on October 15, 2008, at the age of 92, at his residence located at 882 South Orange Avenue, Short Hills, New Jersey.  No will has been found that disposes of the assets of his estate.

6.      Y.C.'s life story inspired many in Taiwan and around the world.  Upon his death, Y.C. was celebrated as the true "son of Taiwan" in a state funeral attended by President Ma Ying-jeou of Taiwan and several thousand people.  Y.C. was born in 1917 in Taipei County, Taiwan to a poor tea farming family that could not afford to send him to high school.  By the year he died, *Forbes* magazine ranked him as the 178th wealthiest person in the world and the second wealthiest person in Taiwan with an estimated net worth between $5.5 and $6.8 billion.  Y.C. founded Formosa Plastics Group ("FPG") in 1954.  Today, FPG is Taiwan's biggest and most profitable manufacturing conglomerate with annual sales of over $60 billion, approximately 94,000 employees and operations in five countries, including the United States.  FPG's affiliates in the United States are all headquartered in Livingston, New Jersey.

#1571247 v1
108901-65396

7.      Dr. Wong is the attorney-in-fact for Plaintiff Yueh-Lan pursuant to a duly
executed power of attorney.  Dr. Wong is Y.C.'s eldest son and has applied for letters of
administration on the estate of Y.C.[1]

8.      Defendant New Mighty U.S. Trust ("NM-US Trust") is a trust formed
under the laws of the District of Columbia and with its principal place of business located
in the District of Columbia at 1666 K Street, NW, Washington, D.C. 20006.

9.      Defendant New Mighty Foundation ("NM Foundation") is a private
foundation formed under the laws of the District of Columbia and with its principal place
of business located in the District of Columbia at 1666 K Street, NW, Washington, D.C.
20006.  The NM Foundation is a beneficiary of the NM-US Trust.

10.     Clearbridge, LLC ("Clearbridge") is a limited liability company organized
under the laws of the laws of the District of Columbia and with its principal place of
business located in the District of Columbia at 1666 K Street, NW, Washington, D.C.
20006.  Clearbridge is the trustee of NM-US Trust.

11.     Defendants John Doe 1 through 10 are individuals whose true names and
capacities are unknown to Plaintiff, who therefore names such individuals by fictitious
names.  When, and if, such identities become known to Plaintiff, Plaintiff will seek leave
of Court to amend this Complaint to reflect the true names and capacities of these
unnamed Defendants who, individually and/or collectively with defendants, planned,

---

[1]      The application brought by Dr. Wong for letters of administration is captioned In the Matter of the
Estate of Yung-Ching Wang, Superior Court of New Jersey, Essex County, Docket No.: CP-0111-2009.
On March 5, 2010, the Superior Court of New Jersey, Appellate Division, granted leave to Dr. Wong to file
an appeal of certain interlocutory orders related to discovery in the matter.  In the same matter, the
Appellate Division also granted leave to Walter Wang, Dr. Wong's brother, to file an interlocutory appeal.
Dr. Wong's appeal is docketed at A-3035-09T3; Walter Wong's appeal is docketed at A-3036-09T3.  The
appeals are fully briefed and are currently awaiting assignment to a panel and a hearing date.

7

#1571247 v1
108901-65396

engaged and intentionally participated in the improper, wrongful and unlawful transfer, diversion and misuse of assets, monies and property owned, held, or maintained by Y.C. or for the benefit of Y.C. or his estate; established, directed or assisted in the creation of testamentary instruments and other offshore accounts to improperly, wrongfully and unlawfully convey said property; and refused to provide any and all information regarding the location and an accounting of said property in order to obstruct the calculation and distribution of Yueh-Lan's undisputed and rightful claim to a fifty-percent share of the Marital Estate.  Upon information and belief, John Does 1 through 10 received distributions of real and personal property from Y.C. during the period of October 15, 2003 to October 15, 2008, without the consent of Yueh-Lan and for the purpose of reducing Yueh-Lan's share of the Marital Estate.

12.     Defendants ABC Corporation 1 through 10 are companies whose true names and businesses are unknown to Plaintiff, who therefore names such companies by fictitious names.  When, and if, such identities become known to Plaintiff, Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and businesses of these unnamed Defendants who, individually and/or collectively with defendants, planned, engaged and intentionally participated in the improper, wrongful and unlawful transfer, diversion and misuse of assets, monies and property owned, held, or maintained by Y.C. or for the benefit of Y.C. or his estate; established, directed or assisted in the creation of testamentary instruments and other offshore accounts to improperly, wrongfully and unlawfully convey said property; and refused to provide any and all information regarding the location and an accounting of said property in order to obstruct the calculation and distribution of Yueh-Lan's undisputed and rightful claim to a fifty-

8

percent share of the Marital Estate.  Upon information and belief, ABC Corporations 1

through 10 received distributions of real and personal property from Y.C. during the

period of October 15, 2003 to October 15, 2008, without the consent of Yueh-Lan and for

the purpose of reducing Yueh-Lan's share of the Marital Estate.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of

citizenship), in that Plaintiff is a citizen and domiciliary of Taiwan and Defendants are all

entities formed and/or organized under the laws of the District of Columbia and with their

principal place of business located in the District of Columbia.

14.     The amount in controversy exceeds $75,000, exclusive of interest and

costs.

15.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(a).

## NATURE OF THE CLAIM

16.     Yueh-Lan, through her attorney-in-fact, Dr. Wong, brings this action so

that she may identify and collect her undisputed and rightful claim as the surviving

spouse to fifty-percent of her Marital Estate with Y.C.  Y.C. and Yueh-Lan had

substantial marital assets during their marriage, continuing such ownership within the five

years prior to Y.C.'s death.

17.     Yueh-Lan's share of the Marital Estate is granted under Taiwan law.  In

accordance with Article 1030-1 of the Civil Code of Taiwan, Yueh-Lan is entitled to fifty

percent of the Marital Estate upon the termination of her marriage to Y.C.  The marriage

between Yueh-Lan and Y.C. was terminated upon Y.C.'s death on October 15, 2008.

#1571247 v1
108901-65396

18.     Pursuant to Article 1030-3 of Taiwan law, to the extent that Yueh-Lan's undisputed and rightful claim to fifty-percent of the Marital Estate cannot be satisfied from property held by the Y.C. at his death, Yueh-Lan is entitled to a "look back" or an accounting of all transfers of the Decedent's assets, monies or properties in the five year period prior to death, and is entitled to restitution from any third-party, including defendants, who received distributions from Y.C. in the five years before his death without her consent.  Accordingly, Yueh-Lan brings this action to recover her rightful share of the Marital Estate.

19.     Upon information and belief, in the five years prior to Y.C.'s death, Defendants, their agents, servants and employees directly or indirectly obtained, acquired, procured, received, maintained, controlled, otherwise came into possession of, used, transferred, disposed of or conveyed assets, monies and property owned, held, controlled, or maintained by Y.C. before his death or for the benefit of Y.C. such that Yueh-Lan's undisputed and rightful claim to fifty-percent of the Marital Estate cannot be satisfied.

20.     In addition, upon information and belief, during the period of October 15, 2003 to October 15, 2008, Y.C. made direct or indirect distributions to Defendants of real and personal property from the Marital Estate for the purpose of reducing Yueh-Lan's spousal share and without her consent.

21.     The value of the property in the Marital Estate is unknown, but is greater than double the value of the property to be paid to Yueh-Lan in the Taiwan Estate Tax Filing, as discussed below.  Accordingly, Yueh-Lan has not and will not receive the full fifty-percent share pursuant to the Taiwan Estate Tax Filing that she is entitled to under Articles 1030-1 and 1030-3 of the Civil Code of Taiwan.

#1571247 v1
108901-65396

22.     Pursuant to Article 1146 of Taiwan Law, Yueh-Lan is further entitled to restitution against any party who infringes upon her right of inheritance.  Defendants have infringed upon Yueh-Lan's right of inheritance by, among other things, directly or indirectly obtaining, acquiring, procuring, receiving, otherwise coming into possession of, using, transferring, disposing of or conveying assets, monies and Y.C. property and property owned, held, controlled, maintained by or for the benefit of Y.C.

### RELATED ACTION

23.     Contemporaneous with the filing of the Complaint, Plaintiff filed an action in the U.S. District Court for the District of New Jersey against Pao Chu Lee ("P.C. Lee"), Susan Ruey-Hwa Wang ("Susan"), and Vanessa Ruey-Ji Wong ("Vanessa"), each of whom is a U.S. citizen and domiciliary of New Jersey, asserting claims similar to the claims in this Complaint.  Susan is a member of the board of directors of NM Foundation.

### BACKGROUND

**A.     Y.C. Wang's Business and Charitable Ventures**

24.     In 1954, when he was 37 years old, Y.C. founded FPG.  By the time of Y.C.'s death in 2008, FPG had grown from the world's smallest PVC production facility into a worldwide organization with annual sales of more than $60 billion and assets in excess of $85 billion.

#1571247 v1
108901-65396

25.     FPG has holdings in Taiwan, the United States, Vietnam, Indonesia and

mainland China.  FPG's core companies are Formosa Plastics Corp., Formosa Chemicals

& Fiber Corp., Nan Ya Plastics Corp. and Formosa Petrochemical Corp., each located in

Taiwan.

26.     FPG has substantial operations in the United States.  FPG's affiliates first

began operating in the United States in 1978, and they now have facilities located

throughout the United States.  Each of FPG's affiliates in the United States is

headquartered at Nine Peach Tree Hill Road, in Livingston, New Jersey.  FPG's affiliates

in the United States include:

    (a)     Formosa Plastics Corp., U.S.A. ("FPC USA"):  a vertically-integrated
supplier of plastic resins and petrochemicals with annual revenues of more
than $4 billion and over 2,100 employees.  Production facilities are
located in Delaware City, Delaware, Baton Rouge, Louisiana, and Point
Comfort, Texas;

    (b)     Nan Ya Plastics Corp., U.S.A.:  a supplier of the rigid PVC film market
with a manufacturing plant in Wharton, Texas;

    (c)     Nan Ya Plastics Corp., America:  a manufacturer of synthetic fiber,
chemical, and plastics-related products with manufacturing plants in Point
Comfort, Texas, Lake City, South Carolina and Batchelor, Louisiana; and

    (d)     Inteplast Group, Ltd.:  offers a wide range of plastic products with
manufacturing plants in Lolita, Texas.

27.     Y.C. served as Chairman of the Board of FPG until June 2006.  Upon

information and belief, in June 2006, Y.C. resigned as Chairman of FPG and formed an

Executive Management Committee responsible for the overall operation of FPG and most

of its affiliates.  Notably, Y.C. retained his chairmanship at Formosa Plastics Corporation,

U.S.A., and he remained chairman of that company until his death.  Even after resigning

12

from certain FPG companies and installing the Executive Management Committee, Y.C. retained ultimate control of FPG and all of its affiliates until his death.

**B.    Y.C.'s Marriage to Yueh-Lan and Surviving Family**

28.    Y.C. married Yueh-Lan (née Kuo) on or about December 20, 1935. Yueh-Lan was Y.C.'s only legal wife. In Taiwan, a marriage may be established by reference to household registrations showing that a woman moved from her parent's household to her new husband's household due to marriage. Y.C. and Yueh-Lan's marriage is evidenced by both (a) the cancellation of Yueh-Lan's household registration in her father's home ("Household registration cancelled after married WANG, YUNG-CHING … on Dec. 20, 1935.") and (b) Yueh-Lan's registration in her father-in-law's house following her marriage to Y.C. ("Registered in the household on Dec, [*sic*] 14, 1935 due to marriage.").

29.    Upon information and belief, there is no household registration evidencing that Y.C. and Yueh-Lan divorced, and any divorce would have been recorded in the household registration records.

30.    Although Y.C. did not have children with Yueh-Lan, during his life, Y.C. had several children with his female companions. These children include plaintiff Dr. Wong, Margaret Kuei-Yung Wang, Charlene Xue-Ling Wong, Cher Xue-Hong Wang, Walter Wen-Hsiang Wang, Susan Ruey-Hwa Wang, Sandy Ruey-Yu Wang, Diana Ruey-Huei Wang and Lora Ruey-Rong Wang.[2]

---

[2]    The translation of the family name from Chinese to English is a matter of personal preference. This is why some children use "Wang" while others use "Wong." However, the Chinese character for the family name (王) is the same for Y.C. and each of his children, including Dr. Wong.

13

#1571247 v1
108901-65396

**C.**     **Y.C.'s Death**

31.     On October 13, 2008, Y.C. traveled to New Jersey from Taiwan, just as he did numerous times on a regular basis every year for each of the last twenty-plus years of his life.[3]  Notably, Y.C. made this trip without the team of doctors and nurses who regularly accompanied him when he traveled.  Upon information and belief, Y.C. spent the two days prior to his death meeting with certain FPG advisors and family members, both at his residence and elsewhere.  According to Y.C.'s death certificate, which was signed by his personal physician, Y.C. died from cardio-pulmonary arrest at 9:30 a.m. on October 15, 2008 – two days after he arrived in New Jersey.[4]  However, upon information and belief, Y.C. actually died several hours earlier, and the exact time and circumstances of Y.C.'s death are unclear.

**D.**     **The Marital Estate**

32.     In 2008, Forbes listed Y.C. as the 2nd richest individual in Taiwan, with a net worth of $6.8 billion.  Yueh-Lan acquired little property during her marriage with Y.C.  Thus, the Marital Estate consists almost entirely of property acquired by Y.C. during their marriage.  The Marital Estate includes, at a minimum, the following property:

---

[3]     Prior to this time period, for several years during the 1980s, Y.C. lived primarily at his Short Hills, New Jersey residence.

[4]     At Item 10 of the Death Certificate, "P.C. Lee" is erroneously identified as Y.C.'s surviving spouse.  In fact, as alleged above, Yueh-Lan is the Decedent's Surviving Spouse and was at all times during Y.C.'s lifetime his only legal wife.  At no time did Y.C. and Yueh-Lan divorce or otherwise terminate their marriage.  Upon information and belief, at the time of Y.C.'s death, P.C. Lee resided with him at 882 South Orange Avenue, Short Hills, New Jersey.

#1571247 v1
108901-65396

1.      **Assets Identified in Y.C.'s Estate Tax Filing**

33.     To date, an accountant retained by Susan Wang and others has identified $1.7 billion of FPG stock, cash, real property and other assets owned by Y.C. in Taiwan upon his death, which assets are now deemed assets of Y.C.'s Estate under Taiwan law. Of the total $1.7 billion in assets, Y.C. directly owned stock in various FPG companies valued at approximately $1.5 billion. Attached as Exhibit A is the list of assets (in Taiwan dollars) identified by the accountant. Upon information and belief, this list is incomplete, and does not include assets held by Y.C. outside Taiwan.

34.     Although the assets identified by the accountant are substantial, they do not include any cash, real property or other assets held by Y.C. in the United States or elsewhere in the world. In addition, the assets do not include any stock held or controlled by Y.C. in FPG's U.S. affiliates or property transferred or distributed by Y.C. to third-parties in the five years before his death.

35.     Upon information and belief, the $1.7 billion in assets identified by the accounting firm retained by Susan Wang and others represents only a portion of Y.C.'s assets, monies and properties, potentially worth billions of dollars, which are located in the United States and elsewhere around the world.

36.     In September 2010, the heirs of Y.C. filed an Estate Tax Return (the "Taiwan Estate Tax Filing") with the National Tax Agency, Treasury Department of Taipei City (the "Taipei Tax Office"). Under the Estate Tax Filing, Yueh-Lan will receive a share of the value of certain property owned by Y.C. in Taiwan at his death and disclosed in the Taiwan Estate Tax Filing. This distribution has not yet occurred.

15

However, the share to be paid to Yueh-Lan pursuant to the Taiwan Estate Tax Filing is less than fifty-percent of the Marital Estate.

37.     For example, the property listed in the Taiwan Estate Tax Filing does not include distributions or transfers made to third-parties in the five years prior to Y.C.'s death, does not include property owned by Y.C. outside of Taiwan, and does not include the $7.5 billion in assets purportedly contributed by Y.C. to certain offshore and to Defendants, as discussed below.

        **2.     The New Mighty Trust**

38.     In or about May 5, 2005 – only three years before Y.C. died – a trust structure called New Mighty Trust was formed to hold certain of Y.C.'s assets, including stock he owned in FPG's U.S. companies.  According to the trust documents, the New Mighty Trust holds stock in Formosa Plastics Corp., U.S.A. and Inteplast Group, Ltd. – both of which are based in Livingston, New Jersey – but does not hold stock in non-U.S. FPG companies.   Any distributions or transfers of stock made by Y.C. to the New Mighty Trust by Y.C. in the five years prior to his death were made to reduce Yueh-Lan's share of the Marital Estate and were made without her consent.

39.     In particular, according to the trust documents,  Defendant NM-US Trust, an irrevocable trust formed under the laws of the District of Columbia, holds stock and interests in FPG's U.S. affiliated companies.  Upon information and belief, the total value of the assets of the New Mighty Trust is approximately $2.162 billion in stock and cash. Upon information and belief, the stock and cash held in Defendant NM-US Trust was transferred and/or distributed by Y.C. to NM-US Trust, either directly or indirectly, in the five years prior to his death.

16

#1571247 v1
108901-65396

40.     Upon information and belief, the New Mighty Trust and/or its related entities were transferred assets, monies and property owned, held, controlled, maintained by Y.C. or for the benefit of Y.C., either directly or indirectly, during the period of October 15, 2003 to October 15, 2008 without the consent of Yueh-Lan.  The distributions made by Y.C. to the New Mighty Trust and/or its related entities, directly or indirectly, during the five years prior to his death, were made to reduce Yueh-Lan's share of the Marital Estate.

41.     The grantors of the NM-US Trust are certain British Virgin Islands holding companies that Y.C. purportedly controlled and to which Y.C. purportedly conveyed certain of the stock that he held in FPG's U.S. affiliates.  Upon information and belief, Wen-Hsiung Hung ("Hung"), a former FPG employee, was involved in the creation of the New Mighty Trust and allegedly contributed assets to the NM-US Trust that he previously held for Y.C. as trustee or in some other unknown capacity.

42.     The initial trustee of NM-US Trust is Defendant Clearbridge, LLC, an entity managed by Donald D. Kozusko, a lawyer in Washington, D.C.   Upon information and belief, Kozusko assisted in the formation and creation of the New Mighty Trust and the addresses for all of the entities of the New Mighty Trust are the same as the address of his law office in Washington, D.C.  Upon information and belief, Clearbridge and Kozusko take direction and instructions with respect to New Mighty Trust matters from Susan.

43.     According to the trust documents, the NM-US Trust is not intended to be exempt from U.S. federal income taxes.  According to the trust documents, trust

17

distributions subject to U.S. tax, if paid to a non-U.S. person or entity, are to be paid from the NM-US Trust to a charity selected by the trustees.

44.     According to the trust documents, NM Foundation is a beneficiary of NM-US Trust, together with certain charities, philanthropies and the grantors of the NM-US Trust.  Hung is the President of NM Foundation and as executed tax filings with the U.S. Internal Revenue Service on behalf of NM Foundation.  Susan is a member of the board of directors of NM Foundation, as is Sandy Wang, William Wong and Wilfred Wang. Over the years, NM-US Trust has distributed tens of millions of dollars to NM Foundation, as one of its beneficiaries.  All distributions of property by NM-US Trust to NM Foundation since October 15, 2003 is property that was distributed or transferred by Y.C. to NM-US Trust, either directly or indirectly, in the five years before his death and is lawfully part of the Marital Estate.

45.     According to the trust documents, trust distributions attributable to income not subject to U.S. tax are to be distributed to the grantors (certain British Virgin Islands companies).  According to the trust documents, the grantors, in turn, grant this income to the New Mighty Family Trust ("NMFT"), a Cayman Islands STAR trust.

46.     According to the trust documents, the trustee of NMFT is the New Mighty Private Trust Company ("NMPTC").  The shares of NMPTC are held by New Mighty Purpose Trust ("NMPT"), a Cayman Islands STAR trust.  According to the trust documents, NMPT was formed by Citco Trustees (Cayman) Limited, a regulated trust company operated by The Citco Group LTD of the Cayman Islands.  Citco was the original trustee of NMPT.

18

#1571247 v1
108901-65396

47.     According to the trust documents, NMFT and NMPT are STAR Trusts under the Cayman Islands Special Trusts (Alternative Regime) Law, 1997, as revised by the Cayman Islands Trusts Law (2001 Revision).   Upon information and belief, Cayman Islands STAR trusts are very similar to Bermuda purpose trusts in that (a) they require a written declaration of trust, a statement that the trust is a STAR trust and an enforcer and (b) they are not subject to rules against duration or perpetuities.

48.     According to the trust documents, the enforcer of NMPT is the Business Management Committee of NMPTC.   Under the trust documents, the Business Management Committee of NMPTC holds the power to enforce both trusts and the purpose of the trusts.   Upon information and belief, the members of both the Business Management Committee and the Board of GVPTCL include, among others, William Wong, Wilfred Wang, Susan Wang and Sandy Wang.

49.     Upon information and belief,  NM-US, NM Foundation, NMPT, NMPTC and NMFT are ultimately controlled, directly or indirectly, by, among others, William Wong, Wilfred Wang, Susan Wang and Sandy Wang.

**3.     The Offshore Trusts**

50.     In addition to the New Mighty Trust, upon information and belief, during the period from 2001 to 2005, several offshore trusts were created to hold certain of Y.C.'s assets, including his stock in FPG companies.   The offshore trusts included Grand View Purpose Trust, Vantura Purpose Trust, Universal Link Purpose Trust and Transglobe Purpose Trust (collectively, the "Offshore Trusts").   Each of these trusts is a combination charitable and non-charitable "purpose trust" formed under Bermuda law, and they are all similarly structured.

19

51.    Upon information and belief, the Offshore Trusts and New Mighty Trust collectively hold cash and stock in FPG companies with a market value of in excess of $7.5 billion.  Any distributions made to the Offshore Trusts by Y.C. in the five years prior to his death were made to reduce Yueh-Lan's share of the Marital Estate and were made without her consent.

52.    Although the Offshore Trusts were allegedly created at the behest of Y.C., there may have been improper circumstances surrounding the creation and formation of the Offshore Trusts given the secrecy surrounding the formation of the Offshore Trusts,[5] the special benefits they confer on certain of Y.C.'s heirs (to the exclusion of other of Y.C.'s heirs), the magnitude of assets held by the Offshore Trusts, the failure of certain knowledgeable heirs to disclose the existence or purpose of the Offshore Trusts to the Taipei Tax Office and that the Offshore Trusts result in the exclusion of substantial assets owned by Y.C. from the Marital Estate.

53.    Upon information and belief, the Offshore Trusts were formed as "purpose trusts" and structured and funded to (a) improperly avoid the payment of certain taxes that are due and owing under Taiwan and U.S. law by Y.C., his estate or certain family members who benefit, directly or indirectly, from the Trusts and (b) to reduce Yueh-Lan's share of the distributions of the Marital Estate that she was entitled to under Article 1030-1 of the Civil Code of Taiwan.  Purpose trusts do not have beneficiaries but are created to fulfill the purpose stated in the trust documents, and are not subject to the typical rules of duration and perpetuities.

---

[5]       The Trusts were formed without the knowledge of either Yueh-Lan or Dr. Wong.  Several other of the heirs of Y.C. were also unaware of the formation of the trusts.

#1571247 v1
108901-65396

54.     Although the Offshore Trusts purport to hold billions of dollars of Y.C.'s assets in trust and to effect his intent for the use of the assets, Y.C. did not personally execute any of the trust documents.  Upon information and belief, Hung was involved in the creation of the Offshore Trusts and allegedly contributed assets to the Offshore Trusts that he previously held for Y.C. as trustee or in some other unknown capacity.

55.     According to trust documents reflecting the formation of the Offshore Trusts, Grand View Purpose Trust (2001), Vantura Trust (formed in 2005), Universal Link Trust (formed in 2005) and Transglobe Trust (formed in 2002) hold stock owned by Y.C. in FPG's non-U.S. operations, Y.C.'s other assets and/or cash.  Upon information and belief, each of the Offshore Trusts holds billions of dollars of assets:  Grand View Trust holds in excess of $1.7 billion; Universal Link Trust holds in excess of $900 million; Vantura Trust holds in excess of $1.2 billion; and Transglobe Trust holds in excess of $1.3 billion.

**E.     Refusal To Provide Information And An Accounting**

56.     Plaintiff Yueh-Lan and Dr. Wong, through their representatives and counsel, have repeatedly requested that Susan, P.C. Lee and Vanessa provide statements, information and an accounting of the assets and property (a) owned or beneficially owned by Y.C. upon his death, either directly or indirectly, or (b) transferred or distributed to third-parties in the five years prior to his death.

57.     Susan, P.C. Lee and Vanessa have refused to provide a response to these requests, and have advised that Plaintiff Yueh-Lan and Dr. Wong are not entitled to such statements, information or accounting.

#1571247 v1
108901-65396

**COUNT ONE**
**(Articles 1030-1 and 1030-3 of the Civil Code of Taiwan)**

58.     Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 57 of the Complaint as if set forth herein at length.

59.     Yueh-Lan is Y.C.'s only surviving spouse and, in accordance with Article 1030-1 of the Civil Code of Taiwan, she is entitled to fifty-percent of the Marital Estate.

60.     Pursuant to Article 1030-3 of Taiwan law, to the extent that Yueh-Lan's undisputed and rightful claim to fifty-percent of the Marital Estate cannot be satisfied from property held by the Y.C. at his death, Yueh-Lan is entitled to restitution from any third-party who received distributions from Y.C. in the five years before his death without her consent.

61.     Defendants received distributions of property from Y.C., either directly or indirectly, during the period of October 15, 2003 to October 15, 2008, without the consent of Yueh-Lan and for the purpose of reducing Yueh-Lan's share of the Marital Estate.

62.     The value of the property in the Marital Estate is presently known to be greater than double the value of the property to be paid to Yueh-Lan in the Taiwan Estate Tax Filing.  Accordingly, Yueh-Lan has not and will not receive the full value of the fifty-percent share she is entitled to under Article 1030-1 of the Civil Code of Taiwan.

63.     Plaintiff is entitled to the return of said assets, monies and property and to be compensated for all damages, including punitive damages pursuant to Articles 1030-1 and 1030-3 of the Civil Code of Taiwan.

#1571247 v1
108901-65396

## COUNT TWO
### (Articles 1030-1 and 1146 of the Civil Code of Taiwan)

64.     Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 63 of the Complaint as if set forth herein at length.

65.     Yueh-Lan is Y.C.'s only surviving spouse and, in accordance with Article 1030-1 of the Civil Code of Taiwan, she is entitled to fifty-percent of Y.C.'s estate.

66.     Pursuant to Article 1146 of Taiwan Law, Yueh-Lan is entitled to restitution against any party who infringes upon her right of inheritance.

67.     Defendants have infringed upon Yueh-Lan's right of inheritance by, among other things, obtaining,  acquiring, procuring, receiving and otherwise coming into possession of assets, monies and Y.C. property and property owned, held, maintained by or for the benefit of Y.C.

68.     Plaintiff is entitled to the return of said assets, monies and property and to be compensated for all damages, including punitive damages pursuant to Articles 1030-1 and 1146 of the Civil Code of Taiwan.

## COUNT THREE
### (Conversion)

69.     Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 68 of the Complaint as if set forth herein at length.

70.     Yueh-Lan is Y.C.'s only surviving spouse and, in accordance with Taiwan law, she is entitled to fifty-percent of the Marital Estate.

71.     Upon information and belief, Defendants, individually and/or collectively, planned, engaged and intentionally participated in the improper, wrongful and unlawful transfer, diversion and misuse of the assets, monies and property owned, held, maintained

23

by or for the benefit of Y.C. prior to his death for the purpose of, among other things, reducing Yueh-Lan's share of the Marital Estate.

72.     Upon information and belief, Defendants, individually and/or collectively, established, directed or assisted in the creation of testamentary instruments, other offshore accounts, corporations and financial accounts to improperly, wrongfully and unlawfully convey said property.

73.     Upon information and belief, Defendants and/or their agents, individually and/or collectively, refused to provide any and all information regarding the location and an accounting of said property in order to obstruct the calculation and distribution of Yueh-Lan's share of the Marital Estate.

74.     As a result of Defendants' unlawful conversion of the assets, monies and property owned, held, maintained by or for the benefit of Y.C. prior to his death, Plaintiff is entitled to the return of said assets, monies and property and to be compensated for all damages, including punitive damages, resulting to her as a result of the unlawful conversion.

## COUNT FOUR
### (Unjust Enrichment)

75.     Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 74 of the Complaint as if set forth herein at length.

76.     Defendants have benefited from the fraudulent acquisition and improper use of the assets, monies and property owned, held, maintained by or for the benefit of Y.C. prior to his death.  This property was part of the Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share.

24

#1571247 v1
108901-65396

77.     Permitting Defendants to retain those assets, monies and property owned, held, maintained by or for the benefit of Y.C. prior to his death would be unjust because the monies and benefits were taken pursuant to unlawful, fraudulent and unauthorized means, and Plaintiff will continue to be irreparably damaged.

## COUNT FIVE
### (Constructive Trust)

78.     Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 77 of the Complaint as if set forth herein at length.

79.     By way of the trust agreements, bank/investment accounts, distributions and transfers discussed above, Defendants improperly acquired, transferred and misused the assets, monies and property owned by Y.C. prior to his death and that are part of the Marital Estate.

80.     This property was part of the Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share and it would be unjust for Defendants to retain said property.

81.     Plaintiff has been damaged by the improper, unlawful and wrongful acquisition, transfer, diversion and misuse of the assets, monies and property owned, held, maintained by or for the benefit of Y.C. prior to his death, which property is part of the Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share, and Plaintiff is entitled to the return of said assets, monies and property.

#1571247 v1
108901-65396

## COUNT SIX
### (Accounting)

82.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 81 of the Complaint as if set forth herein at length.

83.    Defendants are in possession or control the assets, monies and property owned, held, maintained by or for the benefit of Y.C. prior to his death. This property is part of the Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share.

84.    Plaintiff is entitled to and has requested an accounting of all of the assets, monies and property owned, held, maintained by or for the benefit of Y.C. prior to his death so that Yueh-Lan's share of the Marital Estate may be calculated and distributed to her.

85.    To date, Defendants and/or their agents have refused to provide and intentionally impeded and obstructed all attempts to obtain accounting and/or information with respect to the assets, monies and property owned, held, maintained by or for the benefit of Y.C. before his death or property distributed or transferred by Y.C. to Defendants in the five years prior to his death that should be included in the Marital Estate.

## COUNT SEVEN
### (Civil Conspiracy)

86.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 85 of the Complaint as if set forth herein at length.

26

87.     On information and belief, Defendants acted in concert and by agreement to engage in improper, wrongful and other unlawful conduct alleged above and to harm Plaintiff.

88.     On information and belief, Defendants engaged and intentionally participated in, assisted or planned the improper, wrongful and other unlawful conduct alleged above as part of and in furtherance of their agreement, common scheme, plan and purpose to harm Plaintiff and to transfer, diversion and misuse the assets, monies and benefits of property owned by Y.C. prior to his death that should be included in the Marital Estate.

89.     By reason of the foregoing, each Defendant is liable to Plaintiff for compensatory damages for civil conspiracy.

90.     By reason of the foregoing, Plaintiff is entitled to punitive damages.

**WHEREFORE**, as to Counts One through Seven, Plaintiff requests entry of judgment in its favor and against Defendants as follows:

(A)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly owned, held, controlled, or maintained by Y.C. before his death or for the benefit of Y.C. or his estate;

(B)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan;

27

(C)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly held, controlled, maintained or otherwise made an asset of the testamentary instruments, offshore accounts, corporations or financial accounts set forth below;

(D)     Imposing a constructive trust over the assets, monies and property directly or indirectly (i) owned, held, controlled, or maintained by Y.C. or for the benefit of Y.C. or his estate; (ii) received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of  Plaintiff Yueh-Lan; and (iii) held, controlled, maintained or otherwise made an asset of the testamentary instruments, offshore accounts, corporations or financial accounts set forth below;

(E)     Restoring all parties to the status quo that existed prior to the execution of any and all testamentary instruments, creation of offshore accounts, and/or distributions, dispositions or conveyances of assets, monies and property directly or indirectly owned, held, controlled, maintained by Y.C. before his death or for the benefit of Y.C. since October 15, 2003;

(F)     Modifying, amending and/or voiding any testamentary instrument and/or transfer of the assets, monies and property directly or indirectly owned, held, controlled, maintained by Y.C. before his death or for the benefit of Y.C. since October 15, 2003;

(G)     Compelling Defendants to return the assets, monies and property directly or indirectly received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of  Plaintiff Yueh-Lan, and to produce any information related to said property;

#1571247 v1
108901-65396

(H)     Compelling a complete, auditable and accurate accounting of the assets, monies and property directly or indirectly (i) owned, held, controlled, or maintained by Y.C. before his death or for the benefit of Y.C.; (ii) received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan; and (iii) held, controlled, maintained or otherwise made an asset of the testamentary instructions, other offshore accounts, corporations or financial accounts set forth below;

(I)     Compelling a complete, auditable and accurate accounting of the assets, monies and property that are contained in or were directly or indirectly used, disposed of, transferred or otherwise conveyed from the testamentary instruments, offshore accounts, corporations or financial accounts set forth above;

(J)     Compelling Defendants to provide compensatory, incidental, consequential, exemplary and punitive damages in an undetermined amount to Plaintiff as a result of Defendants' improper, wrongful and unlawful acquisition, transfer, diversion and misuse of the assets, monies and property directly or indirectly owned, held, or maintained by Y.C. before his death or for the benefit of Y.C., received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan, and held, controlled, maintained or otherwise made an asset of the testamentary instructions, other offshore accounts, corporations or financial accounts set forth above, all upon which Yueh-Lan is entitled to her fifty-percent share;

#1571247 v1
108901-65396

(K)     Compelling Defendants to provide restitution to Plaintiff for her share of

the Marital Estate (defined below) under Articles 1030-1 and 1030-3 of the Civil Code of

Taiwan;

(L)     Awarding Plaintiff damages under Article 1146 of the of the Civil Code of

Taiwan;

(M)     Awarding fees and costs, including attorneys' fees, as a result of

Defendants' improper, wrongful and unlawful acquisition, transfer, diversion and misuse

of the assets, monies and property directly or indirectly owned, held, controlled, or

maintained by Y.C. before his death  or for the benefit of Y.C. upon which Yueh-Lan is

entitled to her fifty-percent share; and

(N)     For such other and further relief, in law or in equity, as this Court may

deem just and proper.

> **GIBBONS P.C.**
> *Attorneys for Yueh-Lan Wang,*
> *by and through her attorney-in-fact,*
> *Dr. Winston Wen-Young Wong*

Dated:  October 14, 2010

By: _____

Daniel S. Weinberger
D.D.C. Bar Id. D00318
**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, NY 100119
(212) 613-2000 (phone)
(212) 554-9648 (fax)
dweinberger@gibbonslaw.com

#1571247 v1
108901-65396

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable by a jury.

Dated:  October 14, 2010        By: _____

Daniel S. Weinberger
D.D.C. Bar Id. D00318
**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, NY 100119
(212) 613-2000 (phone)
(212) 554-9648 (fax)
dweinberger@gibbonslaw.com

*Attorneys for Yueh-Lan Wang,*
*by and through her attorney-in-fact,*
*Dr. Winston Wen-Young Wong*

#1571247 v1
108901-65396