**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YUEH-LAN WANG,<br>*by and through her attorney-in-fact*,<br>Winston Wen-Young Wong,<br>No. 107, Songqin Street, Neighborhood<br>34, Sanzhang Village, Xinyi District,<br>Taipei City, Taiwan<br><br>Plaintiff,<br>v.<br><br>NEW MIGHTY U.S. TRUST<br>c/o Clearbridge, LLC<br>1666 K Street, NW<br>Washington, D.C. 20006<br><br>and<br><br>NEW MIGHTY FOUNDATION<br>c/o Stephen K. Vetter<br>1666 K Street, NW<br>Washington, D.C. 20006<br><br>and<br><br>CLEARBRIDGE, LLC<br>1666 K Street, NW, Suite 400<br>Washington, D.C. 20006<br><br>Defendants. | Civil Action No. 1:10-cv-01743-JEB<br><br><br>**JURY TRIAL DEMANDED** |

---

**AMENDED COMPLAINT**

---

Plaintiff Yueh-Lan Wang ("Yueh-Lan"), a citizen of Taiwan, by and through her attorney-in-fact, Dr. Winston Wen-Young Wong ("Dr. Wong"), residing at No. 107, Songqin Street, Neighborhood 34, Sanzhang Village, Xinyi District, Taipei City, Taiwan, Republic of China, by and through her undersigned counsel, Gibbons P.C. and Baker & McKenzie LLP, by way of Amended Complaint, states:

## NATURE OF THE CLAIM

1.     Plaintiff Yueh-Lan brings this action against Defendants New Mighty U.S. Trust, New Mighty Foundation and Clearbridge, LLC (collectively "Defendants" or "New Mighty Trust") pursuant to pursuant to Articles 1030-1, 1030-3, 1146 and 767 of the Civil Code of Taiwan and all other applicable laws to account for and recover her portion of the property acquired by Plaintiff and her husband Yung-Ching Wang ("Y.C.") during their 72-year marriage (the "Marital Estate") before his death on October 15, 2008.  Under Taiwan law, upon his death, Plaintiff became entitled to fifty-percent of the Marital Estate.  The exact value of the Marital Estate is unknown by Plaintiff, but is in excess of $9.2 billion.  Defendants have unique knowledge concerning the assets of the Marital Estate and the distributions received by the New Mighty Trust from the Marital Estate in the five years preceding Y.C.'s death.  Plaintiff seeks to recover those unlawful distributions through this action.

2.     Defendants, their agents, servants and employees, directly or indirectly,  hold, control or manage substantial assets, monies and property owned, held or maintained by Y.C. before his death or for the benefit of Y.C. and his estate, worth billions of dollars, which are located in New Jersey and the District of Columbia, as well as other U.S. states and other locations worldwide.   Upon information and belief, Defendants, their agents, servants and employees received distributions of real and personal property from Y.C., directly or indirectly during the period of October 15, 2003 to October 15, 2008, without the consent of Yueh-Lan and for the purpose of reducing Yueh-Lan's share of the Marital Estate.

3.     Yueh-Lan, through her attorney-in-fact, Dr. Wong, brings this action so that she may identify and collect her undisputed and rightful claim as the surviving spouse to fifty-percent of her Marital Estate with Y.C.  In addition, the identification and collection of all assets

that are properly part of the Marital Estate will have the benefit of identifying property that should be distributed to all of the heirs of Y.C.

4.      Yueh-Lan's share of the Marital Estate is granted under Taiwan law.   In accordance with Article 1030-1 of the Civil Code of Taiwan, Yueh-Lan is entitled to fifty-percent of the Marital Estate upon the termination of her marriage to Y.C.  The marriage between Yueh-Lan and Y.C. was terminated upon Y.C.'s death on October 15, 2008.

5.      Pursuant to Article 1030-3 of the Civil Code of Taiwan, to the extent that Yueh-Lan's undisputed and rightful claim to fifty-percent of the Marital Estate cannot be satisfied from Y.C.'s estate at his death, Yueh-Lan is entitled to a "look back" or an accounting of all transfers of Y.C.'s assets, monies or properties in the five-year period prior to death.  In addition, under Article 1030-3, Yueh-Lan is entitled to restitution from any third-party, including Defendants, who directly or indirectly received distributions from Y.C. in the five years before his death without her consent.  Accordingly, Yueh-Lan brings this action to recover her rightful share of the Marital Estate.

6.      In the five years prior to Y.C.'s death, the period of October 15, 2003 to October 15, 2008, Defendants, their agents, servants and employees directly or indirectly obtained, acquired, procured, received, maintained, controlled, otherwise came into possession of, used, transferred, disposed of or conveyed assets, monies and property owned, held, controlled, or maintained by Y.C. before his death or for the benefit of Y.C. such that Yueh-Lan's undisputed and rightful claim to fifty-percent of the Marital Estate cannot be satisfied.  During this period, Y.C. made direct or indirect distributions to Defendants of real and personal property from the Marital Estate for the purpose of reducing Yueh-Lan's spousal share and without her consent. These distributions were not "proper gifts for performing a moral obligation" and are not exempt

from the provisions of Article 1030-1 and 1030-3.

7.     The exact value of the property in the Marital Estate is unknown to Plaintiff and within the knowledge of Defendants, but is greater than double the value of the property paid to Yueh-Lan from Y.C.'s Taiwan Assets (defined below in ¶ 81).  Accordingly, Yueh-Lan has not and will not receive the full fifty-percent share of the Marital Estate that she is entitled to under Articles 1030-1 and 1030-3 of the Civil Code of Taiwan.

8.     Plaintiff Yueh-Lan also asserts a claim under Article 1146 of the Civil Code of Taiwan, which entitles her to restitution against any party who infringes upon her right of inheritance.  Defendants have infringed upon Yueh-Lan's right of inheritance by, among other things, directly or indirectly obtaining, acquiring, procuring, receiving, otherwise coming into possession of, using, transferring, disposing of or conveying assets, monies and property owned, held, controlled, maintained by or for the benefit of Y.C.

9.     Finally, pursuant to Article 767 of the Civil Code of Taiwan, Yueh-Lan demands return of the property distributed or transferred from Y.C., directly or indirectly, to Defendants from the Marital Estate.  Defendants possess such property without authority, and Yueh-Lan is entitled to judgment that she is the owner of the property without interference by Defendants.

## THE PARTIES

10.     Plaintiff Yueh-Lan Wang is a citizen and domiciliary of Taiwan.  Yueh-Lan married Y.C. on December 20, 1935, and was Y.C.'s wife for over 72 years, until the day he died.  Y.C. and Yueh-Lan never divorced and she was at all times during Y.C.'s lifetime his only legal spouse.  After Y.C.'s death, Yueh-Lan was recognized as Y.C.'s only spouse by the Taipei

National Tax Administration, Ministry of Finance ("TNTA").  Yueh-Lan has not been found to be without capacity by any court, government agency or authority.

11.     Y.C. was a citizen of Taiwan and died intestate on October 15, 2008, at the age of 92, at his residence located at 882 South Orange Avenue, Short Hills, New Jersey.  No will has been found that disposes of the assets of his estate and Defendants' agent Susan Ruey-Hwa Wang claims that there was no will.  Y.C. did not speak, read or write English.

12.     Y.C. founded the Formosa Plastics Group ("FPG") in 1954.  Today, FPG is one of Taiwan's biggest and most profitable manufacturing conglomerates with annual sales of over $60 billion and operations in five countries, including the United States.  FPG's affiliates in the United States are all headquartered in Livingston, New Jersey.  In the year he died, *Forbes* magazine ranked Y.C. as the 178th wealthiest person in the world and the second wealthiest person in Taiwan with an estimated net worth of up to $6.8 billion.  Y.C. was celebrated as the true "son of Taiwan" in a state funeral attended by Taiwan's President Ying-jeou Ma and several thousand people.

13.     Dr. Wong is the attorney-in-fact for Plaintiff Yueh-Lan pursuant to a duly executed power of attorney.  The power of attorney evidences Dr. Wong's mandate to act on Yueh-Lan's behalf.  Dr. Wong is Y.C.'s eldest son and has applied for letters of administration for the estate of Y.C.  Dr. Wong had a good relationship with Y.C. and visited with him at his home frequently and regularly in the years leading up to Y.C.'s death.

14.     Defendant New Mighty U.S. Trust ("NM-US Trust") is a trust formed under the laws of the District of Columbia.   NM-US Trust's principal place of business is located in the District of Columbia at 1666 K Street, NW, Washington, D.C., the principal place of business of its trustee, Defendant Clearbridge, LLC.

15.     Defendant New Mighty Foundation ("NM Foundation") is a private foundation formed under the laws of the State of Delaware and with its principal place of business located in the District of Columbia at 1666 K Street, NW, Washington, D.C. Upon information and belief, NM Foundation is the only beneficiary of the NM-US Trust.

16.     Defendant Clearbridge, LLC ("Clearbridge") is a limited liability company organized under the laws of the laws of the District of Columbia and with its principal place of business located in the District of Columbia at 1666 K Street, NW, Washington, D.C. The members of Clearbridge are Donald D. Kozusko, a domiciliary and resident of Virigina, who resides at 1905 Hunters Den Lane, Vienna, Virginia, and John C. Wannen, a domiciliary and resident of the District of Columbia, who resides at 2425 L Street, NW, Apartment 203, Washington, D.C. Defendant Clearbridge is the trustee of NM-US Trust.

17.     Pao Chu Lee ("P.C. Lee") is a defendant in the DNJ Action (defined below in ¶ 24). She is a United States citizen, a domiciliary of New Jersey, and resides at 882 South Orange Avenue, Short Hills, New Jersey (the "Short Hills Residence"). P.C. Lee is not a legal spouse of Y.C., but was his companion during the later years of his life and is the matriarch of the Third Family (defined below in ¶ 30). P.C. Lee is the mother of Susan Ruey-Hwa Wang and Vanessa Ruey-Ji Wong.

18.     In a lawsuit she commenced against Dr. Wong in the Civil Division of the Taipei District Court, Taiwan on September 7, 2009, P.C. Lee claimed that she, in addition to Yueh-Lan, is a legal spouse of Y.C. and therefore entitled to inherit from his estate (the "P.C. Lee Action"). P.C. Lee voluntarily withdrew her lawsuit against Dr. Wong in December 2009 and has never been adjudicated a legal wife of Y.C. by any court, government official, agency or regulatory body in Taiwan. As noted above, the TNTA has only acknowledged Yueh-Lan as the

legal spouse of Y.C. (see ¶ 10), over the contentions of P.C. Lee in estate tax filings she made with the TNTA in 2009.

19.     Susan Ruey-Hwa Wang ("Susan") is a defendant in the DNJ Action.  She is a United States citizen, a domiciliary of New Jersey and resides at 41 Aspen Drive, Livingston, New Jersey.  She is a daughter of Y.C. and P.C. Lee.  Susan is a member of the board of directors of NM Foundation.

20.     Vanessa Ruey-Ji Wong ("Vanessa") is a defendant in the DNJ Action.  She is a United States citizen, a domiciliary of New Jersey and resides at 29 Mohican Road, Blairstown, New Jersey.  She is the daughter of P.C. Lee, but Y.C. is not her father.

## JURISDICTION AND VENUE

21.     The Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship), in that Plaintiff is a citizen and domiciliary of Taiwan and Defendants are all entities that are citizens of diverse states.  NM-US Trust is a citizen of the Commonwealth of Virginia and/or the District of Columbia.  NM Foundation is a citizen of the District of Columbia and the State of Delaware.  Clearbridge is a citizen of the states of its individual members, the Commonwealth of Virginia and the District of Columbia.

22.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

23.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(a).

## RELATED ACTIONS

24.     Contemporaneous with the filing of the Complaint, Plaintiff filed an action in the U.S. District Court for the District of New Jersey against P.C. Lee, Susan, and Vanessa, each of whom is a U.S. citizen and domiciliary of New Jersey, asserting claims similar to the claims in

the Complaint (the "DNJ Action").  Plaintiff filed an Amended Complaint in the DNJ Action on May 27, 2011.

25.     Dr. Wong brought an action for letters of administration in the case captioned *In the Matter of the Estate of Yung-Ching Wang*, Superior Court of New Jersey, Essex County, Docket No.: CP-0111-2009.  On March 5, 2010, the Superior Court of New Jersey, Appellate Division, granted leave to Dr. Wong to file an appeal of certain interlocutory orders related to discovery in the matter.  In the same matter, the Appellate Division also granted leave to Walter Wang, Dr. Wong's brother, to file an interlocutory appeal.  Dr. Wong's appeal is docketed at A-3036-09T3; Walter Wong's appeal is docketed at A-3035-09T3.  The appeals are fully briefed and argued and the parties are awaiting a decision from the Appellate Division.

## BACKGROUND

### A.     Y.C.'s  Marriage to Yueh-Lan

26.     Y.C. was born in 1917 and Yueh-Lan was born in 1919, both in Taiwan.   Y.C. and Yueh-Lan married on or about December 20, 1935.  Yueh-Lan is Y.C.'s only legal spouse. In Taiwan, a marriage may be established by reference to household registrations showing that a woman moved from her parent's household to her new husband's household due to marriage. Y.C. and Yueh-Lan's marriage is evidenced by both (a) the cancellation of Yueh-Lan's household registration in her father's home ("Household registration cancelled after married WANG, YUNG-CHING … on Dec. 20, 1935.") and (b) Yueh-Lan's registration in her father-in-law's house following her marriage to Y.C. ("Registered in the household on Dec, [*sic*] 14, 1935 due to marriage.").

27.     Yueh-Lan is the sole legal spouse of Y.C. recognized by the TNTA in the tax demand notice it issued.  The TNTA's finding was consistent with an opinion letter it issued on

August 4, 2009, stating that it would allow only one spousal deduction for Y.C.'s estate under Article 17 of the Estate and Gift Tax Law of Taiwan, regardless of whether P.C. Lee, Susan or others claimed that Y.C. was survived by more than one spouse.  The TNTA rejected P.C. Lee's claim that there were three spousal deductions and identified a single spousal deduction for Yueh-Lan in the estate tax assessment notice it issued subsequent to its opinion letter.

28.    P.C. Lee and Susan expressly agreed in the Tax Settlement Agreement that they would not object to or oppose the TNTA's determination that Plaintiff Yueh-Lan is Y.C.'s sole legal wife.

29.    Additionally, Yueh-Lan is the only legal spouse of Y.C. recognized by the Taiwan courts.  In proceedings before the Civil Division of the Taipei District Court, Taiwan involving claims by certain individuals to be recognized as the children and heirs of Y.C., the Court found that Yueh-Lan is the only legal spouse of Y.C.

**B.    Y.C. Wang's Children**

30.    Yueh-Lan and Y.C. are referred to as the First Family.  Y.C. did not have any biological children with Yueh-Lan, but she helped raise Dr. Wong.  During his life, Y.C. had several children with his female companions, Wang Yang Chiao and P.C. Lee.  Wang Yang Chiao is deceased.  The children of Y.C. and Wang Yang Chiao, referred to as the Second Family, include Dr. Wong, Margaret Kuei-Yung Wang, Charlene Xue-Ling Wong, Cher Xue-Hong Wang, and Walter Wen-Hsiang Wang.  The children of Y.C. and P.C. Lee, referred to as the Third Family, include Sandy Ruey-Yu Wang, Diana Ruey-Huei Wang and Lora Ruey-Rong

Wang, and Susan.[1]  Y.C. had good relations with all of his children from both the Second Family and the Third Family, and he regularly socialized with each of them, including the grandchildren of each family.

C.     **Y.C. Wang's Founding of FPG**

31.     In 1954, when he was 37 years old and married to Yueh-Lan, Y.C. founded FPG. By the time of Y.C.'s death in 2008, FPG had grown from a small PVC production facility into a worldwide organization with annual sales of more than $60 billion, assets in excess of $85 billion and almost 100,000 employees worldwide.

32.     FPG's four core companies are Formosa Plastics Corporation, Formosa Chemicals & Fibre Corporation, Nan Ya Plastics Corporation and Formosa Petrochemical Corporation (referred to as the "Four Treasures") each of which is headquartered in Taiwan.   Each company is publicly traded on the Taiwan Stock Exchange, a public stock market.   FPG also has companies in the United States, Vietnam, Indonesia and mainland China.

33.     FPG has substantial operations in the United States.  FPG's affiliates first began operating in the United States in 1978, and they now have facilities located throughout the United States.  Each of FPG's affiliates in the United States is headquartered at Nine Peach Tree Hill Road, in Livingston, New Jersey.  FPG's affiliates in the United States include: (a) Formosa Plastics Corp., U.S.A. ("FPC USA"), (b) Nan Ya Plastics Corporation, U.S.A., (c) Nan Ya Plastics Corp., America, and (d) Inteplast Group, Ltd. ("Inteplast").

34.     As the founder of FPG, Y.C. was the largest equity holder in each of the FPG

_____

[1]     The translation of the family name from Chinese to English is a matter of personal preference.  This is why some children use "Wang" while others use "Wong."  However, the Chinese character for the family name  (which is 王) is the same for Y.C. and each of his children, including Dr. Wong.

companies.   Beginning in the 1970s, a series of overseas entities were formed to hold the majority of Y.C.'s stock in each FPG company.   These overseas entities were formed under the laws of the Republic of Liberia ("Liberia") and, later, under the laws of the British Virgin Islands ("BVI").[2]   These entities included, but are not limited to, Creative Corporation (formed in Liberia in 1976), Creative Holding Corporation (formed in Liberia in 1976), Sound International Investment Corporation (formed in Liberia in 1991), Grand Concord Corporation (formed in Liberia in 1990), Island Venture Corporation (formed in Liberia in 1990), Continental Resources Corporation (formed in Liberia in 1990), Goodwell Industrial Corporation (formed in Liberia in 1990), Chin-Shi International Investment Company (formed in Liberia), and Wan-Shun International Investment Company (formed in Liberia) (collectively the "Overseas Entities").

35.   The Overseas Entities were formed at the direction of Y.C. by Y.C.'s consultant, advisor and long-time FPG employee, Wen-Hsiung Hung ("Hung").   At the direction of Y.C., Hung held the legal title to the Overseas Entities and their assets as a nominee for the sole benefit of Y.C. ("Nominee").   Y.C. remained the beneficial owner of the Overseas Entities and the FPG stock and other assets owned by the Overseas Entities.[3]

36.   Y.C. also held FPG stock through accounts in the names of other companies and various FPG employees, including Jin-Chau Wang, Chau-Hsiu Dang and Ruey-Hsiang Dang. These companies and employees were mere nominees of Y.C., and although the stock was held in accounts in their name, beneficial ownership of the FPG stock remained with Y.C.  When the TNTA claimed certain taxes had been evaded by these persons relating to dividends they

---

[2]   Certain of the Liberian companies were subsequently redomiciled in BVI.  See ¶ 121.

received from FPG, Y.C. satisfied the tax liabilities, an acknowledgment that he was the beneficial owner of the stock held in the nominee accounts.

37.     According to Hung, Y.C. held stock in FPG through the Overseas Entities and through individual and company nominees in order to minimize his tax obligations and to confuse the Taiwan tax authorities in the event that they sought to investigate the ownership structure of FPG.  In addition, according to Hung, Y.C.'s use of Overseas Entities also permitted him to circumvent Taiwan law and regulations governing insider trading, securities, tax, overseas investment and investment in mainland China.  According to Hung, Y.C. held stock in FPG through the Overseas Entities and other nominees in order to avoid the public reporting of his positions in FPG, which is required under Taiwan law for the ten largest shareholders. Accordingly, Y.C. was required to maintain extreme secrecy in the details of his ownership structure and to limit knowledge of these details to Defendants and a few trusted FPG employees, including Hung.

38.     Y.C. did not hold and control his equity in FPG with the intent of precluding members of the Second Family from inheriting this FPG stock or so that the Third Family would inequitably and disproportionately benefit upon Y.C.'s death to the detriment of Y.C.'s only spouse and other heirs.  Y.C.'s ownership structure was driven largely by tax and financial considerations, not his concerns or wishes about his heirs or successors.

39.     Y.C. maintained a veil of secrecy over the manner in which he held his equity in FPG, including using secret nominees and the Overseas Entities.  Y.C. relied on a few key persons, including Hung, to assist in the management of this ownership structure.  P.C. Lee,

---

[3]     In December 2010, two years after the death of Y.C., Hung dissolved Continental Resources Corporation and Goodwell Industrial Corporation in his capacity as director of both corporations.

Susan and Vanessa later exploited the ownership structure to their advantage to secure dominance and control of FPG even after Y.C.'s death, as detailed below.  See below ¶¶ 57 to 77.

40.     The majority of Y.C.'s stock in each FPG company was held through the Overseas Entities and the company and individual nominees for many decades, with Hung as Nominee, until approximately 2005 and/or 2006, when Hung purported to transfer and/or assign the assets to the Trusts (defined below in ¶ 57).

41.     Y.C. served as Chairman of the Board of FPG until June 2006.  In June 2006, Y.C. resigned as Chairman of FPG and power was transferred to an Executive Management Committee which was charged with responsibility for the overall operation of FPG and most of its affiliates.

**D.      Y.C. Establishes Major Power Generation Projects in China**

42.     In 1996, Y.C. formed the Huayang Electric Power Co. Ltd. ("HYEP") in the People's Republic of China ("PRC" or "China").   HYEP was formed to build power generation plants in China.  FPC USA, a U.S. affiliate of FPG, made an initial investment of $1.27 billion in HYEP.  In or around 1997, a power plant was constructed by HYEP and went into operation.

43.     FPC USA owned 100% of the shares of HYEP from the time of HYEP's incorporation in 1996 through 2005.  Y.C. was the "Legal Representative" of HYEP for the period of June 1996 to March 2005.

44.     In March of 2005, HYEP passed a resolution transferring 100% of the shares of HYEP held by FPC USA to Hua Yang Investment Corporation "free of charge."  In the same resolution formalizing the transfer, the Legal Representative of HYEP was changed from Y.C. to

Susan.  As a result of this transaction, FPC USA's shares in HYEP were transferred without consideration to Hua Yang Investment Corporation.

45.     In December 2007, the Board of Directors of HYEP approved a resolution formalizing a transaction wherein Hua Yang Investment Corporation transferred 100% of its shares in HYEP to Hua Yang Investment (H.K.) Limited for US $693 million.  This resolution also identified Vanessa as the Legal Representative of HYEP, replacing Susan.  At that time, the Board of Directors of HYEP consisted of Vanessa (chairperson), Edmund Granski (director) and Mao Qunjie (Vice Chair).

46.     In June 2008, the Board of Directors of HYEP approved a resolution for the construction of a new coal-powered generator and seawater desulfurization and smoke denitration facilities.  All construction funds, in the amount of $407 million with $102 million in registered capital, were financed by HYEP.  The addition of the registered capital in the amount of $102 million was financed by Hua Yang Investment (H.K.) Limited.  This resolution identified the Chairperson of HYEP as Vanessa.

47.     Corporate filings in Hong Kong show that 100% of the shares of Hua Yang Investment (H.K.) Limited are owned by Hua Yang Investment (BVI) (referred to as "HYI").  Upon information and belief, HYI is ultimately owned by the Transglobe Purpose Trust.  See below ¶ 99.  As a result of these transactions the Third Family transferred a multi-billion dollar asset from a U.S. company – FPC USA – and placed the asset in an offshore trust that does not pay U.S. taxes.

**E.      Y.C. Establishes the Wang Chang Gung Public Interest Trust**

48.     In 2002, Y.C. established the Wang Chang Gung Public Interest Trust, a charitable trust under the laws of Taiwan.  The trust was named after Y.C.'s father Wang Chang

Gung.  The trust documents are written in traditional Chinese and were signed by Y.C.   The

charitable trust is managed by the trust advisory committee, which includes all of Y.C.'s children

from the Second Family and Third Family.  In addition to Y.C., the trust documents were signed

by Dr. Wong and the other children of the Second Family: Cher Wang, Charlene Wong,

Margaret Wang and Walter Wang, as well as the members of the Third Family: Susan, Sandy,

Lora and Diana Wang.  Y.C.'s consultant and advisor, Hung, also executed the trust documents

as a member of the trust advisory committee.

49.     The trust documents include a mandate from Y.C., which, as translated into

English, states:

> I have the following expectations of the properties in the trust and hope that all
> relevant persons will follow these principles.
>
> It should be first recognized that all wealth derives from society, and, because it is
> derived from society, it should be used for the benefit of society.  Based on this
> fundamental principle, and to ensure the continued survival and growth of wealth,
> and to properly utilize this wealth,  the key is to cultivate correct views and
> understanding.   There is a very famous idiom, "wealth does not outlast three
> generations".  Any wealth that is passed on from generation to generation for
> personal use will be consumed in the blink of an eye, with no exception.
>
> To avoid this foreseeable negative consequence, there is a need to change our
> fundamental beliefs, to reestablish an attitude that accepts the relinquishment of
> wealth ownership while maintaining the control and management of the wealth to
> ensure their proper use.  As long as this fundamental concept can be established
> and accepted within our family, then strong potential will develop, while
> unnecessary conflicts and disputes can be avoided.
>
> **In addition, all members of the family will foster strong bond and see
> themselves as the owners of these entrusted wealth.**  Because, although there is
> no personal ownership, there is power to control, manage, and ensure their proper
> use.

(emphasis added).

50.     The trust documents relating to the Wang Chang Gung Public Interest Trust are

the only known trust documents executed by Y.C.  They unambiguously reflect his intent to

15

place certain assets, including certain FPG stock, in trust for charity. The trust mandate also reflects Y.C.'s intent that all of his family members have a role in the management and control of the trust assets. The Wang Chang Gung Public Interest Trust was not a secret, and – consistent with Y.C.'s intent – members of both the Second and Third Family were involved with and knowledgeable about the trust.

**F.    Third Family's Relationship With Y.C.**

51.    Over the years, P.C. Lee used her status as Y.C.'s companion to put her interests and the interests of her children (the Third Family) ahead of those of the First Family and the Second Family. P.C. Lee manipulated Y.C. so that her children, including Susan, would have preference over the First Family and the Second Family in both social affairs and within the management and operation of FPG.

52.    P.C. Lee actively interfered with Y.C.'s relationships with the members of the Second Family and was instrumental in manufacturing reasons to isolate and distance members of the Second Family from the management of FPG. P.C. Lee's children were given key management roles, board positions, key assignments, sweetheart deals and business contracts.

53.    Because of P.C. Lee's interference, members of the Second Family were driven away from the business and excluded from FPG management. For example, P.C. Lee sought for years to neutralize Dr. Wong and minimize his influence within FPG. As the oldest son of Y.C., Dr. Wong held a special position of favor in the Chinese culture. Given his status as Y.C.'s oldest son and his relationship to Yueh-Lan, Dr. Wong was a substantial threat to the Third Family's power within FPG. Ultimately, P.C. Lee succeeded in minimizing Dr. Wong's and the Second Family's influence within FPG, to the benefit of the Third Family.

54.     Thus, over time, as a result of P.C. Lee's machinations, P.C. Lee, Susan and Vanessa came to enjoy an extremely close relationship with Y.C. and he placed trust and confidence in each of them.

## G.     Y.C.'s Illness

55.     In 2005, at the age of 89, Y.C. became seriously ill, and the Third Family was concerned that his death was potentially imminent.  In particular, Y.C. suffered from a urinary obstruction and he developed a persistent fever.  Because of his illness, he was unable to attend several important family functions, including the weddings of his grandchildren.   Plaintiff believes that Y.C.'s declining health, around the time that Y.C. was forced to relinquish his role as Chairman of FPG, caused P.C. Lee, Susan and Vanessa to undertake a number of transactions, transfers and other actions to enrich themselves and to reduce the Marital Estate, to the detriment of Yueh-Lan and the Second Family.

56.     P.C. Lee, Susan and Vanessa were able to exert undue influence over Y.C. because of his age, illness and the special and confidential relationship that they held with Y.C.  Although Y.C. subsequently recovered from this illness, it was a turning point, and the groundwork was laid for the Third Family's ultimate grab of power and control over Y.C.'s estate and affairs.

## H.     P.C. Lee, Susan and Vanessa Establish the Offshore Trusts

57.     During the period from 2001 to 2006, P.C. Lee, Susan and Vanessa, with the assistance of Hung, directed lawyers to establish five offshore trust structures (collectively, the "Trusts").  Upon information and belief, Y.C. never met with the lawyers that formed the Trusts and was not able to read the Trust documents, since they are written in English, a language which

Y.C. did not read or speak.  Instead, Hung traveled to Bermuda and the United States to meet with lawyers who were involved in the formation of the Trusts.

58.     P.C. Lee, Susan and Vanessa established the Trusts to hold Y.C.'s assets, including his stock in FPG companies.  Upon information and belief, the Trusts hold cash and stock in FPG companies with a market value in excess of $7.5 billion (as of January 2009), which represents the majority of the equity that Y.C. held in FPG companies at his death.  The distributions made to the Trusts in the five years prior to Y.C.'s death were made to reduce Yueh-Lan's share of the Marital Estate and were made in secret and without her consent.

59.     Upon information and belief, although certain of the Trusts were set up beginning in 2001, Y.C.'s assets were transferred to the Trusts in 2005 and 2006, in and around the time that he was ill and when he was required to give up his FPG management duties to the FPG Executive Committee.  P.C. Lee, Susan and Vanessa directed and/or participated in the formation and funding of the Trusts and continue to be involved in the activities of the Trusts.

60.     According to trust documents reflecting the formation of the Trusts, Grand View Purpose Trust, Vantura Purpose Trust, Universal Link Purpose Trust and Transglobe Purpose Trust are trust structures that hold stock owned by Y.C. in FPG's non-U.S. operations or Y.C.'s other assets.  Each of these trusts is a "purpose trust" formed under Bermuda law, and they are all similarly structured.   Defendant New Mighty Trust is a trust structure that includes a trust formed under the laws of the District of Columbia and a trust formed under the laws of the Cayman Islands pursuant to the Special Trusts Alternative Regime ("STAR").

61.     Grand View Purpose Trust, Vantura Purpose Trust, Universal Link Purpose Trust and Transglobe Purpose Trust are "purpose trusts" formed under Bermuda law and were structured and funded to (a) improperly avoid the payment of certain taxes that were due and

owing under Taiwan and U.S. law by Y.C., his estate or certain family members who benefit, directly or indirectly, from the Trusts, (b) to reduce Yueh-Lan's share of the distributions of the Marital Estate that she was entitled to under Article 1030-1 of the Civil Code of Taiwan, (c) to neutralize the Second Family and to prevent them from gaining influence within FPG, and (d) to attempt to conceal prior actions that violated Taiwan law, including securities laws, tax laws, and laws governing overseas investments.

62.     Purpose trusts do not have beneficiaries but are created to fulfill the purpose stated in the trust documents, and are not subject to the typical rules of duration and perpetuities. Purpose trusts formed under Bermuda law are often established and used in tandem with private trust companies to acquire or hold shares in family-owned companies.  Through the use of a purpose trust, the settlor or grantor is separated from the ownership of the company.   The company acts as the trustee of a family trust and thus insulates from risk the parties holding direct shares in the company.  A typical purpose trust structure formed under Bermuda law is shown below:



63.     Starting in 2001 and continuing through 2005, Hung directed the creation of the Trusts for the purpose of "centralizing Y.C.'s equity in FPG."  Hung was assisted in the formation of the Trusts by George Harris, a lawyer practicing in Washington, D.C., other members of his law firm and various law firms in Bermuda and the Cayman Islands.

64.     In or around 2005 and 2006, upon information and belief, Hung assigned and/or transferred the FPG stock held through the Overseas Entities to the Trusts, as discussed below. Prior to his assignment and/or transfer of the assets to the Trusts, Hung was Y.C.'s Nominee, and Y.C. was the beneficial owner of the assets.

### 1.     P.C. Lee, Susan and Vanessa Directed the Formation and Funding of the Trusts Without Y.C.'s Knowledge

65.     P.C. Lee, Susan and Vanessa foresaw that upon Y.C.'s death the Second Family would inherit substantial equity in FPG if Y.C.'s equity passed through his estate and to all of his heirs.   Upon information and belief, to avoid this result, they conspired to establish a trust structure that they controlled and that would preserve their power over FPG upon Y.C.'s death. By placing Y.C.'s equity in the Trusts, which were controlled by the Third Family, they positioned themselves to assert dominance and control over FPG upon his death.

66.     Upon information and belief, for all of the reasons discussed herein, Y.C. was not aware of the Trusts and did not authorize the formation and funding of the Trusts.  Thus, although the Trusts were allegedly created at the instruction of Y.C., given the improper circumstances surrounding the creation and formation of the Trusts, Plaintiff believes that Y.C. did not direct the formation and funding of the Trusts and was unaware of their existence.

67.     Although the Trusts purport to hold billions of dollars of Y.C.'s assets in trust and purport to reflect his intent for the use of the assets, Y.C. did not personally execute any of the

trust documents.   Furthermore, the Trusts were formed without the knowledge of either Yueh-Lan or Dr. Wong.  In fact, none of the members of the Second Family were aware of the offshore trusts before Y.C.'s death.   Thus, unlike the Wang Chang Gung Public Interest Trust, the Trusts were formed without any Chinese language document executed by Y.C. and in secret, without the knowledge of the Second Family.

68.    Other facts demonstrate that Y.C. did not direct the formation and funding of the Trusts and was unaware of their existence.  In particular (a) the trust documents are written in a language Y.C. could neither read, speak nor understand, (b) the Trusts confer special benefits on certain of Y.C.'s heirs, including the Third Family, to the exclusion of Y.C.'s other heirs, including Dr. Wong and the Second Family, (c) the Trusts purport to contain billions of dollars of Y.C.'s assets but there is no writing by Y.C. authorizing the transfer of his assets to the Trusts, (d) P.C. Lee, Susan and Vanessa and other members of the Third Family failed to disclose the existence or purpose of the Trusts to the TNTA, and (e) the Trusts result in the exclusion of substantial assets owned by Y.C. from the Marital Estate.

## 2.    The Trusts Resulted From Undue Influence on Y.C.

69.    In the alternative, even if Y.C. was aware of the formation and funding of the Trusts, which is unlikely for the reasons stated above, he participated only because he was unduly influenced by P.C. Lee, Susan and Vanessa.  Upon information and belief, P.C. Lee, Susan and Vanessa took advantage of the special relationship and influence that they enjoyed with Y.C. to ensure that they and the other members of the Third Family would dominate and control the Trusts, to the total exclusion of the members of the Second Family.  P.C. Lee, Susan and Vanessa have attempted to remove these assets from Y.C.'s estate so as to prevent the Second Family from gaining influence and authority within FPG after Y.C.'s death.

70.     P.C. Lee, Susan and Vanessa's objective was (and is) to maintain and ensure that control of FPG, and the billions of dollars of profits it has generated, remain in the hands of the Third Family.   Upon information and belief, P.C. Lee, Susan and Vanessa exercised undue influence over Y.C. during the last few years of his life, when he was in his late 80s and early 90s and after he had suffered a serious illness, to establish a trust structure that would preserve their power over Y.C.'s equity in FPG and their dominance within FPG.   P.C. Lee, Susan and Vanessa took advantage of the close personal relationship and confidence Y.C. placed in them to, among other things, improperly dissipate and transfer assets out of the Marital Estate.

**3.      P.C. Lee, Susan and Vanessa Perverted the Trusts, Contrary to Y.C.'s Wishes**

71.     Even if Y.C. was aware of the formation and funding of the Trusts, and even if Y.C. was free of undue influence, the structure contemplated by the so-called Founder's Vision was perverted by P.C. Lee, Susan and Vanessa, because the Second Family was excluded from the Trusts, contrary to Y.C.'s wishes.

72.     Each of the Trusts includes nearly identical language reflecting the so-called "Founder's Vision."   For example, the Grand View Trust documents state that it shall be operated according to the following principles of Y.C.:

> It should be first recognized that all assets come from the society, and, if they are from the society, they should be used for the benefit of society.
>
> As a result of this fundamental concept, and in order to ensure the continued survival and growth of all assets, and to properly utilize them, the key lies in cultivating correct views and understanding.   There is a very famous old saying, "from rags to riches and back to rags in three generations".   Any wealth that is passed on from generation to generation for personal use will be consumed in the blink of an eye, and there is no exception.
>
> To avoid this foreseeable negative consequence, there is the need to shift our fundamental beliefs, to reestablish an attitude that accepts the relinquishment of asset ownership while maintaining the control and management of the assets to

22

ensure their proper use.  As long as this fundamental concept can be established and accepted within our family structure, then strong potential can develop, while unnecessary conflicts and disputes can be avoided.

**In addition, all members of the family will foster strong bondage and see themselves as the owners of the assets entrusted.**  Although there is no personal ownership, yet there is power to control, manage, and ensure their proper use.

(emphasis added)

73.     Although the language quoted above purports to represent Y.C.'s vision for each of the Trusts, Y.C. did not sign any of the trust documents, and the vision is written in English, a language Y.C. did not read or understand.

74.     The language of the Founder's Vision is nearly identical to the language of the mandate in the Wang Chang Gung Public Interest Trust, which is quoted above in paragraph 49. Like the Wang Chang Gung Public Interest Trust, the documents for each of the offshore Trusts provides that "all of the family members" will see themselves as "the owners of the assets entrusted" and "[a]lthough there is no personal ownership, yet there is power to control, manage, and ensure their proper use."  Like the Wang Chang Gung Public Interest Trust, one of the purposes of the offshore Trusts is to benefit institutions founded by Y.C., as well as to promote the interests of FPG.  Thus, like the Wang Chang Gung Public Interest Trust, the Trust documents purport to require that "all" of Y.C.'s family members be entrusted with the management and control of the Trusts' assets.

75.     But that is not what happened.  Instead, P.C. Lee, Susan and Vanessa perverted Y.C.'s purported "vision."  The Trusts do not include "all family members" in the management and control of the Trusts, as was done with the Wang Chang Gung Public Interest Trust, and as Y.C. directed.  Instead, the Trust documents empower the Third Family to control and manage the Trusts' assets, to the exclusion of Yueh-Lan and members of the Second Family.

76.     The trust structure established by P.C. Lee, Susan, Vanessa and Hung is inconsistent with the wishes of Y.C. as expressed in his only known writing on the issue – the trust mandate for the Wang Chang Gung Public Interest Trust.  In the Wang Chang Gung Public Interest Trust mandate executed by Y.C., the only trust document executed by Y.C., he instructed that his assets be managed and controlled by all of his heirs, including the members of the Second Family.

77.     Thus, even if Y.C. had knowledge that Trusts containing $7.5 billion of his personal fortune had been set up, which is questionable, there is no indication that he intended to exclude Yueh-Lan and members of the Second Family from any knowledge or role in the Trusts whatsoever.  To the contrary, Y.C. intended that all of his family members have a role in the management and control of his assets, including the assets Y.C. allegedly directed be placed in the Trusts.  Y.C.'s intent is clearly stated in the Wang Chang Gung Public Interest Trust and is even stated in the trust documents for the Trusts.

## I.     Y.C.'s Death

78.     A few years after his serious illness, on October 13, 2008, Y.C. traveled to New Jersey from Taiwan, just as he did numerous times on a regular basis every year for each of the last twenty-plus years of his life.  Notably, Y.C. made this trip to New Jersey without the team of doctors and nurses who regularly accompanied him when he traveled.

79.     Upon information and belief, Y.C. spent the two days prior to his death meeting with certain FPG advisors and family members, including Joseph Barone, the husband of Vanessa, both at Y.C.'s residence in Short Hills and elsewhere.  According to Y.C.'s death certificate, which was signed by his personal physician, Y.C. died from cardio-pulmonary arrest at 9:30 a.m. on October 15, 2008 – two days after he arrived in New Jersey.  However, upon

information and belief, Y.C. actually died several hours earlier, and the exact time and circumstances of Y.C.'s death are unclear.

## J.  The Marital Estate

80.     The Marital Estate consists almost entirely of property acquired by Y.C. during his marriage to Yueh-Lan, because Yueh-Lan acquired little property during their marriage.  The Marital Estate should include, at a minimum, the Taiwan Assets, the Trusts and the Credit Suisse Account, as discussed below:

### 1.  Taiwan Assets

81.     FPG and an accountant retained by Susan and others identified $1.7 billion of FPG stock, cash, real property and other assets owned by Y.C. in Taiwan at his death, which assets are deemed assets of  Y.C.'s Estate under Taiwan law (the "Taiwan Assets").  Of the total $1.7 billion in Taiwan Assets, Y.C. directly owned stock in various FPG companies valued at approximately $1.5 billion.

82.     Although the Taiwan Assets are substantial, they do not include any cash, real property or other assets held by Y.C. outside of Taiwan or property held by nominees.  In addition, the assets do not include any stock held or controlled by Y.C. in FPG's U.S. affiliates, do not include property transferred or distributed by Y.C. to third-parties in the five years before his death, and do not include the $7.5 billion in assets purportedly contributed by Y.C. to certain offshore and U.S. trusts, as discussed below.  See ¶¶ 87-140.

83.     In sum, upon information and belief, the $1.7 billion in Taiwan Assets represents only a portion of Y.C.'s assets, monies and properties, potentially worth billions of dollars, which are located in the District of Columbia, New Jersey, in other U.S. states and elsewhere around the world.

84.     In 2009, Dr. Wong filed an estate tax return with the TNTA identifying Yueh-Lan as the only spouse of Y.C. and claiming a single spousal deduction.  Dr. Wong disclosed the Taiwan Assets but noted that the Taiwan Assets were not Y.C.'s only assets because they did not include Y.C.'s property and assets located outside of Taiwan or property held by nominees.  Also in 2009, P.C. Lee, Susan and Vanessa and other heirs of Y.C. filed an estate tax return with the TNTA disclosing the Taiwan Assets and claiming that Y.C. had three spouses and seeking three spousal deductions.  P.C. Lee, Susan and Vanessa did not disclose the Trusts or the Credit Suisse Account.

85.     The TNTA recognized that Yueh-Lan, as the sole spouse, is entitled to receive a fifty-percent share of the value of certain property owned by Y.C. in Taiwan at his death.   The TNTA did not recognize P.C. Lee or Wang Yang Chiao as legal spouses of Y.C.

86.     Even though Yueh-Lan is recognized as the sole spouse entitled to the full spousal share of Y.C.'s estate, the share to be paid to Yueh-Lan from the Taiwan Assets is less than fifty-percent of the Marital Estate.  The Taiwan Assets do not include distributions or transfers made to third-parties in the five years prior to Y.C.'s death, do not include property owned by Y.C. outside of Taiwan, and do not include the $7.5 billion in assets purportedly contributed by Y.C. to certain offshore and U.S. trusts.

**2.      The Offshore Trusts**

87.     Billions of dollars of assets, representing the majority of Y.C.'s equity in the Four Treasures of his FPG conglomerate were purportedly contributed to the Trusts.  Nevertheless, the formation, management, enforcement and legality of the Trusts are dubious and of questionable validity for all of the reasons discussed in this Amended Complaint.  Each of the structures of the Trusts is described in turn below:

### a.  The Grand View Purpose Trust

88.     The Grand View Purpose Trust, which was formed on or about May 7, 2001, was created using the structure of a Bermuda purpose trust.

89.     According to the trust documents, at the direction of Hung, Harrington Trust Limited, a licensed and registered Bermuda trust company, declared the non-charitable purpose trust, Grand View Purpose Trust, by executing a declaration of trust.  Harrington serves as the original trustee of Grand View Purpose Trust.  The purpose of the Grand View Purpose Trust was to form Grand View Private Trust Company Limited ("GVPTCL") and to hold the shares of GVPTCL.

90.     According to the trust documents, the enforcer of Grand View Purpose Trust is the Business Management Committee of GVPTCL.  Upon information and belief, the Grand View Purpose Trust is ultimately controlled by the directors and officers of GVPTCL.  According to the Register of Directors and Officers of GVPTCL as of November 17, 2009, the following individuals were the registered Directors and Officers of GVPTCL:  Hung, Director/Chairman; William Wong, Director; Susan, Director/Deputy Chairman; Wilfred Wang, Director; Sandy Wang, Director; Charnita L. Howes, Secretary; and Appleby Services (Bermuda) Ltd., Assistant Secretary.

91.     According to the trust documents, GVPCTL, in turn, declared the Wang Family Trust, also a Bermuda purpose trust, and serves as the original trustee of the Wang Family Trust pursuant to a declaration of trust.  The declared purpose of the Wang Family Trust was "[t]o take possession of, hold, control, manage and vote the shares of stock of the Formosa Group Companies held by the Trust and to ensure the continued growth and prosperity of such companies . . . ," and "to invest all or a substantial portion of the Trust Fund in shares of stock of

the Formosa Group Companies and to acquire, from time to time, such additional shares of stock of the Formosa Group Companies to ensure that the Trust maintains the ownership of a sufficient number of shares of stock of the Formosa Group Companies" to ensure their continued growth and prosperity.

92.     In 2005 and/or 2006, Hung transferred and/or assigned assets to the Wang Family Trust that he had previously held for Y.C. as a Nominee.   These assets included eight companies formed under the laws of BVI that own stock in the Four Treasures.   Y.C. was the beneficial owner of the stock held in the BVI entities and which Hung transferred and/or assigned to the Wang Family Trust.

93.     Upon information and belief, the Wang Family Trust and/or its related entities, including the BVI entities, were transferred assets, monies and property owned, held, controlled or maintained by or for the benefit of Y.C. during the period of October 15, 2003 to October 15, 2008 without the consent of Yueh-Lan.  The distributions made to the Wang Family Trust and/or its related entities, directly or indirectly, during the five years prior to his death, were made to reduce Yueh-Lan's share of the Marital Estate.

94.     Upon information and belief, the Grand View Purpose Trust, the Wang Family Trust and their related entities hold in excess of $1.779 billion in stock and cash.

### b.     Transglobe Purpose Trust

95.     The Transglobe Purpose Trust, which was formed on or about June 13, 2002, was created using the typical structure of a Bermuda purpose trust.

96.     According to the trust documents, at the direction of Hung, Harrington Trust Limited, a licensed and registered Bermuda trust company, declared the non-charitable purpose

trust, Transglobe Purpose Trust, by executing a declaration of trust.  Harrington serves as the original trustee of Transglobe Purpose Trust.  The purpose of the Transglobe Purpose Trust was to form Transglobe Private Trust Company Limited ("TPTCL") and to hold the shares of TPTCL.

97.     According to the trust documents, the enforcers of the Transglobe Purpose Trust is the Business Management Committee of TPTCL.  Upon information and believe, the Transglobe Purpose Trust is ultimately controlled by the directors and officers of TPTCL. According to the Register of Directors and Officers of TPTCL as of November 17, 2009, the following individuals were the registered Directors and Officers of GVPTCL:   Hung, Director/Chairman; William Wong, Director; Susan, Director/Deputy Chairman; Wilfred Wang, Director; Sandy Wang, Director; Charnita L. Howes, Secretary; and Appleby Services (Bermuda) Ltd., Assistant Secretary.

98.     According to the trust document, TPCTL, in turn, declared the Transglobe Trust a/k/a the China Trust, also a Bermuda purpose trust, and serves as the original trustee of the Transglobe Trust pursuant to a declaration of trust.  The purpose of the Transglobe Trust, among other things, is to make investments in enterprises primarily within mainland China.

99.     According to the Trust documents, the China Trust is the owner of HYI, which ultimately owns HYEP, a power generation project launched by Y.C. in China in 1996, as discussed above.  Upon information and belief, Hung caused ownership of HYI to be placed in the China Trust in or about 2007.  Y.C. was the beneficial owner of the stock held in the HYI and which Hung transferred and/or assigned to the China Trust.

100.     Upon information and belief, the stock, cash, properties and assets held in HYI and HYEP or on behalf of HYI and HYEP, was the property of Y.C. before his death and should

be included in the assets of the Marital Estate for purposes of determining Yueh-Lan's fifty-percent share of the Marital Estate.

101.    Upon information and belief, the Transglobe Trust and/or its related entities were transferred assets, monies and property owned, held, controlled, maintained by or for the benefit of Y.C. during the period of October 15, 2003 to October 15, 2008 without the consent of Yueh-Lan.   The distributions made to the Transglobe Trust and/or its related entities, directly or indirectly, during the five years prior to Y.C.'s death, were made to reduce Yueh-Lan's share of the Marital Estate.

102.    Upon information and belief, the Transglobe Purpose Trust, the China Trust and their related entities hold in excess of $1.368 billion in stock and cash.

### c.    Vantura Purpose Trust

103.    The Vantura Purpose Trust, which was formed on or about May 6, 2005, was also created using the structure of a Bermuda purpose trust.

104.    According to the trust documents, at the direction of Hung, Codan Trust Company Limited ("Codan"), a licensed and registered Bermuda trust company, declared the non-charitable purpose trust, Vantura Purpose Trust, by executing a declaration of trust.   Codan serves as the original trustee of Vantura Purpose Trust.   The purpose of the Vantura Purpose Trust was to form Vantura Private Trust Company Limited ("VPTCL") and to hold shares in VPTCL.

105.    According to the trust documents, the enforcer of Vantura Purpose Trust is the Business Management Committee of VPTCL.   Upon information and belief, the Vantura Purpose Trust is ultimately controlled by the directors and officers of VPTCL.   According to the Register

of Directors and Officers of VPTCL as of November 17, 2009, the following individuals were the registered Directors and Officers of VPTCL:  Hung, Director/Chairman; William Wong, Director; Susan, Director/Deputy Chairman; Wilfred Wang, Director; Sandy Wang, Director; Belinda F. Clarke, Secretary; and Craig W. MacIntyre, Assistant Secretary.

106.    On or about May 9, 2005, VPTCL created the Vantura Trust, an irrevocable trust, using the structure of a Bermuda purpose trust.  The declared purpose of the Vantura Trust was "[t]o take possession of, hold, control, manage and vote the shares of stock of the Formosa Group Companies held by the Trust and to ensure the continued growth and prosperity of such companies . . . ,"  "to invest all or a substantial portion of the Trust Fund in shares of stock of the Formosa Group Companies and to acquire, from time to time, such additional shares of stock of the Formosa Group Companies to ensure that the Trust maintains the ownership of a sufficient number of shares of stock of the Formosa Group Companies" to ensure their continued growth and prosperity.

107.    In 2005 and/or 2006, Hung transferred and/or assigned assets to the Vantura Trust that he had previously held for Y.C. as a Nominee.  These assets included stock in Chin-Shi International Investment Company, a Liberian company, which held close to a billion dollars of Y.C.'s stock in the Four Treasures.  Y.C. was the beneficial owner of Chin-Shi International Investment Company and the stock that it owned in the Four Treasures.

108.    Chin-Shi International Investment Company was a nominee for Y.C. and is among the ten largest shareholders of each of the Four Treasures.   For example, in 2009 it owned 4.16% of Formosa Plastics Corporation, 1.86% of Nan Ya Plastics Corporation, and 6.35% of Formosa Chemicals & Fibre Corporation.

109.     Upon information and belief, the Vantura Trust and/or its related entities were transferred assets, monies and property owned, held, controlled or maintained by or for the benefit of Y.C. during the period of October 15, 2003 to October 15, 2008 without the consent of Yueh-Lan.  The distributions made to the Vantura Trust and/or its related entities, directly or indirectly, during the five years prior to Y.C.'s death, were made to reduce Yueh-Lan's share of the Marital Estate.

110.     Upon information and belief, the Vantura Trust and its related entities hold in excess of $1.206 billion in stock and cash.

### d.     Universal Link Purpose Trust

111.     The Universal Link Purpose Trust, which was formed on or about May 6, 2005, was created using the structure of a Bermuda purpose trust.  The purpose of the Vantura Purpose Trust was to form Vantura Private Trust Company Limited ("VPTCL") and to hold shares in VPTCL.

112.     According to the trust documents, at the direction of Hung, Codan Trust Company Limited ("Codan"), a licensed and registered Bermuda trust company, declared the non-charitable purpose trust, Universal Link Purpose Trust, by executing a declaration of trust. Codan serves as the original trustee of Universal Link Purpose Trust.  The purpose of the Universal Link Purpose Trust was to form Universal Link Private Trust Company Limited ("ULPTCL"), to hold the shares of ULPTCL and to acquire shares of other private trust companies.

113.     According to the trust documents, the enforcer of Universal Link Purpose Trust is the Business Management Committee of ULPTCL.  Upon information and belief, the Universal Link Purpose Trust is ultimately controlled by the directors and officers of ULPTCL.  According

to the Register of Directors and Officers of ULPTCL as of November 17, 2009, the following individuals were the registered Directors and Officers of ULPTCL:  Hung, Director/Chairman; William Wong, Director; Susan, Director/Deputy Chairman; Wilfred Wang, Director; Sandy Wang, Director; Belinda F. Clarke, Secretary; and Craig W. MacIntyre, Assistant Secretary.

114.    According to the trust documents, ULPTCL, in turn, declared the Universal Link Trust, also a Bermuda trust, and serves as the original trustee of the Universal Link Trust pursuant to a declaration of trust.  The purpose of the Universal Link Trust is "[t]o take possession of, hold, control, manage and vote the shares of stock of the Formosa Group Companies held by the Trust and to ensure the continued growth and prosperity of such companies . . . ,"  "to invest all or a substantial portion of the Trust Fund in shares of stock of the Formosa Group Companies and to acquire, from time to time, such additional shares of stock of the Formosa Group Companies to ensure that the Trust maintains the ownership of a sufficient number of shares of stock of the Formosa Group Companies" to ensure their continued growth and prosperity.

115.    In 2005 and/or 2006, Hung transferred and/or assigned assets to the Universal Link Trust that he had previously held for Y.C. as a Nominee.  These assets included stock in Wan-Shun International Investment Company, a Liberian company, which held close to a billion dollars of Y.C.'s stock in the Four Treasures.  Y.C. was the beneficial owner of Wan-Shun International Investment Company and the stock that it owned in the Four Treasures.

116.    Wan-Shun International Investment Company was a nominee for Y.C. and is among the ten largest shareholders of each of the Four Treasures.   For example, in 2009 it owned 3.05% of Formosa Plastics Corporation, 2.39% of Nan Ya Plastics Corporation, and 3.80% of Formosa Chemicals & Fibre Corporation.

117.    Upon information and belief, the Universal Link Trust and/or its related entities were transferred assets, monies and property owned, held, controlled or maintained by or for the benefit of Y.C. during the period of October 15, 2003 to October 15, 2008 without the consent of Yueh-Lan.  The distributions made to the Universal Link Trust and/or its related entities, directly or indirectly, during the five years prior to Y.C.'s death, were made to reduce Yueh-Lan's share of the Marital Estate.

118.    Upon information and belief, the Universal Link Trust and its related entities hold in excess of $948 million in stock and cash.

**3.    The U.S. Trust: Defendant New Mighty Trust**

119.    In or about May 5, 2005, New Mighty Trust was formed to hold certain of Y.C.'s assets, including stock he owned in FPG's U.S. companies.  According to the trust documents, New Mighty Trust holds stock in FPC USA and Inteplast – both of which are based in Livingston, New Jersey – but does not hold stock in non-U.S. FPG companies.

120.    The distributions or transfers of stock made to New Mighty Trust in the five years prior to Y.C.'s death were made to reduce Yueh-Lan's share of the Marital Estate and were made without her consent.  In particular, according to the trust documents, Defendant NM-US Trust, an irrevocable trust formed under the laws of the District of Columbia, holds stock and interests in FPG's U.S. affiliated companies.  The initial trustee of Defendant NM-US Trust is Defendant Clearbridge, an entity managed by Donald D. Kozusko, a lawyer in Washington, D.C. and a partner of George Harris.

121.    Just prior to the formation of New Mighty Trust, certain of the Overseas Entities that Y.C. had formed as early as 1976 to hold his equity in FPG were redomiciled from Liberia to the BVI at the direction of Hung.  On April 22, 2005, Creative Holding Corporation, which was

formed in Liberia in 1976, was redomiciled in BVI to continue under the name Creative II Holding, Inc.   Hung, a director of Creative Holding Corporation, signed a resolution dated March 15, 2005 authorizing the redomiciling of the company out of Liberia and into the BVI. On the same date, Creative Corporation, which was formed in Liberia in 1976, was redomiciled in BVI to continue under the name Creative II Corporation, Inc.  Also on April 22, 2005, Sound International Investment Corporation, which was formed in Liberia in 1991, was redomiciled in BVI to continue under the name Sound International Investment Corporation.   These entities were redomiciled in BVI in April 2005 so that they could be placed in New Mighty Trust, which was created weeks later.

122.   According to the trust documents, the grantors of Defendant NM-US Trust are Creative II Holding, Inc., Creative II Corporation, Inc. and Sound International Investment Corporation, the BVI holding companies through which Y.C. held stock in FPG's U.S. affiliates.

123.   The beneficiaries of Defendant NM-US Trust are certain charities, philanthropies and the grantors of Defendant NM-US Trust, including Defendant NM Foundation, which was formed in January 2006.

124.   According to the trust documents, Defendant NM-US Trust is not intended to be exempt from U.S. federal income taxes.  According to the trust documents, trust distributions subject to U.S. tax, if paid to a non-U.S. person or entity, are to be paid from Defendant NM-US Trust to a charity selected by the trustees.  According to the trust documents, Defendant NM Foundation was established to receive the charitable distributions of Defendant NM-US Trust.

125.   Defendant NM Foundation, according to its filings with the Internal Revenue Service for tax years 2007, 2008, and 2009, has made substantial donations, in the amount of tens of millions of dollars, exclusively to Chinese government bodies that control school districts in

China.  Upon information and belief, these donations to the school districts were made at the same time that FPG and Hua Yang were pursuing projects, approvals and licenses from Chinese government authorities.

126.    According to the trust documents, trust distributions attributable to income not subject to U.S. tax are to be distributed to the grantors (Creative II Holding, Inc., Creative II Corporation, Inc. and Sound International Investment Corporation).  According to the trust documents, the grantors, in turn, grant this income to the New Mighty Family Trust ("NMFT"), a Cayman Islands STAR trust.

127.    Upon information and belief, the purpose of this structure is to enable profits to be distributed from a U.S. company free from federal and state tax to be used to fund so-called educational projects administered by district governments in China.

128.    According to the trust documents, the trustee of NMFT is the New Mighty Private Trust Company ("NMPTC").  The shares of NMPTC are held by New Mighty Purpose Trust ("NMPT"), a Cayman Islands STAR trust.  According to the trust documents, NMPT was formed by Citco Trustees (Cayman) Limited, a regulated trust company operated by The Citco Group LTD of the Cayman Islands.  Citco was the original trustee of NMPT.

129.    According to the trust documents, NMFT and NMPT are STAR Trusts under the Cayman Islands Special Trusts (Alternative Regime) Law, 1997, as codified by the Cayman Islands Trusts Law (2001 Revision).  Cayman Islands STAR trusts are similar to Bermuda purpose trusts in that (a) they require a written declaration of trust, a statement that the trust is a STAR trust and an enforcer, (b) they are not subject to rules against duration or perpetuities and (c) they do not have beneficiaries.

130.     According to the trust documents, the enforcer of NMPT is the Business Management Committee of NMPTC.  The trust documents have provisions similar to the Grand View Trust concerning the appointment and constitution of the Board of NMPTC and the Business Management Committee.  Upon information and belief, New Mighty Trust is ultimately controlled, directly or indirectly, by, among others, William Wong, Wilfred Wang, Susan and Sandy Wang.

131.     In 2005, Hung transferred and/or assigned to the New Mighty Trust assets that he had previously held for Y.C. as a Nominee.  These assets included stock in Creative II Holding, Inc., Creative II Corporation, Inc. and Sound International Investment Corporation which, in turn, held almost two billion dollars of Y.C.'s stock in FPC USA and Inteplast.  Y.C. was the beneficial owner of Creative II Holding, Inc., Creative II Corporation, Inc. and Sound International Investment Corporation and the stock that those entities owned in FPC USA and Inteplast.

132.     Upon information and belief, New Mighty Trust and/or its related entities were transferred assets, monies and property owned, held, controlled, maintained by or for the benefit of Y.C. during the period of October 15, 2003 to October 15, 2008 without the consent of Yueh-Lan.   The distributions made to New Mighty Trust and/or its related entities, directly or indirectly, during the five years prior to Y.C.'s death, were made to reduce Yueh-Lan's share of the Marital Estate.

133.     New Mighty Trust holds stock in FPC USA and Inteplast, valued at $1.9 billion as of January 2009.  Upon information and belief, the total value of the assets of New Mighty Trust, both stock and cash, is approximately $2.162 billion.

### a.   FPC USA

134.   FPC USA is a non-public Delaware corporation headquartered in Livingston, New Jersey.  According to the 2008 annual report for FPC USA, 22.35% of the outstanding shares of FPC USA are owned by Formosa Plastics Corporation – Taiwan.

135.   Y.C. was the founder of FPC USA and was listed as the chairman and director of FPC USA in corporate filings and the Delaware Annual Franchise Tax Reports from 2000 to 2008, inclusive.

136.   According to the trust documents, New Mighty Trust holds shares in FPC USA. Upon information and belief, the shares of FPC USA held by New Mighty Trust were shares for which Y.C. was the beneficial owner prior to September 12, 2006.  On or about that date, Y.C.'s ownership of the FPC USA shares were purportedly transferred by unknown means to New Mighty Trust and/or entities that it manages or controls.

137.   At various times, the officers and/or directors of FPC USA, according to corporate filings, include:  Susan (officer and director); C.T. Lee (President or CEO and director); C.S. Wang (director); Y.T. Wang (director); Gino Wey (officer); Alice Nightingale (secretary); C.L. Tseng (CEO or Executive Vice President); and David Lin (treasurer).

138.   During the five years prior to 2008, Susan executed certificates of amendments to the certificate of incorporation for FPC USA in her capacity as "Vice President," "Assistant to the President," "Executive Vice President," and "Executive Committee of the Board of Directors."  According to the Delaware Annual Franchise Tax Report for FPC USA from 2000 through 2008, inclusive, Susan is listed as a director of FPC USA.

### b.   Inteplast

139.    In March 1991, Y.C. formed Inteplast Corporation, a non-public Delaware corporation headquartered in New Jersey at the same address as all of FPG's other U.S. entities -- Nine Peach Tree Hill Road, Livingston, New Jersey.   From 1999 to 2005, the directors of Inteplast were Y.C., Susan and John D.E. Young, Susan's husband.   Inteplast Corporation was succeeded and/or affiliated with Inteplast Group, Ltd. and John D.E. Young serves as the "Group President" of Inteplast Group, Ltd.

140.    According to the trust documents, New Mighty Trust holds shares in Inteplast. Upon information and belief, the shares of Inteplast held by New Mighty Trust were shares for which Y.C. was the legal and/or beneficial owner prior to September 12, 2006.  On or about that date, Y.C.'s ownership of the Inteplast shares was purportedly transferred by unknown means to New Mighty Trust and/or entities that it manages or controls.

### 4.   The Credit Suisse Account

141.    Upon information and belief, there exists (or existed) an account maintained by Credit Suisse containing substantial cash and securities of Y.C. valued at approximately $1 billion.

142.    On May 20, 2009, Dr. Wong met with Ms. Orchid Yuan, Managing Director of Credit Suisse, and Ms. Candice Chen, Senior Vice President of Credit Suisse, and at that meeting they confirmed Dr. Wong's understanding that this account exists and is an asset of Y.C.'s estate, notwithstanding that it may be in the name of either P.C. Lee and/or Vanessa.  Upon information and belief, the account is held in the name of P.C. Lee and/or Vanessa, even though Y.C. was the beneficial owner of the account.

143.    Upon information and belief the Credit Suisse account consists of distributions of property P.C. Lee and Vanessa received from Y.C., directly or indirectly, during the period of October 15, 2003 to October 15, 2008, without the consent of Yueh-Lan and for the purpose of reducing Yueh-Lan's share of the Marital Estate.

144.    Upon information and belief, the cash and securities held in this account are the property of Y.C. and should be included in the assets of the Marital Estate for purposes of determining Yueh-Lan's fifty-percent share of the Marital Estate.

**K.**     **January 2009 Heirs Committee Meeting**

145.    At a meeting of Y.C.'s heirs held in January 2009, and attended by Dr. Wong, Susan and others, Susan contended that the assets in the Trusts should not be part of Y.C.'s estate so that it would not be taxed by the TNTA.  Susan sought agreement from Y.C.'s other heirs that certain assets in the trusts were not the property of Y.C. and therefore not part of his inheritance.

146.    Dr. Wong repeatedly stated during the meeting that he would only agree if the plan promoted by Susan complied with Taiwan law.  Dr. Wong stated that he would not agree to a plan that resulted in illegal conduct with respect to the reporting and payment of tax to the TNTA or foreign tax authorities.  P.C. Lee, Susan and Vanessa failed to present an opinion from any qualified professional stating that the Trusts and the manner in which Y.C.'s assets were placed in the Trust did not violate Taiwan or U.S. law, including tax and securities laws.

**L.**     **Refusal To Provide Information And An Accounting**

147.    Plaintiff Yueh-Lan and Dr. Wong, through their representatives and counsel, have repeatedly requested that P.C. Lee, Susan and Vanessa provide statements, information and an accounting of the foregoing identified assets of Y.C.

148.    P.C. Lee, Susan and Vanessa have refused to provide a response to these requests, and have advised that Plaintiff Yueh-Lan and Dr. Wong are not entitled to such statements, information or accounting.

**M.**    **Tax Settlement Agreement**

149.    On May 26, 2010, Dr. Wong, P.C. Lee, Susan and other heirs of Y.C., including the members of the Second Family and Third Family entered into the Tax Settlement Agreement (the "Tax Settlement Agreement").  Yueh-Lan was also a party to the Tax Settlement Agreement.

150.    In the Tax Settlement Agreement, P.C. Lee and Susan agreed that they would not challenge the TNTA's determination that there was only one spousal deduction and that Yueh-Lan was Y.C.'s spouse.

151.    Thus, Dr. Wong and Yueh-Lan did not acknowledge in the Tax Settlement Agreement that P.C. Lee was a legal spouse of Y.C.  They merely acknowledged that P.C. Lee played a significant role in Y.C.'s personal life.  Indeed, no court or other authority has recognized P.C. Lee as Y.C.'s legal spouse and P.C. Lee voluntarily discontinued the lawsuit she filed in which she sought legal recognition as Y.C.'s legal spouse.

152.    Pursuant to the Tax Settlement Agreement, the parties agreed to the apportionment of taxes assessed by the TNTA against Y.C.'s estate and to a distribution of the Taiwan Assets that passed to Y.C.'s heirs after the payment of estate tax.

153.    Dr. Wong executed the Tax Settlement Agreement on Yueh-Lan's behalf pursuant to the power of attorney issued to him by Yueh-Lan.  In the Tax Settlement Agreement, P.C. Lee and Susan warranted that they did not object to Yueh-Lan's capacity or the authority of Dr. Wong to act as her agent.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Article 1030-1 of the Civil Code of Taiwan)

154.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 153 of the Complaint as if set forth herein at length.

155.    Yueh-Lan is Y.C.'s only surviving spouse and, in accordance with Article 1030-1 of the Civil Code of Taiwan, she is entitled to fifty-percent of the Marital Estate.

156.    Defendants received distributions of property from Y.C., directly or indirectly during the period of October 15, 2003 to October 15, 2008, without the consent of Yueh-Lan and for the purpose of reducing Yueh-Lan's share of the Marital Estate.  Therefore the distributions of property shall be counted into the Marital Estate pursuant to Paragraph 1, Article 1030-3 of the Civil Code of Taiwan.

157.    The value of the property in the Marital Estate is presently known to be greater than double the value of the property paid to Yueh-Lan from Y.C.'s Taiwan Assets. Accordingly, Yueh-Lan has not and will not receive the full value of the fifty-percent share she is entitled to under Article 1030-1 of the Civil Code of Taiwan.

158.    Plaintiff is entitled to fifty-percent of the Marital Estate calculated pursuant to Articles 1030-1 and Paragraph 1, Article 1030-3 of the Civil Code of Taiwan.

159.    Accordingly, Plaintiff is entitled to damages including the return of the assets, monies and property wrongfully held or controlled by Defendants under this claim and/or to be compensated for all damages and for all other relief pursuant to Articles 1030-1 of the Civil Code of Taiwan.

## COUNT TWO
### (Article 1030-3 of the Civil Code of Taiwan)

160.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 159 of the Complaint as if set forth herein at length.

161.    Yueh-Lan is Y.C.'s only surviving spouse and, in accordance with Article 1030-1 of the Civil Code of Taiwan, she is entitled to fifty-percent of the Marital Estate.

162.    Pursuant to Paragraph 2, Article 1030-3 of the Civil Code of Taiwan, to the extent that Yueh-Lan's undisputed and rightful claim to fifty-percent of the Marital Estate cannot be satisfied from property held by Y.C. at his death, Yueh-Lan is entitled to restitution from any third-party who received distributions from Y.C. in the five years before his death without her consent.

163.    Defendants received distributions of property from Y.C., directly or indirectly during the period of October 15, 2003 to October 15, 2008, without the consent of Yueh-Lan and for the purpose of reducing Yueh-Lan's share of the Marital Estate

164.    These distributions were not "proper gifts for performing a moral obligation" and are not exempt from the provisions of Articles 1030-1 and 1030-3 of the Civil Code of Taiwan.

165.    The value of the property in the Marital Estate is presently known to be greater than double the value of the property paid to Yueh-Lan from Y.C.'s Taiwan Assets. Accordingly, Yueh-Lan has not and will not receive the full value of the fifty-percent share to which she is entitled.

166.    Plaintiff is entitled to restitution from Defendants in the amount of the shortness of her share pursuant to Paragraph 2, Article 1030-3 of the Civil Code of Taiwan

167.    Accordingly, Plaintiff is entitled to damages including the return of the assets, monies and property wrongfully held or controlled by Defendants under this claim and/or to be

compensated for all damages and for all other relief pursuant to Articles 1030-1 of the Civil Code of Taiwan.

168.    Plaintiff is entitled to damages including the return of the assets, monies and property wrongfully held or controlled by Defendants under this claim and/or to be compensated for all damages and for all other relief pursuant to Article 1030-3 of the Civil Code of Taiwan.

<strong><u>COUNT THREE</u></strong><br/><strong>(Article 1146 of the Civil Code of Taiwan)</strong>

169.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 168 of the Complaint as if set forth herein at length.

170.    Article 1146 of the Civil Code of Taiwan provides: "Where the right to inherit has been infringed upon, the injured party or his statutory agent may claim its restitution."

171.    Pursuant to Article 1146 of the Civil Code of Taiwan, Yueh-Lan is entitled to restitution against any party who infringes upon her right of inheritance.

172.    Defendants have infringed upon Yueh-Lan's right of inheritance by, among other things, obtaining, acquiring, procuring, receiving and otherwise coming into possession of assets, monies and property owned, held, maintained by or for the benefit of Y.C. and asserting that Yueh-Lan is not the only spouse of Y.C. and have otherwise challenged her lawful right to her full share of Y.C.'s Estate.

173.    Plaintiff is entitled to the return of the assets, monies and property wrongfully held or controlled by Defendants under this claim and/or to be compensated for all damages and for all other relief pursuant to Article 1146 of the Civil Code of Taiwan.

## COUNT FOUR
### (Article 767 of the Civil Code of Taiwan)

174.   Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 173 of the Complaint as if set forth herein at length.

175.   Article 767 of the Civil Code of Taiwan provides that:  "The owner of a thing has the right to demand its return from anyone, who possesses it without authority or who seizes it. Where his ownership is interfered, he is entitled to claim the removal of the interference; and where the ownership might be interfered, he is entitled to claim the prevention of such interference."

176.   Pursuant to Article 767 of the Civil Code of Taiwan, Yueh-Lan demands return of the property distributed or transferred from Y.C. to Defendants from Y.C.'s Estate.

177.   Defendants possess property that was part of Y.C.'s Estate, and to which Yueh-Lan has a claim as an heir, without authority.  Yueh-Lan is entitled to the return of the property and to a judgment that she is the owner of the property.

178.   Plaintiff is entitled to the return of the assets, monies and property wrongfully held or controlled by Defendants under this claim and/or to be compensated for all damages and for all other relief pursuant to Article 767 of the Civil Code of Taiwan.

## COUNT FIVE
### (Conversion)

179.   Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 178 of the Complaint as if set forth herein at length.

180.   Yueh-Lan is Y.C.'s only surviving spouse and, in accordance with Taiwan law, she is entitled to fifty-percent of the Marital Estate.

181.     Upon information and belief, Defendants, individually and/or collectively, planned, engaged and intentionally participated in the improper, wrongful and unlawful transfer, diversion and misuse of the assets, monies and property owned, held or maintained by or for the benefit of Y.C. prior to his death for the purpose of, among other things, reducing Yueh-Lan's share of the Marital Estate.

182.     Upon information and belief, Defendants, individually and/or collectively, established, directed or assisted in the creation of testamentary instruments, other offshore accounts, corporations and financial accounts to improperly, wrongfully and unlawfully convey said property.

183.     Defendants and/or their agents, individually and/or collectively, refused to provide any and all information regarding the location and an accounting of said property in order to obstruct the calculation and distribution of Yueh-Lan's share of the Marital Estate.

184.     As a result of Defendants' unlawful conversion of the assets, monies and property owned, held or maintained by or for the benefit of Y.C. prior to his death, Plaintiff is entitled to the return of said assets, monies and property and to be compensated for all damages resulting to her as a result of the unlawful conversion.

## COUNT SIX
### (Unjust Enrichment)

185.     Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 184 of the Complaint as if set forth herein at length.

186.     Defendants have benefited from the fraudulent acquisition and improper use of the assets, monies and property owned, held or maintained by or for the benefit of Y.C. prior to his death.  This property was part of the Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share.

187.    Permitting Defendants to retain those assets, monies and property owned, held or maintained by or for the benefit of Y.C. prior to his death would be unjust because the monies and benefits were taken pursuant to unlawful, fraudulent and unauthorized means, and Plaintiff will continue to be irreparably damaged.

## COUNT SEVEN
### (Constructive Trust)

188.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 187 of the Complaint as if set forth herein at length.

189.    By way of the trust agreements, bank/investment accounts, distributions and transfers discussed above, Defendants improperly acquired, transferred and misused the assets, monies and property owned by Y.C. prior to his death and that are part of the Marital Estate.

190.    This property was part of the Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share and it would be unjust for Defendants to retain said property.

191.    Plaintiff has been damaged by the improper, unlawful and wrongful acquisition, transfer, diversion and misuse of the assets, monies and property owned, held or maintained by or for the benefit of Y.C. prior to his death, which property is part of the Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share, and Plaintiff is entitled to the return of said assets, monies and property.

## COUNT EIGHT
### (Accounting)

192.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 191 of the Complaint as if set forth herein at length.

193.    Defendants are in possession of or control the assets, monies and property owned, held or maintained by or for the benefit of Y.C. prior to his death.  This property is part of the

Marital Estate upon which Yueh-Lan is entitled to her fifty-percent share.

194.    Plaintiff is entitled to and has requested an accounting of all of the assets, monies and property owned, held, maintained by or for the benefit of Y.C. prior to his death so that Yueh-Lan's share of the Marital Estate may be calculated and distributed to her.

195.    To date, Defendants and/or their agents have refused to provide and intentionally impeded and obstructed all attempts to obtain accounting and/or information with respect to the assets, monies and property owned, held or maintained by or for the benefit of Y.C. before his death or property distributed or transferred by Y.C. to Defendants in the five years prior to his death that should be included in the Marital Estate.

## COUNT NINE
### (Civil Conspiracy)

196.    Plaintiff repeats and realleges each of the allegations in Paragraphs Nos. 1 through 195 of the Complaint as if set forth herein at length.

197.    On information and belief, Defendants acted in concert and by agreement to engage in improper, wrongful and other unlawful conduct alleged above and to harm Plaintiff.

198.    On information and belief, Defendants engaged and intentionally participated in, assisted or planned the improper, wrongful and other unlawful conduct alleged above as part of and in furtherance of their agreement, common scheme, plan and purpose to harm Plaintiff and to transfer, divert and misuse the assets, monies and benefits of property owned by Y.C. prior to his death that should be included in the Marital Estate.

199.    By reason of the foregoing, each Defendant is liable to Plaintiff for compensatory damages for civil conspiracy.

## PRAYER FOR RELIEF

**WHEREFORE**, as to Counts One through Nine, Plaintiff requests entry of judgment in her favor and against Defendants as follows:

(A)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly owned, held, controlled, or maintained by Y.C. before his death or for the benefit of Y.C. or his estate;

(B)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan;

(C)     Enjoining Defendants, their agents, servants and employees from using, disposing of, transferring or otherwise conveying assets, monies and property directly or indirectly held, controlled, maintained or otherwise made an asset of the testamentary instruments, offshore accounts, corporations or financial accounts set forth herein;

(D)     Imposing a constructive trust over the assets, monies and property directly or indirectly (i) owned, held, controlled, or maintained by Y.C. or for the benefit of Y.C. or his estate; (ii) received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of  Plaintiff Yueh-Lan; and (iii) held, controlled, maintained or otherwise made an asset of the testamentary instruments, offshore accounts, corporations or financial accounts set forth herein;

(E)     Restoring all parties to the status quo that existed prior to the execution of any and all testamentary instruments, creation of trusts, creation of offshore accounts, and/or distributions, dispositions or conveyances of assets, monies and property directly or indirectly owned, held, controlled, maintained by Y.C. before his death or for the benefit of Y.C. since

49

October 15, 2003;

(F)     Modifying, amending and/or voiding any instrument and/or transfer of the assets, monies and property directly or indirectly owned, held, controlled or maintained by Y.C. before his death or for the benefit of Y.C. since October 15, 2003;

(G)     Compelling Defendants to return the assets, monies and property directly or indirectly received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan, and to produce any information related to said property;

(H)     Compelling a complete, auditable and accurate accounting of the assets, monies and property directly or indirectly (i) owned, held, controlled, or maintained by Y.C. before his death or for the benefit of Y.C.; (ii) received by Defendants from Y.C. during the period of October 15, 2003 through October 15, 2008, without the consent of Plaintiff Yueh-Lan; and (iii) held, controlled, maintained or otherwise made an asset of the trusts, other offshore accounts, corporations or financial accounts set forth herein;

(I)     Compelling a complete, auditable and accurate accounting of the assets, monies and property that are contained in or were directly or indirectly used, disposed of, transferred or otherwise conveyed from the trusts, offshore accounts, corporations or financial accounts set forth herein;

(J)     Compelling Defendants to provide compensatory, incidental, and consequential damages in an undetermined amount to Plaintiff as a result of Defendants' improper, wrongful and unlawful acquisition, transfer, diversion and misuse of the assets, monies and property directly or indirectly owned, held, or maintained by Y.C. before his death or for the benefit of Y.C., received by Defendants from Y.C. during the period of October 15, 2003 through October

15, 2008, without the consent of  Plaintiff Yueh-Lan, and held, controlled, maintained or otherwise made an asset of the trusts, other offshore accounts, corporations or financial accounts set forth herein, all upon which Yueh-Lan is entitled to her fifty-percent share;

(K)     Compelling Defendants to provide restitution to Plaintiff for her share of the Marital Estate under Articles 1030-1 and 1030-3 of the Civil Code of Taiwan and/or awarding Plaintiff damages and other relief under Articles 1030-1 and 1030-3 of the Civil Code of Taiwan;

(L)     Awarding Plaintiff damages and other relief  under Article 1146 of the Civil Code of Taiwan;

(M)     Awarding Plaintiff damages and other relief under Article 767 of the Civil Code of Taiwan;

(N)     Awarding fees and costs, including attorneys' fees, as a result of Defendants' improper, wrongful and unlawful acquisition, transfer, diversion and misuse of the assets, monies and property directly or indirectly owned, held, controlled, or maintained by Y.C. before his death or for the benefit of Y.C. upon which Yueh-Lan is entitled to her fifty-percent share; and

(O)     For such other and further relief, in law or in equity, as this Court may deem just and proper.

**Plaintiff hereby demands a trial by jury on all issues triable by a jury.**

Respectfully submitted,

Dated:  May 27, 2011

*/s/ Carl W. Hampe*
Carl W. Hampe (DC Bar # 440475)

*/s/ Steven M. Chasin*
Steven M. Chasin (DC Bar # 495853)

Baker & McKenzie LLP
815 Connecticut Ave., NW
Washington, D.C.  20006
Carl.Hampe@bakermckenzie.com
Tel (202) 835-4259  Fax (202) 416-6979
Steven.Chasin@bakermckenzie.com
Tel (202) 835-6132  Fax (202) 416-7132

and

*/s/ Michael R. Griffinger*
Michael R. Griffinger (not admitted in D.D.C.)

*/s/ Mark W. Stoutenburg*
Mark W. Stoutenburg (not admitted in D.D.C.)

*/s/ Lan Hoang*
Lan Hoang (not admitted in D.D.C.)

*/s/ Daniel S. Weinberger*
Daniel S. Weinberger
D.D.C. Bar Id. D00318

GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY 100119
(212) 613-2000 (phone)
(212) 554-9648 (fax)
dweinberger@gibbonslaw.com

*Attorneys for Yueh-Lan Wang,*
*by and through her attorney-in-fact,*
*Dr. Winston Wen-Young Wong*