**YUEH-LAN WANG, by and through her attorney-in-fact, Winston Wen-Young Wong,**

      **Plaintiff,**

          **v.**

**NEW MIGHTY U.S. TRUST, *et al.*,**

      **Defendants.**

**Civil Action No. 10-1743 (JEB)**

<u>**MEMORANDUM OPINION**</u>

This case begins in a Taiwanese rags-to-riches tale. Yung-Ching (Y.C.) Wang was born in 1917 into a tea-farming family so poor that he could not afford to attend high school. By his death in 2008, he was his country's second wealthiest person — a plastics tycoon worth an estimated $6.8 billion.

But, as is often true on both sides of the Pacific: more money, more problems. Y.C. died without a known will, and his heirs — belonging to three "Families" — have since been locked in an international struggle for his assets. This case is one chapter of that saga. Winston Wen-Young Wong, Y.C.'s son from his Second Family, filed this suit in 2010 in the name of Plaintiff Yueh-Lan Wang, Y.C.'s wife from his First Family. Operating under a power-of-attorney from Yueh-Lan, who was herself childless, Winston brought her claims seeking assets held by Defendants as part of her marital share under Taiwanese law. Yueh-Lan has since died, and the Executors of her estate now seek to take over and revise the Complaint. As the Court ultimately concludes that this is permissible and that some of Defendants' objections to the contrary should be reserved for later briefing, it will grant the Executors' Motion to do so.

## I.  Background

Because the core question at this stage is whether the Executors' proposed Second
Amended Complaint could survive a motion to dismiss, the Court draws its facts from that
pleading and accepts them as true.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see In re
Interbank Funding Corp. Securities Litigation, 629 F.3d 213, 218 (D.C. Cir. 2010).  The Court
does not, however, "accept as true a legal conclusion couched as a factual allegation." Iqbal, 556
U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A teen bride, Yueh-Lan was married to Y.C. for 72 years — about the average life
expectancy of a newborn today.  See ECF No. 37-3 (Proposed Second Amended Complaint), ¶ 1.
(As many individuals in this case share the same last name, the Court refers to them by their first
names for sake of convenience and not as a mark of disrespect.)  Over the course of their long
union, Y.C. founded several companies, most notably the Formosa Plastics Group, which is "one
of Taiwan's biggest and most profitable manufacturing conglomerates with annual sales of over
$60 billion and operations in five countries." Id., ¶ 17.  These ventures made him the second
wealthiest person in Taiwan by 2006 with a conservative estimated net worth of around $6.8
billion. Id., ¶ 18.

Two years later, in 2008, Y.C. died in New Jersey without a known will. Id., ¶ 16.
Because he had distributed his riches around the world, his estate in Taiwan eventually identified
less than $2 billion in assets for disbursement to his heirs. Id., ¶ 18.  Complicating matters
further still, during his long marriage to Yueh-Lan (his "First Family"), Y.C. created other
families by fathering children with two other women — Wang Yang Chiao and Pao Chu (P.C.)
Lee. Id., ¶ 26.  While he and Yueh-Lan had no offspring, his relationship with Wang Yang

Chiao resulted in the birth of five children known as the "Second Family," and his relationship with P.C. Lee produced another four known as the "Third Family." Id.

Perhaps not surprisingly given such fecundity, Y.C.'s intestate death has spawned a good deal of international litigation among his three families, this action being one example. It was first filed on October 14, 2010, by Dr. Winston Wen-Young Wong, a member of the Second Family and Y.C.'s eldest son, who asserted that he was acting through a valid power-of-attorney in bringing the suit on Yueh-Lan's behalf. See ECF No. 1 (Complaint). Yueh-Lan's claims sought property allegedly transferred by Y.C. to Defendants during the five years prior to his death on the ground that Taiwanese law would entitle her to recover these assets as part of her 50% spousal share upon his passing. Wang ex rel. Wong v. New Mighty U.S. Trust (Wang I), 841 F. Supp. 2d 198, 200 (D.D.C. 2012). Defendants are a trust formed under the laws of the District of Columbia — New Mighty U.S. Trust — as well as its trustee, Clearbridge, LLC, and a beneficiary of the trust, New Mighty Foundation. See SAC, ¶¶ 19-21. (Both the Foundation and Clearbridge, it should be noted, are linked to children of the Third Family. See ECF No. 38-29 (Declaration of Susan Wang), ¶ 1; ECF No. 38-30 (Declaration of William Wong), ¶ 5.)

Defendants moved to dismiss these claims on numerous grounds, and this Court granted that entreaty. Wang I, 841 F. Supp. 2d at 208; see Wang ex rel. Wong v. New Mighty U.S. Trust (Wang II), 843 F.3d 487, 488 (D.C. Cir. 2016). While recognizing the question was "close" and one of first impression, it held that a traditional trust like New Mighty assumed the citizenship of all of its beneficiaries for the purposes of diversity jurisdiction and, accordingly, diversity was lacking in this case. Wang I, 841 F. Supp. 2d at 203.

Plaintiff appealed this ruling, but Yueh-Lan died shortly thereafter. Wang II, 843 F.3d at 489. The D.C. Circuit thus had to hold the case in abeyance for years while the Taiwanese

courts determined who should act as the executors of her will because Yueh-Lan had named Winston as her sole heir but failed to appoint an executor. Id.; see SAC, ¶ 14. Eventually, Chen-Teh Shu, Dong-Xung Dai, and Robert Shi were chosen by the courts, and the three men moved to substitute themselves as Yueh-Lan's personal representatives under the appropriate Federal Rule of Appellate Procedure while the case was still pending at the D.C. Circuit. Wang II, 843 F.3d at 489. Before ruling on that motion, though, the D.C. Circuit again stayed the case after the Supreme Court granted certiorari in Americold Realty Trust v. ConAgra Foods, Inc., 136 S. Ct. 1012 (2016), which addressed the appropriate citizenship test for a real-estate trust. Wang, 843 F.3d at 489 n.6.

Based on the decision in Americold, the D.C. Circuit eventually reversed this Court's dismissal of Yueh-Lan's complaint after holding that the citizenship of a traditional trust like New Mighty Trust depends only on the trustee's citizenship, not the beneficiaries', as this Court had ruled. Id. at 489-96. As a result, diversity was not lacking. Id. The Circuit, at the same time, also granted the Executors' substitution motion "without prejudice to the defendants' ability to renew in district court those arguments they ha[d] pressed before" it about Winston's potentially defective POA and the consequences flowing therefrom. Id. at 496.

Now back in this Court, Plaintiff Executors filed the current Motion for Leave to File a Second Amended Complaint and for Other Relief. See ECF No. 37. Defendants have opposed, contending that the proposed new Complaint remains defective for myriad reasons. The matter is now ripe.

## II. Legal Standard

A plaintiff may amend her complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading. See Fed. R. Civ. P. 15(a)(1).

Otherwise, she must seek consent from the defendant or leave from the court. The latter permission "should [be] freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). In deciding whether to grant leave to file an amended complaint, courts may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962). In this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason." Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996). "The defendant bears the burden of demonstrating that a plaintiff's motion to file an amended complaint should be denied." Clayton v. District of Columbia, 999 F. Supp. 2d 178, 183 (D.D.C. 2013).

It is clear, however, that amendment should not be permitted if it would be futile. Foman, 371 U.S. at 182 (noting "futility of amendment" is permissible reason to deny Rule 15(a) motion). In other words, if the new causes of action would still be deficient notwithstanding the proposed amendment, courts need not grant leave. Interbank Funding, 629 F.3d at 218 ("[A] district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss."); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.").

## III. Analysis

Defendants oppose Plaintiff Executors' Second Amended Complaint on a congeries of grounds that primarily fall under the rubric of either futility or bad faith. The Court addresses the futility-related arguments first and then turns to the much easier question of whether the Executors have demonstrated any bad faith in seeking amendment here. It next considers

whether the SAC, having survived these arguments, relates back to the date of the filing of the original Complaint or is instead barred by statutes of limitations. Finally, the Court takes up Defendants' more focused arguments that New Mighty Foundation (a beneficiary of the trust) and New Mighty Trust should be dismissed from any surviving action for reasons particular to them.

A. Futility

Most of Defendants' objections to the SAC are in essence futility arguments. In other words, they contend that the pleading "would not survive a motion to dismiss," and thus leave to file should not be granted. Interbank Funding, 629 F.3d at 218. They advance four such arguments, which the Court weighs in turn: 1) this action was a legal nullity from its inception because Winston's Power of Attorney was defective; 2) required persons are absent from the suit and cannot be joined; 3) this is not the proper forum for this litigation; and 4) the SAC fails to state a claim. The Court rejects the first three and concludes that the last should be at least partially reserved for later briefing.

1. *Ratification by Executors*

Defendants loose most of their arrows on a single target: the Power of Attorney that Winston used to initiate this action on Yueh-Lan's behalf back in 2010. According to them, the POA did not authorize him to commence a legal action in her name because the mandate had facial defects, it lacked an express authorization to bring suit in her name, and Yueh-Lan became incompetent prior to this action's filing. See Opp. at 12-13. Defendants claim that the Court, as a result, lacks jurisdiction to hear a case that was a legal nullity since its inception. Id. at 14-15. Because the Federal Rules of Civil Procedure cannot expand this Court's jurisdiction, moreover, Defendants further contend that this Court cannot swap in the Executors under those Rules to

cure that defect now.  Id.  The Court disagrees.  Any alleged problem with Winston's POA did not present an insurmountable jurisdictional hurdle.

At the outset of its analysis, the Court sets aside two issues.  First, it need not rule on the lengthy affidavits on Taiwanese law that each party submits about the POA's scope and validity.  It instead assumes for purposes of this Motion that Defendants are correct that the POA was ineffective.  Second, the Court does not rehash whether, if the case survives, the Executors are Yueh-Lan's proper substitutes under Federal Rule of Civil Procedure 25.  See Fed. R. Civ. P. 25(a)(1) ("If a party dies and the claim is not extinguished, the court may order substitution of the proper party.").  The D.C. Circuit has already found that the Executors would be the parties in a proper action under the appellate version of this rule.  That ship has rightly sailed.

The Circuit nevertheless expressly reserved the nub of the parties' dispute on this score for this Court's consideration on remand.  Wang II, 843 F.3d at 496.  That question asks: If Winston's POA was ineffective, was this suit a legal nullity from its inception, which Plaintiff Executors' substitution could not revive and thus should be dismissed?  Id.

The Court now concludes that it was not.  Federal courts have long been reluctant to allow a party to be trapped into forfeiting a potentially legitimate claim based on the sort of honest defect or incidental mistake that Defendants seek to exploit here.  Federal Rule of Civil Procedure 17(a), in fact, was amended in 1966 to reflect this modern trend toward leniency when an honest and reasonable mistake as to the personal representative has been made at the outset of a case.  See Fed. R. Civ. P. 17 advisory committee notes on 1966 amendment (mentioning "action may be filed in the name of John Doe (a fictitious person), as personal representative" of another, "in the hope that at a later time . . . the real name of the real personal representative" is substituted); see also Fed. R. Civ. P. 9(a)(1)(B) (setting pleading requirements for "a party's

authority to sue or be sued in a representative capacity").  This is especially true where, as in this action, the proper party in interest — Yueh-Lan and her Executors — seeks to cure such an innocent defect by later ratifying the action and where the mistake caused no prejudice to Defendants.  See, e.g., Link Aviation, Inc. v. Downs, 325 F.2d 613, 614-15 (D.C. Cir. 1963) (rejecting argument that suit improperly brought in name of insured, rather than real party in interest — the insurance company — was a legal nullity and allowing substitution as well as relation back to avoid running of statute of limitations).  This is the wisest and most appropriate outcome in a case such as this one.

Contrary to Defendants' contention, there is no jurisdictional obstacle to this course of action.  The matter of a person's capacity or authority to sue on behalf of someone else who indisputably has standing to bring the asserted claims does not raise a jurisdictional problem at all.  See Davis v. Lifetime Capital, Inc., 560 F. App'x 477, 478 (6th Cir. 2014) ("Generally, capacity is considered an affirmative defense, not a jurisdictional issue."); see also 5A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice & Procedure § 1294 (3d ed. 2014) (treating "specific denial as to a party's capacity, authority, or legal existence required by Rule 9(a)" as "an affirmative defense").

A recent case out of the Fifth Circuit illustrates why.  In Rideau v. Keller Independent School District, 819 F.3d 155 (5th Cir. 2016), parents of a severely disabled child successfully sued, as their son's next friend, the school district where he had suffered abuse.  Four days after the verdict, the district brought additional arguments "relating to whether the Rideaus had Article III 'standing'" to bring the suit on their child's behalf.  Id. at 159-60.  In considering these claims on appeal, the Circuit first rejected the school district's "attempt[] to shoehorn all of its post-trial arguments into the doctrine of constitutional standing" because the question of who could

properly sue on the child's behalf was merely one of "capacity." Id. at 161. Instead, "[i]t recognized that the question of who could pursue those damages on [another's] behalf is a capacity problem, not a standing problem." Id. (emphases added). While it ultimately agreed that the Rideaus lacked capacity to bring the child's claims under Texas estates law, it concluded that the district court had abused its discretion by not allowing the child's trustee (the legal guardian of his assets) to ratify the suit under Rule 17(a). Id.

Other courts have likewise distinguished authority-to-sue issues from questions of jurisdictional standing. See, e.g., Esposito v. United States., 368 F.3d 1271, 1277 (10th Cir. 2004) (rejecting argument that case should be dismissed as "nullity" and forfeited due to running of statute of limitations simply because suit was mistakenly brought in name of decedent who lacked "capacity to sue"); De Saracho v. Custom Food Mach., Inc., 206 F.3d 874, 878 n.4 (9th Cir. 2000) ("Even if defendants are correct that [a corporation] lacked authorization to sue, this court does not lack subject matter jurisdiction in the sense that it would if plaintiffs lacked standing to sue under the 'case or controversy' requirement of Article III of the Constitution."); cf. CFPB v. Gordon, 819 F.3d 1179, 1187-90 (9th Cir. 2016) (rejecting notion that CFPB director's lack of authority to bring suit given his improper recess appointment deprived him of standing to initiate suit). To the extent, moreover, that other courts to confront such issues have spoken in terms of standing, they have indicated that issues of capacity and authority are a prudential, rather than constitutional, aspect of that doctrine. See, e.g., Zanowick v. Baxter Healthcare Corp., 850 F.3d 1090, 1096 n.11 (9th Cir. 2017) (noting defendants could waive "prudential standing" issues of wife's failure to "file a successor-in-interest declaration"); Brown v. Keller, 274 F.2d 779, 780 (6th Cir. 1960) ("This is not strictly a question of jurisdiction, but lack of capacity on the part of the plaintiffs to sue is a bar to the action."). As a result, they are

subject to the same principles of waiver or cure that govern other such procedural defects.  See 5A Wright & Miller, § 1295.

There is similarly no jurisdictional wall to scale here.  Just as in Rideau, it is undisputed that the named plaintiff — *i.e.*, Yueh-Lan — had standing to bring her spousal-related claims. After all, "economic harm" is the "bread-and-butter injury for private-law causes of action in which constitutional standing is rarely an issue."  Rideau, 819 F.3d at 163.  Defendants do not even bother to argue otherwise.  They instead hope to muddy the waters of this standing analysis, as did the school district in Rideau, by focusing on whether Winston had his own standing to bring claims.  As the Fifth Circuit explained, however, that is a matter of capacity to bring suit on Yueh-Lan's behalf, not one of standing to do so.  Winston, after all, is not a party.  This Court will not turn that legal issue into a matter of jurisdictional proportions when it could at best be one of prudential standing.  Cf. United States v. Kwai Fun Wong, 135 S. Ct. 1625, 1632 (2015) (collecting recent cases "repeatedly" holding "high bar" exists to establish procedural rules as jurisdictional); Montes v. Janitorial Partners, Inc, 859 F.3d 1079, 1083-84 (D.C. Cir. 2017) (holding individual's procedural failure to opt in to collective action was non-jurisdictional).

Defendants, moreover, point to no case holding that a defective power-of-attorney creates an incurable jurisdictional problem when the plaintiff, who indisputably did have standing, later ratified the action.  Rather, even where a case has been brought in the name of a corporate debtor without proper authorization, federal bankruptcy courts routinely deny efforts by these debtors to dismiss such suits where the person with proper authorization has later taken actions to ratify it. See, e.g., Hager v. Gibson, 108 F.3d 35, 40 (4th Cir. 1997) ("[T]he unauthorized filing of a voluntary petition in bankruptcy [o]n behalf of a corporation might be ratified in appropriate circumstances by ensuing conduct of persons with power to have authorized it originally.").

Instead, they often force those plaintiffs to prosecute the action, despite such initial defects. Id. If Defendants were correct that courts lacked jurisdiction over these cases or the ability to revive them, this common federal-court practice could not stand.

Defendants, rather, rely on cases readily distinguishable from the scenario presented by this case. See, e.g., Opp. at 16 (citing Zurich Ins. Co. v. Logitrans, Inc., 297 F.3d 528, 531 (6th Cir. 2002) (holding named plaintiff who "had no standing to bring th[e] action" also lacked "standing to make a motion to substitute the real party in interest")). For example, they cite Meredith v. Ionian Trader, 279 F.2d 471 (2d Cir. 1960), to establish that "[a] suit initiated without authority from the party named as plaintiff is a nullity and any judgment obtained in such a suit is void." Opp. at 13. But that case made no mention of standing at all and involved an insurance underwriter's bringing the claim, without the insured's permission or later ratification, in the name of the insured. See id. (also incorrectly citing Cortlandt St. Recovery Corp. v. Hellas Telecomms., 790 F.3d 411, 423 (2d Cir. 2015), which declined to "resolve" the alleged "standing deficiency").

More critically, the D.C. Circuit eschewed Ionian Trader's overly rigid approach three years later in Link Aviation, 325 F.2d at 615 (adopting Tenth Circuit's approach to substitution under Federal Rules of Civil Procedure). That holding is still binding law in this Circuit. See Empire Lofts Condo. Ass'n v. A.C.&R. Foam Insulators, LLC, No. 15-792, 2016 WL 81222, at *1 (D.D.C. Jan. 7, 2016) (citing Link Aviation favorably). Three years after Link Aviation, Rule 17(a)(3), too, was amended to reflect this modern lenient approach. See 6A Wright & Miller § 1555; see also 5A Wright & Miller § 1295 ("Although there is a nexus between capacity, authority, or legal existence and subject matter jurisdiction in some contexts, that is not always the case as some early cases had suggested. In the majority of cases the party status issue is not

significant.") (footnote omitted).  Even the Second Circuit, in fact, has been reluctant to transform substitution issues into standing ones.  See Cortlandt St., 790 F.3d at 423; id. at 425-27 (Sack, J., concurring) (approving of Link Aviation's pragmatic approach).  Put simply, the Court finds no support for Defendants' contention that any of the issues they identify with Winston's POA caused this case to be a legal nullity, which defect could not later be cured.

Assured, then, of its jurisdiction, this Court is also satisfied that Plaintiff Executors should now be allowed to ratify this action.  Under Rule 17(a)(3), a court "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."  This Rule "reflects the general policy of the drafters of the federal rules that the choice of a party at the pleading stage ought not have to be made at the risk of a final dismissal of the action should it later appear that there had been an error."  6A Wright & Miller, § 1555. Ratification by the correct party is thus justified where necessary "as the result of an understandable mistake."  Wieburg v. GTE Sw. Inc., 272 F.3d 302, 308 (5th Cir. 2001) (collecting cases).  Classic examples include situations where complex legal issues hinder the identification of the correct person with the capacity to sue or there exists a mistaken "belief, not wholly unfounded" about a party's competency at the commencement of the suit.  See Magallon v. Livingston, 453 F.3d 268, 273 (5th Cir. 2006) (holding district court abused its discretion in refusing substitution where Consul General of Mexico had believed named plaintiff was incompetent); Rideau, 819 F.3d at 166 (finding district court abused its discretion by not allowing trustee to ratify where determining the "property party to sue is difficult" and when there had been a "good-faith, nonfrivolous mistake of law").

This case falls squarely within these exemplars. Both parties provide lengthy affidavits by prominent Taiwanese law experts opining on the validity or invalidity of Winston's POA. See ECF No. 38-25 (Declaration of Yeong-Chin Su); ECF No. 39-1 (Declaration of Tsung-Fu Chen). This Court, after reviewing these, would be hard pressed to choose a clear winner in that debate. Likewise, there was no court ruling that Yueh-Lan was incompetent in 2010 when this case was brought or that Winston's POA was thus no longer valid.

Allowing ratification by her Executors now that the statute of limitations has run on these claims, as a result, amply serves "Rule 17(a)(3)'s intended purpose: the avoid[ance of] forfeiture and injustice when an understandable mistake has been made." Rideau, 819 F.3d at 165-66 (quoting 6A Wright & Miller, § 1555). The Court further finds no evidence that Winston's reasonable mistake as to the scope of the POA — assuming one was even made — was not an honest one. See Scheuffler v. Gen. Host Corp., 126 F.3d 1261, 1270 (10th Cir. 1997) (permitting joinder when failure to include real parties in interest "was the result of a mistake as to the legal effectiveness of documents"); Link Aviation, 325 F.2d at 615 (rejecting reading of Rule 17(a) that is "highly technical without meaningful purpose"). Nor does it find any reason to believe that Defendants are prejudiced by this swapping in of the Executors, as the essential nature of the claims and their posture remain unchanged. Adv. Magnetics, Inc. v. Bayfront Partners, Inc., 106 F. 3d 11, 21 (2d Cir. 1997) (indicating prejudice to defendants should be considered).

The Court will therefore deny Defendants' effort to vitiate the filing of the SAC on the ground that the original suit was a legal nullity.

### 2. *Joinder*

Defendants next contend that substituting the Executors is not enough; instead, they believe, the SAC cannot survive because Rule 19 requires more actors to be added to this

litigation. To recap, the present parties are Plaintiff Executors and Defendants New Mighty Foundation, New Mighty Trust, and Clearbridge. See SAC, ¶ 22. Executors are domiciled in Taiwan for diversity purposes, see Smith v. Sperling, 354 U.S. 91, 93 n.1 (1957) (noting, if plaintiff dies during suit, diversity is measured by her citizenship), and Defendants are completely diverse from Plaintiff as they are either D.C., Delaware, or Virginia citizens. See SAC, ¶ 22. The purported absentees, by contrast, are: (1) P.C. Lee (Y.C.'s Third Family partner) and (2) the Grantors of New Mighty Trust, which are three British Virgin Islands companies. See Opp. at 30, 36. Because joining these parties would purportedly "destroy[] diversity" jurisdiction, Defendants ask that the Court wield its discretion and dismiss the case as lacking necessary and indispensable parties. Id.

Before separately considering whether the absence of P.C. Lee or the Grantors warrants this drastic remedy, the Court first sets out the relevant required-joinder principles.

a. Dismissal under Rules 12(b)(7) & 19

Rule 12(b)(7) provides that a complaint may be dismissed for "failure to join a party under Rule 19." Courts are generally reluctant to grant Rule 12(b)(7) motions, and "dismissal is warranted only when the defect is serious." 5C Wright & Miller, § 1359. While "the court must accept the complaint's allegations as true," it "may also consider matters outside the pleadings" in ruling on such a motion. Ali v. Carnegie Inst. of Wash., 306 F.R.D. 20, 25 (D.D.C. 2014); see Direct Supply, Inc. v. Specialty Hosps. of Am., LLC, 878 F. Supp. 2d 13, 23 (D.D.C. 2012).

Rule 19, in turn, "establishes a two-step procedure for determining whether an action must be dismissed because of the absence of a party needed for a just adjudication." Cherokee Nation of Okla. v. Babbitt, 117 F.3d 1489, 1495-96 (D.C. Cir. 1997); see Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1351 (D.C. Cir. 1996) (labeling Rule 19(a) and (b) as

"necessary" and "indispensable" prongs); see also W. Md. Ry. Co. v. Harbor Ins. Co., 910 F.2d 960, 961 (D.C. Cir. 1990) (Thomas, J.) (framing inquiry, alternatively, as three questions).

First, Rule 19(a)(1) makes joinder of absent parties "necessary" if:

> (A)    in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B)    that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i)    as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii)    leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

As Defendants do not contend that "complete relief" is impossible, the focus is on whether P.C. Lee's or the Grantors' interests might be impaired in their absence or whether an existing party might endure a substantial risk of inconsistent obligations. See Opp. at 30-36.

Second, the Court examines whether those absent parties are "indispensable." This inquiry begins by asking if the necessary but absent party cannot in fact be added — for instance, if joinder would destroy diversity. See, e.g., Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 108 (1968). If joinder of a necessary party is impossible, then "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In other words, the Court can continue without the absentees or dismiss the case as a whole as lacking the necessary-and-indispensable parties. In weighing these options, the Court considers, *inter alia*:

> (1)    the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2)    the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures;

(3)     whether a judgment rendered in the person's absence would be adequate; and

(4)     whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Id.  "The decision whether to dismiss (*i.e.*, the decision whether the person missing is 'indispensable') must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests."  Provident Tradesmens Bank, 390 U.S. at 118-19.

b.  P.C. Lee

Defendants first argue that the absence of P.C. Lee, the Third Family matriarch, requires dismissal.  See Opp. at 31.  Some further exposition is helpful here.  Despite the SAC's allegations that Yueh-Lan was Y.C.'s sole legal spouse, see SAC, ¶¶ 25-27, Defendants contend that the High Court of Taiwan in 2015 confirmed that P.C. Lee was a lawful wife under Taiwanese law.  See ECF No. 38-4 (Declaration of Pao Chu Lee), Exh. A (Civil Judgment of High Court of Taiwan) at 2 ("Pao-chu LEE is hereby confirmed to be the living spouse of Yung-Ching Wang.").  Because this action "seek[s] to recover the property purportedly transferred to Defendants from the Marital Estate," SAC, ¶ 2, Defendants assert that P.C. Lee, too, is entitled to her marital share.  Her joinder, however — presumably as a plaintiff (although Defendants do not so specify) — would allegedly be impossible as she was a dual American-Taiwanese citizen domiciled in Taiwan when the case commenced, rendering her "stateless" for diversity purposes and unable to bring suit here.  See Opp. at 34; see also Core VCT Plc v. Hensley, 59 F. Supp. 3d 123, 125 (D.D.C. 2014) (holding "stateless" person "cannot sue or be sued in federal court on the basis of diversity").  As she is nonetheless necessary, Defendants ask the Court to find that she is indispensable and thus dismiss the case instead.

The Court finds no reason to do so. Even if P.C. Lee is a lawful wife under Taiwanese law, dismissal does not necessarily follow.

First, looking at the two Rule 19(a)(1)(B) prongs, Defendants have not carried their burden to show that P.C. Lee's share of the marital estate is in jeopardy. See Fed. R. Civ. P. 19(a)(1)(B)(i). Courts do not always require all heirs to participate in actions to recover estate property. In Jiménez v. Rodríguez-Pagán, 597 F.3d 18 (1st Cir. 2010), for instance, the First Circuit considered whether absent non-diverse heirs needed to be added in a contract action to recover moneys owed to the decedent's estate. The Circuit explained that the absentees would be unnecessary where local Puerto Rican law held that "an individual participant in a community of property does not impair other participants' interests merely by asserting common legal rights to the property while the other participants are absent." Id. at 26 (collecting cases). Where an absent heir holds her own interest, too, another heir's suit would be "something of a free shot for the non-diverse heirs." Id. ("Success inures to their benefit while failure is costless."). It may very well be the case that the Executors' victory or loss would not result in P.C. Lee's forfeiting her own right to those sums. See, e.g., Sadler v. Sadler, 167 F.2d 1, 2 (9th Cir. 1948) ("That one or more [heirs] may have a trust declared in his or their favor as well as in favor of persons not parties does not make the absent persons indispensable or even necessary parties.").

Critically, Defendants present no argument that Taiwanese marital-property rights or causes of action are arranged in such a way that Yueh-Lan's loss would affect P.C. Lee's own legal interests in the marital estate. See, e.g., Morrison v. New Orleans Pub. Serv. Inc., 415 F.2d 419, 423 (5th Cir. 1969) (requiring joinder because Louisiana law "permits only a single lump-sum damage award" that "would deprive the absent children of a share in the recovery"). They also do not claim that Yueh-Lan's losing in a suit to vindicate her spousal rights would somehow

prevent P.C. Lee from bringing her <u>own</u> case later to seek her <u>own</u> marital share.  In the event the

Executors win, moreover, both sides agree that "litigation in Taiwan over P.C. Lee's spousal

rights would follow if [Plaintiffs] are awarded a judgment now 'for return of all of the property'

in P.C. Lee's absence."  Opp. at 32 (quoting Mot. at 25-26).  In other words, if Yueh-Lan's

Executors were to recover in this suit, Defendants acknowledge that P.C. Lee could seek her

share of the marital property in another forum.

The Court also dispenses with Defendants' fear that a judgment favorable to Plaintiffs

might be based on the faulty "premise that Yueh-Lan is the <u>sole spouse</u> entitled to the <u>entire</u>

<u>spousal share</u>," a holding that would "'conflict[]'" with P.C. Lee's marital rights.  <u>See</u> Opp. at 32

(emphases added) (quoting <u>Wach v. Byrne, Goldenberg & Hamilton, PLLC</u>, 910 F. Supp. 2d

162, 169 (D.D.C. 2012)); <u>see id.</u> ("[T]he Executors likely would cite any ruling on the basis that

Yueh-Lan was the sole wife favorably in the future . . . .").  Assuming that the Court had the

power to resolve Taiwanese marital rights definitively, the chances that its holding would

inadvertently sweep so broadly as to extinguish P.C. Lee's spousal rights are extremely remote.

As a practical matter, P.C. Lee has long been well aware of the litigation and is ably represented

by the same counsel as Defendants, who no doubt also have an interest in appropriately cabining

the Court's ultimate holding and preventing the entirety of the alleged marital property from

falling into Plaintiff Executors' hands.  <u>See</u> ECF No. 10-2, Exh. B; <u>Shu v. Wang</u>, No. 10-5302,

2016 WL 6080199 (D.N.J. Oct. 17, 2016) (listing counsel); <u>see also Altmann v. Republic of</u>

<u>Austria</u>, 317 F.3d 954, 971 (9th Cir. 2002) (finding joinder unnecessary where absentee was

"aware of the litigation"); <u>Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.</u>, 94 F.3d 1407,

1411-12 (10th Cir. 1996) (holding that "[i]f, as a practical matter, the interests of the absent

parties will be adequately represented, their interests will not be impaired").

Second, Defendants also present little reason to believe that they will be subject to duplicative or inconsistent obligations. See Fed. R. Civ. P. 19(a)(1)(B)(ii). The question here is whether P.C. Lee would later create a "substantial risk" that Defendants incur multiple liabilities. W. Md. Ry., 910 F.2d at 963. As mentioned, however, despite knowing about this action for over six years, P.C. Lee has made no attempt to intervene — indeed, Defendants presently only claim that the case should be dismissed, not that she actually seeks to participate. See ECF No. 10-2, Exh. B; Lee Decl., ¶ 8 (mentioning only that she is "prepared, should this Court decide not to dismiss this case," to vindicate her rights in Taiwan); see also Adams v. Bell, 711 F.2d 161, 197 (D.C. Cir. 1983) ("Nor can the [defendant] legitimately bemoan the threat of inconsistent obligations since it never attempted to foreclose that possibility by seeking to join [the absentees] in the . . . litigation."). She herself "question[s] that any of the alleged marital property that is the subject of this action is actually marital property that is subject under Taiwan law to a claim on behalf of Yueh-Lan." Lee Decl., ¶ 23; see 7 Wright & Miller, § 1610 (holding that "court's [diversity] jurisdiction also can be preserved" if absentee "disclaims any interest in the subject matter of the action"). Never mind the conflicts-of-interest and Taiwanese statute-of-limitations issues that might abound if P.C. Lee were actually to sue these Defendants. See Opp. at 33 (acknowledging that Plaintiffs raise timeliness questions). "In order to qualify as a necessary party under Rule 19(a), the possibility of being subject to multiple or inconsistent obligations must be real, and not a mere possibility." FDIC v. Bank of N.Y., 479 F. Supp. 2d 1, 12 (D.D.C. 2007) (quoting TRT Telecomm. Corp. v. W. Union Tel. Co., No. 87-2760, 1988 WL 19259, at *2 (D.D.C. 1988)). Here, the risk is speculative.

Even passing Rule 19(a), the Rule 19(b) factors also do not counsel dismissal. In considering those factors, the Court assumes that P.C. Lee is indeed necessary and that she

should still be treated as a "stateless" American-Taiwanese national domiciled in Taiwan (despite her relinquishing her American citizenship in 2013). <u>See</u> Lee Decl., ¶ 25. It also bears in mind that Rule 19(b) "calls for practically-oriented consideration of the competing interests at stake." <u>Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.</u>, 699 F.2d 1274, 1277 (D.C. Cir. 1983).

The factors again may be summarized as prejudice, remedy, adequacy, and the effects of dismissal. The first "overlaps considerably with the Rule 19(a) analysis," which points to little or no prejudice to P.C. Lee or existing parties. <u>Capitol Med. Ctr., LLC v. Amerigroup Md., Inc.</u>, 677 F. Supp. 2d 188, 194 n.9 (D.D.C. 2010) (quoting <u>Gardiner v. Virgin Islands Water & Power Auth.</u>, 145 F.3d 635, 641 n.4 (3rd Cir. 1998)). As to whether the remedy could accommodate P.C. Lee's spousal interest, Plaintiffs suggest that the judgment here could set aside "all or a portion of the award" based on the result of "any proceedings in Taiwan." Mot. at 26; <u>see</u> <u>Major v. Shaver</u>, 6 F.R.D. 207, 208-09 (D.D.C. 1946) (commenting, in case with absent heirs, that judgment could convey only a "one-fifth interest" in property). The adequacy consideration — whether dismissal would help avoid multiple litigation and settle the dispute as a whole — is a toss-up, as it appears practically inevitable that a billion-dollar, multinational intestacy dispute over the New Mighty Trust apparatus among three putative wives would spawn multiple lawsuits, whether this Court keeps the case alive or not. <u>See</u> <u>Republic of Philippines v. Pimentel</u>, 553 U.S. 851, 870 (2008). Finally, as discussed in Section III.A.1, *supra*, dismissal would leave Yueh-Lan's estate without legal recourse, as the limitations period has since run, and the Court does not see how subjecting an otherwise timely suit to that fate would be equitable.

Because P.C. Lee is neither necessary nor indispensable, the Court rejects Defendants' effort to obtain dismissal based on her absence.

c.   Grantors

The final extras Defendants wish to add to this cast are the Grantors (or, settlors) of New Mighty Trust.  See Opp. at 35.  Those Grantors originally held numerous assets — principally, shares of two of Y.C.'s companies — before transferring them into New Mighty Trust.  See SAC, ¶¶ 46-50.  Because the Grantors are British Virgin Islands citizens, adding these entities as defendants would defeat diversity (between them and the Executors, as both are foreign citizens) and lead to dismissal.  See Opp. at 36.

It is not clear, first, why prior owners of the disputed assets are required parties.  Whereas P.C. Lee claimed a spousal interest in the marital estate, Defendants fail to explain what live interest the Grantors maintain in property that is no longer theirs.  See Sax v. Sax, 294 F.2d 133, 136 (5th Cir. 1961) (holding absent trust settlor not required when his "position would not be changed nor his interest altered" by suit); Brownell v. Fid. Union Trust Co., 119 F. Supp. 755, 758 (D.N.J. 1954) (similar); see also Rawlings v. Nat'l Molasses Co., 394 F.2d 645, 647 (9th Cir. 1968) (holding, in patent context, that prior owner that had relinquished its rights was not necessary); E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., No. 00-8670, 2003 WL 22064257, at *4 (S.D.N.Y. Sept. 5, 2003) (finding unnecessary a party who "no longer has any interest").  Absent the Grantors' stake in New Mighty Trust, Defendants similarly cannot show how their participation would create inconsistent legal obligations.  See E-Z Bowz, 2003 WL 22064257, at *4 (holding that disinterested party would no longer have "right to sue").

Even if the Grantors were necessary, the Court would not dismiss the suit.  First, Defendants do not explain why the Court would not add the Grantors as additional plaintiffs as opposed to defendants — thus preserving diversity by keeping foreign citizens on the same side of the controversy.  See Fed. R. Civ. P. 19(a)(2) ("A person who refuses to join as a plaintiff may

be made either a defendant or, in a proper case, an involuntary plaintiff.").  Indeed, the Executors assert that the Grantors might assert some cause of action against Defendants to recover "the same [assets]" that Plaintiffs now seek.  See Opp. at 36 (quoting Wach, 910 F. Supp. 2d at 172).  Second, given the Grantors' rather distant relationship with this action, it is difficult to envision how any of the Rule 19(b) factors favor dismissal, especially if there is no prejudice at all and if the Grantors do not threaten future litigation.

The Court thus finds that Defendants' Rule 19 objections do not render the filing of the SAC a futile endeavor.

### 3.  Forum non Conveniens

Defendants next ask this Court to exercise its "sound discretion" to dismiss the case because this forum is inconvenient to the litigation.  See Opp. at 37-43.  After considering their reasons on this score, however, the Court finds them currently wanting.

Defendants' primary argument in favor of dismissal on *forum non conveniens* grounds relies on the fact that Clearbridge, a D.C. limited-liability corporation, has delegated its trustee duties to Trust Managers who are located in Taiwan.  Id. at 37.  Because Winston and Plaintiff Executors are also Taiwanese residents, Defendants contend that the island is plainly an adequate alternative forum for the litigation.  Id. at 38.  They further point out that a similar action brought in New Jersey by Plaintiffs was already dismissed on FNC grounds, and private and public factors counsel in favor of litigating this dispute in Taiwan because the case revolves around the application of Taiwanese spousal law and most of the evidence is located there.  Id. at 38-40.

Defendants, however, overlook a key variable in asking for an FNC dismissal.  "Courts apply a two-step test to determine whether a case may be dismissed under the *forum non conveniens* doctrine when the only alternative forum is in a foreign country."  Fireman's Fund

Ins. Co. v. Thyssen Min. Const. of Canada, Ltd., 703 F.3d 488, 495 (10th Cir. 2012). The Court here need look only to the first step, at which it must verify that there is "an adequate alternative forum in which the defendant is amenable to process." Id. (quoting Gschwind v. Cessna Aircraft Co., 161 F.3d 602, 605 (10th Cir. 1998)). If there is not, the *forum non conveniens* doctrine is inapplicable. Id. Here, Defendants effectively concede that they are not amenable to process in Taiwan, but agree in affidavits to submit themselves to its jurisdiction anyway. See Opp. at 38. At least on that Taiwanese personal-jurisdiction issue, such a concession is sufficient to overcome any problems.

But Defendants have not carried their burden to prove that an alternative forum is actually, not just theoretically, available. Fireman's Fund, 703 F.3d at 495-96 (establishing defendants bear this burden). In their Reply, Plaintiff Executors contend that the statute of limitations has now run on their claims. See Reply at 10, 17. Defendants fail to adequately respond to this potential problem by fully waiving their right to a limitations defense in Taiwan. See ECF No. 42 (Sur-Reply) at 8-9. In fact, they implicitly argue, as discussed more fully below, that the statute of limitations has indeed run on many of Plaintiff Executors' claims, see Opp. at 19, and generally agree in their declarations to waive in Taiwan any new defenses that they could not have asserted here. See Susan Wang Decl., ¶ 2; William Wong, ¶ 8; ECF No. 38-31 (Declaration of Donald D. Kozusko), ¶ 12. As far as this Court can tell, they still remain intent on claiming in Taiwan that the limitations period has since run while this case was being litigated. See Susan Wang Decl., ¶ 2; William Wong, ¶ 8; Kozusko Decl., ¶ 12. The Court remains unsure of the scope of their willingness to waive such defenses based on the vague reservations in their current affidavits.

This alone dooms their *forum non conveniens* argument for now.  See Fireman's Fund, 703 F.3d at 496 (rejecting effort by Defendants to ask for FNC dismissal while also arguing statute of limitations had run); Carijano v. Occidental Petroleum Corp., 643 F.3d 1216, 1235 (9th Cir. 2011) ("The danger that the statute of limitations might serve to bar an action is one of the primary reasons for the limitation on the court's discretion with respect to the application of the doctrine of *forum non conveniens*.") (quoting Paper Operations Consultants Int'l, Ltd. v. S.S. Hong Kong Amber, 513 F.2d 667, 672-73 (9th Cir. 1975)); Chang v. Baxter Healthcare Corp., 599 F.3d 728, 736 (7th Cir. 2010) ("[I]f the plaintiff's suit would be time-barred in the alternative forum, his remedy there is inadequate[,] . . . . and in such a case dismissal on grounds of *forum non conveniens* should be denied unless the defendant agrees to waive the statute of limitations in that forum . . . ."); Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV, 569 F.3d 189, 202 (4th Cir. 2009) ("[I]f the statute of limitations has expired in the alternative forum, the forum is not available, and the motion to dismiss based on *forum non conveniens* would not be appropriate."); Norex Petrol. Ltd. v. Access Indus., Inc., 416 F.3d 146, 159 (2d Cir. 2005) (same); Kontoulas v. A.H. Robins Co., Inc., 745 F.2d 312, 316 (4th Cir. 1984) (same).

The Court will therefore deny a dismissal of this case on FNC grounds at this point.  It is not clear that the Taiwanese courts would permit this litigation to proceed there, nor is it plain that Defendants would not assert that the course of this case has given rise to new limitations defenses.  See Stromberg v. Marriott Int'l, Inc., 256 Fed. Appx. 359, 360 (D.C. Cir. 2007) (holding district court did not abuse its discretion in finding Mexico an adequate forum because "[a]ppellees agreed to accept service in Mexico and waived any statute of limitations defenses").

If Defendants will waive, they can renew their request for an FNC dismissal in a future motion that fully articulates such a position.

### 4. *Failure to State a Claim*

Defendants' final futility argument is that the SAC should not be filed because it fails to state a claim. In this regard, too, Defendants overreach at this stage in the litigation. Their arguments either come up short or are more properly reserved for future briefing.

Their first quarrel with the well-drafted, 35-page SAC is that it allegedly does not meet the standard for information-and-belief pleading or contains fatally implausible allegations. Defendants point in particular to the SAC's assertion that Yueh-Lan was the "sole lawful spouse" of Y.C. who was "shorted" in her marital property upon his death, that Y.C. held a beneficial ownership of the shares eventually transferred to New Mighty Trust, and that Y.C. did so to reduce Yueh-Lan's alleged spousal share. See Opp. at 24. In addition, they take issue with the SAC's statement that the value of Y.C.'s estate was greater than that reflected in the amount that was paid to Yueh-Lan as her spousal share. Id. at 25.

This sort of factual nitpicking, though, is misplaced in an opposition to a motion to amend, and probably even in a future motion to dismiss. Whether or not Plaintiff Executors' contentions are eventually borne out by the evidence, they are not facially implausible by any stretch of the imagination, nor are they unsupported — as Defendants contend — by appropriate factual allegations in the SAC. All that is required for a claim to be facially plausible is that the SAC provide "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

On this score, even Defendants recognize that at least one Taiwanese court arguably appears to have held it accurate that Yueh-Lan was indeed the sole "legal" spouse. See Opp. at

24. Even had it not, the fact that P.C. Lee might also be a spouse would not make implausible Yueh-Lan's claim to her fair spousal portion from Defendants' coffers; at most, it would merely reduce her remedy as she would have to share her recovery with any other wives. The SAC's factual rendition in this regard is thus plausible. Likewise, the SAC adequately supports its allegation that the amount Yueh-Lan received in the Taiwanese probate matter was not in line with the estimation of Y.C.'s wealth prior to his death by pointing to a credible 2006 publication on his net worth. <u>See</u> SAC, ¶ 18. In short, none of these factual averments is unsupported or implausible, and, even if they were, their absence alone would not be fatal to the SAC.

This sort of largely factual dispute, once again, is not something appropriately resolved in response to a motion seeking leave to amend a complaint. <u>S.S. Silberblatt, Inc. v. E. Harlem Pilot Block Bldg. 1 Hous. Dev. Fund Co.</u>, 608 F.2d 28, 42 (2d Cir. 1979) (refusing to reach factual dispute allegedly supported by conclusive documentation in considering motion to amend and noting defendants suffered little prejudice from waiting until summary judgment to present their evidence). Rather, if Defendants truly believe the SAC can be so impeached, they may devote more effort to pinning down the details of the reasons why in a later motion. The Court, however, sees little potential benefit in doing so itself now.

A similar fate befalls Defendants' next set of salvos, which focuses on the elements of the various Taiwanese legal claims asserted in the SAC, arguing that each count fails to assert some required element to state a claim. <u>See</u> Opp. at 26-28. For instance, they argue that one count is defective because the Taiwanese law at issue provides relief only against the disposing spouse, rather than third parties like Defendants. <u>Id.</u> at 26. They point, in support, to a lengthy expert declaration provided by a Taiwanese law professor. <u>Id.</u> Not surprisingly, Plaintiff Executors' similarly credentialed expert on Taiwanese law urges that quite the opposite is true in his own

declaration. See Reply at 5. Neither party, however, supports these conclusions in their briefing. This sort of difficult legal dispute is simply not ripe for resolution based on such passing reference in an opposition to a motion to amend; yet again, it is better reserved for more comprehensive and refined briefing in a future motion. See 6 Wright & Miller, § 1487 ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper.") (collecting cases).

Finally, the Court has some difficulty following many of Defendants' other objections that fall under this heading. An illustrative example is the contention that Count Two fails to support a plausible inference that Y.C. transferred this marital property with the specific intent to reduce Yueh-Lan's spousal share because the SAC only alleges that Y.C. "directed," "caused" and/or "permitted" transfers that were intended to reduce Yueh-Lan's share. See Opp. at 26. If Defendant does decide to pursue dismissal in the future, such cavils will require further explication to prevail.

Because the remaining attacks on the SAC's D.C.-law counts are dependent on the problematic arguments above, the Court concludes that Defendants have not shown that the SAC is so infirm that filing is not warranted.

B. Bad Faith

Defendants next shift gears and argue that leave to amend should be denied because Plaintiff Executors are proceeding in bad faith. See Opp. at 21-23 (citing Foman, 371 U.S. at 182). As evidence of this, Defendants first point to the SAC's continued assertion of claims against New Mighty Trust, which they say contradicts the Executors' argument before the D.C. Circuit on appeal that the Trust could not sue or be sued. Id. They also contend that the Executors are both misrepresenting the D.C. Circuit's decision in this case by misconstruing the

substitution motion as effective on remand and making allegations contrary to those put forth in the First Amended Complaint.  The Court does not concur.

As to Defendants' first two arguments, the Court agrees with Plaintiff Executors that the SAC does nothing more than restate the D.C. Circuit's language that New Mighty Trust is a "nominal" party to this litigation.  See Wang, 843 F.3d at 496; SAC, ¶ 22 ("Defendant New Mighty U.S. Trust is a nominal party whose citizenship depends on the citizenship of its trustee, Defendant Clearbridge.").  To the extent that the Trust should now be dismissed as a result, that is a separate legal issue.  The Executors are not acting in bad faith simply by following the language used in the D.C. Circuit's own opinion, even if the scope of that wording or holding contradicts the full extent of the arguments pressed by Plaintiffs on appeal.  Likewise, the SAC's notation that the same opinion granted their substitution motion is accurate, as this Court explained *supra* in section III.A.1.  Even if it were not, it certainly was at least an arguable stance to take and thus not evidence of bad faith.

Last, but not least, the Court finds no reasoned basis to conclude that the SAC's refined theories of its claims are improper.  Although Plaintiff's First Amended Complaint indicated that the financial transfers to Defendants had been made without Y.C.'s knowledge, discovery in a separate action in Bermuda has since uncovered evidence that Y.C. may in fact have been aware of the shares being placed in the Trust prior to his death.  See ECF No. 39-2 (Declaration by Daniel Weinberger), ¶¶ 46-61.  Not only that, but Defendant Clearbridge is well aware that its client and a member of its Board, Susan Wang, attested to his knowledge in a sworn affidavit based on her personal conversations with her father.  Id., ¶ 46; Wang Decl., ¶ 2.  Defendants thus appear to do the same thing they accuse Plaintiff Executors of — namely, seeking to say one thing in one forum, while alleging the opposite in another.  See, e.g., Opp. at 25 (asserting no

basis for "rote recitation" in SAC that Y.C. knew of the transfer). The Court will not reward

such behavior on Defendants' part. Rather, Plaintiff Executors are free to pursue their own

refined theory of Yueh-Lan's original claims, irrespective of the theories that Winston might

choose to pursue in his own litigation in another forum.

One last point bears mentioning here. The new version of the facts added to the SAC

about Y.C.'s knowledge of the transfers is an understandable revision at this point in the

litigation. Indeed, these are just the sort of recently discovered facts that courts allow plaintiffs

to add to an amended complaint. Compare Wimm v. Jack Eckerd Corp., 3 F.3d 137, 141-42 (5th

Cir. 1993) (finding of bad faith permissible where relevant facts were within plaintiffs'

knowledge from outset of litigation), with Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir. 1999)

(holding "a plaintiff is not bound by the legal theory on which he or she originally relied")

(citation omitted); see also Hourani v. Mirtchev, 282 F.R.D. 278, 279 (D.D.C. 2012) (holding no

bad faith imputed where plaintiffs simply revise theory of claims). The Executors, moreover,

moved swiftly to make these changes at the earliest possible opportunity, and the Court sees no

prejudice to Defendants in letting Plaintiffs now proceed on their improved knowledge of the

evidence. After all, the relevant facts were clearly well known to Defendants, if not Plaintiffs,

from the start.

As a result, the Court will deny Defendants' objections to the SAC to the extent that they

rely on allegations of bad faith.

C. Relation Back under Rule 15(c)

Having determined that the SAC should be filed over the objections raised by

Defendants, one final issue flagged by both parties must also be resolved: whether that pleading

should now relate back to the filing date of the original Complaint. See Hartley v. Wilfert, 931

F. Supp. 2d 230, 233 (D.D.C. 2013) ("The appropriate posture for the Court to address [a] relation-back question is in connection with a motion to amend the complaint.").  While Rule 15(a) governs an amendment to a pleading, Rule 15(c) controls whether such "an amendment to a pleading relates back to the date of the original pleading."  In fact, because the statute of limitations on Plaintiff Executors' claims has "long since passed," Mot. at 26, there would be little point in allowing this case to proceed if the SAC does not relate back to that first timely pleading.

The Court easily concludes that relation back to the filing of the original Complaint on October 14, 2010, is appropriate here.  "Rule 15(c) . . . governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations."  <u>Krupski v. Costa Crociere S.p.A.</u>, 560 U.S. 538, 541 (2010).  Both sides agree that Rule 15(c)(1)(C) provides that, when "the amendment changes the party or the naming of the party against whom a claim is asserted," relation back is appropriate only if: 1) "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading"; and 2) "the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

The careful reader will notice that this Rule does not quite fit this case.  While Rule 15(c) does not expressly mention what is required when substitutions are made to <u>plaintiffs</u>, rather than <u>defendants</u>, the Advisory Committee Notes to its Amendment in 1966 states:

> The relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is

> generally easier. Again the chief consideration of policy is that of the statute of limitations, and the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs.

Some federal courts thus apply the same factors to amendments substituting plaintiffs as this rule prescribes for defendants, asking whether "'the defendant knew or should have known that it would be called on to defend against claims asserted by the newly-added plaintiff,' unless 'the defendant would be unfairly prejudiced in maintaining a defense against the newly-added plaintiff.'" Plubell v. Merck & Co., 434 F.3d 1070, 1072 (8th Cir. 2006) (quoting Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1132 (11th Cir. 2004)) (considering previously numbered version of Rule 15(c)). Other courts, by contrast, craft their own similar rule "based on considerations of notice and prejudice to determine whether an amendment regarding plaintiffs relates back." Cliff, 363 F.3d at 1131.

This slight difference matters not for this case. As should be obvious, relation back under either standard is unlikely to be denied in a situation such as the one presented here —*i.e.*, where Executors merely step into the shoes of a deceased Plaintiff under Rule 25 and then must ratify the action under Rule 17 because of some potential defect with the initial surrogate's capacity to sue. The Court, in fact, is skeptical that these facts even raise concerns with the relation-back principle set out in Rule 15(c)(1)(B) — instead of the more general one provided by Rule 15(c)(1)(A), which looks only at the consistency in the claims — because the Executors step wholly into the shoes of Yueh-Lan.

Out of an abundance of caution, however, the Court will engage in a full analysis. As to the first consideration, the SAC asserts almost exactly the same causes of action found in the original Complaint. All of its claims arise out of the same conduct that has been at the heart of this litigation from the start — namely, whether transfers of Y.C.'s assets made to Defendants in

the five years prior to his death denied Yueh-Lan her forced spousal share under Taiwanese law. See ECF No. 38-2 (Red-Line Comparison of original Complaint and SAC).  Defendants also knew of these claims from the outset, and Yueh-Lan's Executors step into precisely the same shoes that she once wore.  Defendants thus never had any right of "repose" from these claims inasmuch as they have been defending against them this whole time.  Rendall-Speranza v. Nassim, 107 F.3d 913, 917-18 (D.C. Cir. 1997) (explaining right of repose arises where defendant did not know it would need to defend against claims).  Likewise, Defendants suffer no prejudice from the small refinements in the SAC, as they will continue to maintain the same defenses that they have asserted all along to these claims.

No discovery, in fact, has even taken place yet in this litigation, and any alteration in the factual theories from the original Complaint seem largely due to evidence Defendants turned over in similar litigation elsewhere.  Plaintiff Executors' need to revise their factual rendition to reflect this newly revealed evidence, then, should hardly come as surprise to Defendants, who had such information in their possession this whole time.  If anything, they got a head start on what would surely have been a necessary amendment to the First Amended Complaint after discovery in this case divulged those same facts.

The Court thus readily concludes that the SAC relates back to the filing of the original Complaint in 2010.

D.  Dismissal of New Mighty Foundation & New Mighty Trust

Having disposed of the major arguments asserted by Defendants against the SAC, a few stragglers remain.  Defendants first provide two brief reasons that New Mighty Foundation (the beneficiary) should be dismissed — *viz.*, because it was not properly served and because the SAC fails to state a claim against it.  Defendants then contend that New Mighty Trust should also

be dismissed from the suit under the principle of judicial estoppel.  The Court rejects each of these contentions in turn.

### 1. *New Mighty Foundation's Service of Process*

Defendants' first position is that one member of their ranks, New Mighty Foundation, was improperly served and thus should be dismissed from the action.  See Opp. at 43.  In response to such a motion, "[t]he party on whose behalf service is made has the burden of establishing its validity when challenged; to do so, he must demonstrate that the procedure employed satisfied the requirements of the relevant portions of Rule 4 [of the Federal Rules of Civil Procedure] and any other applicable provision of law."  Light v. Wolf, 816 F.2d 746, 751 (D.C. Cir. 1987); see Fed. R. Civ. P. 12(b)(5).  "A signed return of service," however, "constitutes prima facie evidence of valid service, which can be overcome only by strong and convincing evidence."  Roland v. Branch Banking & Tr. Corp., 149 F. Supp. 3d 61, 65 (D.D.C. 2015) (quoting Gates v. Syrian Arab Republic, 646 F. Supp. 2d 79, 85-86 (D.D.C. 2009)); see Pollard v. District of Columbia, 285 F.R.D. 125, 127-28 (D.D.C. 2012) (applying rebuttable presumption where defendants challenged that person served was authorized agent); Philippe v. Wallace, 714 F. Supp. 2d 219, 221 (D. Mass. 2010) (similar).  Defendants, at least at this juncture, have not supplied such evidence.

Rule 4(h) provides, in part, that a plaintiff may serve a corporation by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  Fed. R. Civ. P. 4(e)(1) (incorporated by reference in Fed. R. Civ. P. 4(h)(1)(A)).  District law states, in turn:

> In an action against a foreign corporation doing business in the District, process may be served on the agent of the corporation or person conducting its business, or, when he is absent and can not be found, by leaving a copy at the principal place of business in the District, or, where

> there is no such place of business, by leaving a copy at the place of business or residence of the agent in the District, and that service is effectual to bring the corporation before the court.

D.C. Code § 13-334(a); see Gonzalez v. Internacional De Elevadores, S.A., 891 A.2d 227, 233 (D.C. 2006) (construing § 13-334 as relating to both "service of process" and "personal jurisdiction"). There is no dispute here that the Foundation is a Delaware corporation with its principal place of business located in Washington, D.C. See Weinberger Decl., Exh. K (NMF Certificate of Incorporation); id., Exh. L (NMF Form 990-PF). Defendants allege, however, that the process server did not nail down the right person.

The Executors, however, have at least made out a *prima facie* case that the individual served — John C. Wannen — was a "person conducting [New Mighty Foundation's] business." Mot. at 27. Defendants New Mighty Foundation, New Mighty Trust, and Clearbridge all share the same address (down to the office-suite number) in Washington. See ECF No. 3 (Affidavits of Service) at 4, 6, 8. On February 9, 2011, Plaintiffs' process server headed over to that office and left copies of the Summons and Complaint with Wannen, who appears to be the registered agent of Clearbridge, which acts as trustee for the Trust. Id. at 8. At that time, Wannen also accepted service on behalf of the Foundation. Id. at 4. Plaintiffs then filed affidavits describing these efforts. See Roland, 149 F. Supp. 3d at 65.

Defendants do not offer enough evidence to convince the Court that this service was faulty. They only submit a declaration that states that Wannen was not a "registered agent," "officer," or "managing or general agent" of the Foundation, or an agent otherwise "authorized to receive service of process on behalf of NMF." ECF No. 38-13 (Declaration of Stephen K. Vetter), ¶ 5. Nowhere, however, does the declaration actually pin down his role — that is, Defendants are silent as to his actual affiliation with the Foundation and whether he conducts any of its business. Rather, from what the Court can tell, Wannen and the Foundation do not occupy

entirely separate spheres.  The Foundation's tax forms bear his signature as the preparer, while his tax-preparation company shares the same exact address as Defendants.  See NMF Form 990-PF at 13; see also Kozusko Decl., ¶ 4 (mentioning also that Wannen holds a 50% interest in Clearbridge).

Absent evidence that clarifies Wannen's relationship with New Mighty Foundation, the Court will not require Plaintiffs to engage in a further "cat-and-mouse game" with Defendants' various entities and their agents.  Ali v. Mid-Atl. Settlement Servs., Inc., 233 F.R.D. 32, 36 (D.D.C. 2006).  Their bid to dismiss based on service-of-process concerns thus founders.

## 2. *Statement of Claim Against New Mighty Foundation*

Defendants next point out that the SAC's only allegations against the Foundation are that it received "gratuitous distributions" of cash from the Trust that were "authorized and/or directed" by Clearbridge.  See Opp. at 44 (citing SAC, ¶ 57).  Yet this is not accurate.  The reference to the Foundation in the SAC incorporates the allegations made throughout the pleading that these transfers were done at the direction of Y.C. in the five years prior to his death to deny Yueh-Lan her fair marital share.  See SAC, ¶ 57.

To the extent that Defendants also mean to challenge the pleading under Federal Rule of Civil Procedure 8, as indicated through a single supportive citation in their pleading, the Court finds their contention wanting.  See Opp. at 44-45 (citing Toumazou v. Turkish Rep. of N. Cyprus, 71 F. Supp. 3d 7, 21 (D.D.C. 2014)).  Rule 8 prevents plaintiffs from "lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." Toumazou, 71 F. Supp. 3d 7, 21 (D.D.C. 2014).  But, as should be clear, the detailed SAC breaks out the individual Defendants where appropriate in order to specify the conduct each is accused of committing in denying Yueh-Lan her fair marital share.  Indeed, the very part of the pleading

Defendants point to in support of their Rule 8 argument, as explained above, represents just such an effort to tease out a distinction, while still incorporating by reference other more general allegations lodged against all Defendants.

The Court will, accordingly, deny Defendants' effort to dismiss the Foundation from the action as this point.

### 3. *Judicial Estoppel*

In their final shot, Defendants posit that the SAC's counts against the Trust should be dismissed based on representations that Plaintiff Executors made before the D.C. Circuit about the Trust's status as a "nominal party" to this litigation. See Opp. at 45.

As previously explained, though, the Executors have merely restated in the SAC that the Trust is a nominal party to this suit. This is consistent with what they argued on appeal on the jurisdictional question and with what the Circuit adopted in its opinion on that issue. Wang, 843 F.3d at 496 ("To the extent New Mighty itself is a named party to the lawsuit, it is only a nominal one.") (citing Navarro Savings Ass'n v. Lee, 446 U.S. 458, 461 (1980) ("[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy.")). The Executors are not prevented from a course of action that complies with the Circuit's holding on this score. Nothing in that opinion, moreover, explicitly indicates that the Trust must now be dismissed as a result. And, because Defendants had filed a petitition for writ of certoriari at the Supreme Court that challenged that Circuit decision when the SAC was proposed, the Court finds compelling the Executors' explanation that they had wished to preserve the status quo pending the outcome of that diversity-jurisdiction dispute, which hinged on the citizenship of the pending parties. See Weinberger Decl., ¶ 11.

The Court, in short, finds no indication that Plaintiff Executors are trying to get away with the "improper use of judicial machinery" in this case.  See Konstantinidis v. Chen, 626 F.2d 933, 938 (D.C. Cir. 1980) (describing purpose of judicial estoppel).  Judicial estoppel, moreover, "is an equitable doctrine invoked by a court at its discretion."  New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990) (quotation omitted).  The Court declines to call upon it here.

If Defendants nevertheless wish to pursue the dismissal of the Trust based on the legal implications of the Circuit's decision, they are free to do so in a future motion.  The Court reserves judgment on that question for now.

## IV.      Conclusion

For the reasons explained above, the Court concludes that no barriers exist to the filing of Plaintiff Executors' Second Amended Complaint.  The Court thus grants their Motion in full.  A contemporaneous Order so stating, and amending the caption of the case, shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  August 15, 2017