## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CHIN-TEN HSU**, *et al.*, as Executors of the will of Yueh-Lan Wang, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 10-1743 (JEB)** |
| **NEW MIGHTY U.S. TRUST**, *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Having watched this case wend its way through many twists and turns, the Court must now determine whether it in fact belongs across the Pacific. Bringing a Motion to Dismiss for *forum non conveniens,* Defendants contend that Taiwan, not the District of Columbia, is the appropriate jurisdiction in which to resolve this dispute over the estate of plastics magnate Yung-Ching (Y.C.) Wang. At the time of his death in 2008, Y.C. was worth an estimated $6.8 billion – making him, according to Forbes, the 178th wealthiest individual in the world. Although he amassed quite a fortune, he lacked one crucial asset: a last will and testament. In the years since his passing, the distribution of Y.C.'s estate has thus become a significant source of contention among his many putative heirs. These claimants, to further complicate matters, belong to three separate "families" derived from Y.C.'s relationships with different women.

Nearly eight years ago, Winston Wen-Young Wong, Y.C.'s son from his Second Family, kicked off this modern-day <u>Jarndyce v. Jarndyce</u> when he filed suit on behalf of the First Family, which consists solely of Yueh-Lan Wang, the woman to whom Y.C. had been married since 1935. Winston, whom Yueh-Lan named as her lone heir, alleged that her marital share of Y.C.'s

estate had been "shorted" by unlawful transfers of funds prior to Y.C.'s death. Asserting that

Defendants – a D.C.-based trust and its affiliates – held a portion of these assets, Winston sought

to reclaim Yueh-Lan's full disbursement from Y.C.'s estate. After a series of intervening events

– including Yueh-Lan's death and the subsequent appointment of Executor-Plaintiffs in Taiwan

– and procedural detours, the case returned to this Court's docket last year. This past August, the

Court allowed Plaintiffs to file a Second Amended Complaint, and today it turns to Defendants'

Motion to Dismiss that Complaint. Finding that Taiwan is an adequate alternative forum and

that the relevant interests weigh strongly in favor of dismissal, the Court will grant their Motion

under the doctrine of *forum non conveniens*. It will, however, condition that grant upon

Defendants' waiver of statue-of-limitations defenses and potential additional constraints.

## I.    Background

### A.    Factual and Procedural History

As the lengthy and colorful history of this case is set forth in full in the Court's prior

Opinions, it need not repeat the complete narrative here. See Yueh-Lan Wang ex rel. Wong v.

New Mighty U.S. Tr. (Wang I), 841 F. Supp. 2d 198, 200 (D.D.C. 2012), rev'd sub nom. Wang

by & through Wong v. New Mighty U.S. Tr. (Wang Appellate Decision), 843 F.3d 487 (D.C.

Cir. 2016); Yueh-Lan Wang by & through Winston Wen-Young Wong v. New Mighty U.S. Tr.

(Wang II), 322 F.R.D. 11, 15 (D.D.C. 2017). The Court also frequently refers to participants by

their first name to avoid confusion and not out of any disrespect.

To recap briefly: this dispute centers on the disbursement of the estate of Y.C. Wang.

When Y.C. died in 2008, his plastics empire made him the second-wealthiest individual in

Taiwan. See Second Am. Compl, ¶ 18. Yet he had no will – an unfortunate oversight given that

he left behind nine children and three putative wives. This suit is brought on behalf of the estate

of the first of those partners, Yueh-Lan.  Married to Y.C. for 72 years, Yueh-Lan witnessed her husband's meteoric rise, including his founding of Formosa Plastic Group, which is "one of Taiwan's biggest and most profitable manufacturing conglomerates with annual sales of over $60 billion and operations in five countries." Id., ¶ 17.  She, as the "First Family," also witnessed his fathering children with two other women — Wang Yang Chiao and Pao Chu (P.C.) Lee. Id., ¶¶ 25-26.  While Y.C. and Yueh-Lan had no offspring, his relationship with Wang Yang Chiao resulted in the birth of five children known as the "Second Family," and P.C. Lee produced another four known as the "Third Family." Id., ¶ 26.

As any reader of Bleak House could have been predicted, the matter of Y.C.'s estate and its disbursement has led to some discord among his three families and their various children. Related suits have been brought in Taiwan, Bermuda, New Jersey, Hong Kong, and, of course, before this Court.  See ECF 38-4 (discussing Taiwan action); SAC, ¶ 64 (discussing Bermuda action); Shu v. Wang (DNJ Action), 2016 WL 6080199, at *1 (D.N.J. Oct. 17, 2016); ECF 49-21, ¶ 60 (discussing Hong Kong Action).  This case was first filed on October 14, 2010, by Dr. Winston Wen-Young Wong (Winston), a member of the Second Family and Y.C.'s eldest son, who asserted that he was acting through a valid power-of-attorney in bringing the suit on Yueh-Lan's behalf.  See ECF No. 1 (Complaint).  Although Winston is a Second Family member, Yueh-Lan named him as her sole heir, and he thus has a significant interest in the restoration of any assets to her estate.  See SAC, ¶ 14.  Defendants are a trust formed under the laws of the District of Columbia — New Mighty U.S. Trust — as well as its trustee, Clearbridge, LLC, and a beneficiary of the trust, New Mighty Foundation.  See SAC, ¶¶ 19-21.  Both the Foundation and Clearbridge, it should be noted, are linked to children of the Third Family.  See Wang II, 322 F.R.D. at 16.

Yueh-Lan's claims sought the return of property transferred by Y.C. to Defendants during the five years prior to his death, on the ground that Taiwanese and D.C. law would allegedly entitle her to recover these assets as part of her 50% spousal share. Wang I, 841 F. Supp. 2d at 200. Although Yueh-Lan received a portion of Y.C.'s $1.7 billion "Taiwan Assets" after his death, she asserted that this sum "represent[ed] only a fraction of Y.C.'s" holdings, and that the full Marital Assets were in fact "greater than double the value of [that] property." SAC, ¶¶ 5, 34-36; see ECF No. 47-2 (Decl. of Andrew Muscato), ¶ 20 (asserting that Yueh-Lan received "hundreds of millions of dollars" from Y.C.'s Taiwan Assets).

Defendants initially moved to dismiss these claims on a variety of grounds, and this Court granted that entreaty after finding a lack of diversity jurisdiction. Wang I, 841 F. Supp. 2d at 208; see Wang Appellate Decision, 843 F.3d at 488. Plaintiff appealed this ruling, but Yueh-Lan died shortly thereafter. Although she had named Winston as her sole heir, she had failed to appoint an executor. See Wang Appellate Decision, 843 F.3d at 489; SAC, ¶ 14. The D.C. Circuit thus held the case in abeyance while the Taiwanese courts determined who should act in that role. Eventually, Chen-Teh Shu, Dong-Xung Dai, and Robert Shi were chosen by the courts, and the three men moved to substitute themselves as Yueh-Lan's personal representatives under the appropriate Federal Rule of Appellate Procedure while the case was still pending at the D.C. Circuit. Id. at 489. Before ruling on that motion, though, the D.C. Circuit again stayed the case after the Supreme Court granted certiorari in Americold Realty Trust v. ConAgra Foods, Inc., 136 S. Ct. 1012 (2016), which addressed the appropriate citizenship test for a real-estate

trust – a question germane to the existence of diversity jurisdiction in this case. Wang Appellate Decision, 843 F.3d at 489 n.6.

Based on the decision in Americold, the D.C. Circuit eventually reversed this Court's dismissal of Yueh-Lan's Complaint. The Circuit, at the same time, also granted the Executors' substitution motion "without prejudice to the defendants' ability to renew in district court those arguments they ha[d] pressed before." Id. at 496. Returning to this Court, Plaintiff Executors filed a Motion for Leave to File a Second Amended Complaint and for Other Relief. See Wang II, 322 F.R.D. at 30; ECF No. 37. Finding that Defendants' various futility, joinder, and bad-faith arguments fell short, and that many should be reserved for later briefing, the Court concluded that "no barriers exist[ed] to the filing of Plaintiff Executors' Second Amended Complaint" and granted the motion in full. Wang II, 322 F.R.D. at 32.

B.  Second Amended Complaint

The operative Second Amended Complaint alleges five counts under the Civil Code of Taiwan: (1) Yueh-Lan has not received the full value of the 50% share she is entitled to under Article 1030-1; (2) to the extent her claim cannot be satisfied from property held by Y.C. at his death, Plaintiffs are entitled to restitution from third parties pursuant to Article 1030-3; (3) Yueh-Lan is entitled to restitution from Defendants for infringing upon her right of inheritance pursuant to Article 1146; (4) Plaintiffs are entitled to the return of assets, monies, and property distributed or transferred to Defendants from the marital estate pursuant to Article 767; and (5) Defendants unjustly benefited from the improper acquisition of Y.C.'s assets and are bound to return them under Article 179. See SAC, ¶¶ 66-101. Plaintiffs also bring four counts under D.C. common law: (1) unlawful conversion of Yueh-Lan's rightful marital property; (2) unjust enrichment from the improper acquisition and use of such property; (3) an action for a

constructive trust to be imposed to ensure that Plaintiffs receive Yueh-Lan's statutory share of Y.C.'s estate; and (4) an action for an accounting of all the assets, monies, and property owned by Y.C. prior to his death. See id., ¶¶ 102-120.

Defendants have now filed a Motion to Dismiss the Second Amended Complaint, alleging both that it fails to state a claim under Fed. R. Civ. 12(b)(6) and that it should be discretionarily dismissed under the doctrine of *forum non conveniens*. See ECF 47 (Mot. to Dismiss SAC). Briefing on this Motion is now complete, and the Court must decide whether this suit will remain on its docket.

## II. Standard of Review

Because the Court ultimately grants Defendants' Motion to Dismiss pursuant to *forum non conveniens*, it need not address their Motion under Rule 12(b)(6). It therefore presents the standard for only the former below.

Whether to dismiss a case under *forum non conveniens* is a "discretionary decision that can be made at any time." Stromberg v. Marriott Int'l, Inc., 474 F. Supp. 2d 57, 60 (D.D.C. 2007), aff'd, 256 F. App'x 359 (D.C. Cir. 2007). Dismissal under the doctrine is a "non-merits threshold inquiry," which "reflects a court's assessment of a range of considerations, most notably the 'convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality.'" MBI Grp., Inc. v. Credit Foncier du Cameroun, 558 F. Supp. 2d 21, 26-27 (D.D.C. 2008) (quoting Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422 (2007)).

Applying *forum non conveniens* is a two-fold inquiry. First, the Court asks whether an adequate alternative forum exists. If so, it next looks to a set of public and private factors to determine if they favor dismissal. "If the balance favors the foreign forum, and if the Court is

convinced that plaintiff effectively can bring its case in the alternative forum, the Court may dismiss the case on grounds of *forum non conveniens*." KPMG Fin. Advisory Servs. Ltd. v. Diligence LLC, 2006 WL 335768, at *1 (D.D.C. Feb. 14, 2006) (citing Pain v. United Techs. Corp., 637 F.2d 775, 785-86 (D.C. Cir. 1980)). In asserting the doctrine, "the defendant has the burden on all aspects of a motion to dismiss on *forum non conveniens* grounds, including the obligation to establish as a prerequisite that an adequate alternative forum exists." Id.

III.    **Analysis**

Before turning to the two-step inquiry, the Court begins with a preliminary dispute over the application of *forum non conveniens* to this case – *i.e.*, the timing of Defendants' Motion. Finding that this issue does not preempt a full analysis under FNC, the Court then proceeds to separately assess the adequacy of the alternative forum, and the private and public interests at stake.

A.    Timing

As Plaintiffs acknowledge, motions to dismiss pursuant to *forum non conveniens* are not subject to any jurisdictional time bar or procedural waiver. See Opp. at 21. Yet they nonetheless assert that Defendants' Motion in this case should be rejected as untimely, citing to a series of cases holding that FNC motions must be brought within a "reasonable" time. Id. at 21-22. According to the Executors, this period has elapsed. Pointing out that this case has been pending since October 2010, Plaintiffs contend that Defendants had a number of opportunities to raise FNC earlier, but instead engaged in a "long-term, deliberate choice to not move for dismissal on FNC grounds." Id. at 22. Plaintiffs assert that "no new facts have emerged" over the long life of this lawsuit that "might justify Defendants' recent shift" in asking for FNC dismissal. Id. at 25. Their "eleventh-hour decision to file an FNC motion," the Executors maintain, thus "has the

appearance of improper forum shopping and gamesmanship." Id. Finally, they state that "it would be highly inefficient for the parties and the courts, as well as prejudicial to Plaintiffs, to dismiss the case at this stage." Id. at 26.

The Court begins its analysis by noting that, although some courts have held that a defendant must bring an FNC motion within a "reasonable" period of time, the D.C. Circuit is not among them. See, e.g., Stromberg, 474 F. Supp. 2d at 60 (decision "to dismiss a case under the *forum non conveniens* doctrine . . . can be made at any time"); L & L Const. Assocs., Inc. v. Slattery Skanska, Inc., 2006 WL 1102814, at *3 (D.D.C. Mar. 31, 2006) (court retains flexibility to make FNC dismissal decision "at any time"). In the absence of governing Circuit precedent, this Court declines to impose any such timeliness requirement. Yet, even if it were to consider the "reasonableness" of Defendants' timing, Plaintiffs would nonetheless not prevail. Although they are correct that this suit has been pending for eight years, this longevity is due not to any dilatory tactics or "gamesmanship" by Defendants, but instead is the result of the case's circuitous procedural history.

As discussed above, the Court granted Defendants' first Motion to Dismiss for lack of subject-matter jurisdiction in 2012. After Plaintiffs appealed, the Court of Appeals suspended briefing and held the case in abeyance in order to resolve the executorship proceedings after Yueh-Lan's death, a process that took three years. See Wang II, 322 F.R.D. at 16-17. Restarting the appeal in the fall of 2015, Plaintiffs filed their motion for substitution, and Defendants requested dismissal on the ground that the suit was a "legal nullity." Id. at 18. Yet the briefing on these claims was again suspended, pending the Supreme Court's decision in Americold, which finally issued in spring 2016. On December 9 of that year, the D.C. Circuit ruled in Plaintiffs' favor and remanded the case to this Court. Plaintiffs then moved to amend their

Complaint in March 2017, and Defendants opposed on a number of grounds – including FNC. In August, the Court granted the Motion to Amend and denied FNC dismissal at that time, but permitted Defendants to reassert the defense in later briefing. The Executors filed their Amended Complaint in August 2017, and Defendants responded with the instant Motion to Dismiss, briefing on which was complete in late December. As this recounting demonstrates, the fact that 2018 has now arrived without even the filing of an Answer is hardly the result of Defendants' strategic choice.

Defendants admittedly <u>could</u> have sought an FNC dismissal in their initial Motion to Dismiss, but they instead asserted a lack of diversity jurisdiction. This was certainly proper. While "*forum non conveniens* may justify dismissal of an action though jurisdictional issues remain unresolved," the doctrine may also be raised <u>after</u> such threshold questions have been addressed. <u>Sinochem</u>, 549 U.S. at 429, 424 (finding that FNC dismissal may precede jurisdictional inquiry, but noting contexts in which court might "first determine its own authority to adjudicate the case"). Although Plaintiffs suggest that Defendants were under some sort of obligation to raise FNC when Yueh-Lan appealed from this Court's ruling in <u>Wang I</u>, this position makes little sense in light of fundamental rules and practices of appellate procedure. This Court's first Opinion addressed a discrete issue of law – whether or not Yueh-Lan had established subject-matter jurisdiction in the District. <u>Wang I</u>, 841 F. Supp. 2d at 200. Concluding that the citizenship of a trust required consideration of the citizenship of the trust's beneficiaries, this Court found that Plaintiff had not adequately demonstrated diversity and dismissed the First Amended Complaint on that ground. It was that decision that was appealed, and, given the intervening decision in <u>Americold</u>, overruled. <u>See</u> <u>Wang Appellate Decision</u>, 843 F. 3d at 494-96. Plaintiffs' contention that Defendants should have tacked on a novel FNC

submission during the course of this proceeding ignores the narrow scope of the issue on appeal and the fact that appellate courts generally do not "consider an issue not passed upon below," particularly when it involves a discretionary, fact-intensive analysis such as *forum non conveniens*. See Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1039 (D.C. Cir. 2003). In sum, Plaintiffs' suggestion that Defendants should be deemed to have forfeited their FNC defense by not raising it in prior stages of this suit – or that their decision to now mount such a defense evinces any gamesmanship or improper motive – holds no water.

Similarly unavailing is Plaintiffs' more pragmatic assertion that it would be "highly inefficient" to dismiss the case at this stage. It is true that where "litigation has progressed significantly," efficiency concerns may weigh against a belated assertion of FNC. See Wright & Miller, Federal Practice & Procedure § 3828 (4th ed. 2017). Yet the Executors are off the mark when they state that "[t]his case is analogous to decisions denying an FNC motion after discovery" or other substantial stages in litigation. See Opp. at 27. While this case is now approaching the eight-year mark, it has not progressed beyond a Motion to Dismiss; there has been no answer, no discovery, no motions for summary judgment, and, of course, no trial date set. Cf. Zelinski v. Columbia 300, Inc., 335 F.3d 633, 642-43 (7th Cir. 2003) (holding that district court did not abuse discretion in denying *forum non conveniens* motion that was not made until one month before scheduled trial); Lony v. E.I. Du Pont de Nemours & Co., 935 F.2d 604, 614 (3d Cir. 1991) (holding that when "discovery in a case has proceeded substantially so that the parties already have invested much of the time and resources they will expend before trial" presumption against FNC increases); Jimmerson v. Kaiser Found. Health Plan of Mid-Atl. States, Inc., 663 A.2d 540, 545 (D.C. 1995) (finding that "belated dismissal" on FNC grounds would waste litigants' and court's efforts when "[d]iscovery was complete, a detailed joint pre-

trial statement filed, the pretrial conference completed, and a trial date selected"). At bottom, this suit may be aged in years, but it is still young at heart. Although the Court recognizes that Plaintiffs have put in substantial hours and effort on this matter, see Opp. at 26, 45, such a commitment of resources does not justify denying Defendants' Motion as untimely or unduly prejudicial.

    B. <u>FNC Analysis</u>

    Having resolved this preliminary issue, the Court may now focus on the substance of Defendants' attempt to dismiss this case pursuant to *forum non conveniens*. Under the doctrine, "[a] court first determines whether there is an adequate alternative forum and, if so, then proceeds to balance both private interest factors and public interest factors in favor of the respective forums." <u>Jackson v. American Univ., Cairo</u>, 52 Fed. App'x. 518, 518 (D.C. Cir. 2002) (citing <u>Piper</u>, 454 U.S. at 241). If the Court concludes that the alternative forum is sufficient, and either the private-interest factors <u>or</u> the public-interest factors evince a "strong tilt" towards that forum, dismissal may be appropriate. <u>MBI Grp.</u>, 558 F. Supp. 2d at 26–27. At bottom, however, FNC is a fact-based and flexible analysis, and one that is committed to the discretion of the district court. As the Supreme Court has opined, "[I]f central emphasis were placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable." <u>Piper</u>, 454 U.S. at 249-50; <u>see also</u> <u>Van Cauwenberghe v. Biard</u>, 486 U.S. 517, 529 (1988) ("[T]he district court is accorded substantial flexibility in evaluating a *forum non conveniens* motion, and each case turns on its facts.") (internal citations and quotation marks omitted). So long as an adequate alternative forum is available and the district court has found that the public or private interests favor dismissal, it may dismiss an action "when it appears that there is an imposition upon its jurisdiction." <u>Cruise Connections</u>

Charter Mgmt. 1, LP v. Attorney Gen. of Canada, 764 F. Supp. 2d 155, 160 (D.D.C. 2011) (citation omitted).

### 1. *Adequate Alternative Forum*

The Court thus begins by asking whether Taiwan is an adequate alternative forum to hear this action.  See El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 677 (D.C. Cir. 1996), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010) ("Availability of adequate alternative fora is a threshold test . . . in the sense that a *forum non conveniens* motion cannot be granted unless the test is fulfilled.") (quotation marks and citation omitted).  "In determining the suitability of an alternative forum, the Court must determine whether an alternative forum is available (*i.e.*, whether defendants are amenable to process or otherwise within the forum's jurisdiction) and whether the forum is adequate (*i.e.*, whether the parties will be deprived of all remedies or treated unfairly)."  Irwin, 448 F. Supp. 2d at 33 (citing Piper, 454 U.S. at 254) (emphasis added).

### a. Availability

In its prior Opinion, this Court concluded that "Defendants have not carried their burden to prove that an alternative forum is actually, not just theoretically, available."  Wang II, 322 F.R.D. at 25-26.  At that time, Defendants had submitted affidavits establishing that they would, in fact, "consent to process in Taiwan."  Id.  The Court found, however, that they had not "adequately respond[ed]" to Plaintiffs' contention that the statute of limitations had run on the underlying claims.  Id.  Noting that Defendants did not "fully waiv[e] their right to a limitations defense in Taiwan," the Court held that "[t]his alone dooms their *forum non conveniens* argument for now."  Id.  Yet the Court left the FNC door ajar, stating, "If Defendants will waive,

they can renew their request for an FNC dismissal in a future motion that fully articulates such a position." Id.

Defendants took up that charge. They have now returned with waivers in hand and have fully disavowed raising any statute-of-limitations defenses if this case is dismissed and re-filed in Taiwan. See ECF Nos. 47-9 (Decl. of Susan Wang), 47-10 (Decl. of William Wen-Yuan Wong), 47-11 (Decl. of Donald D. Kozusko). Defendants' expert on Taiwanese law, Professor Yeong-Chin Su, has stated that Taiwan courts will enforce these agreements, a conclusion that Plaintiffs do not dispute. See ECF Nos. 47-6 (Decl. of Yeong-Chin Su IV), ¶¶ 6-7; 42-25 (Su Decl. III), ¶¶ 5-7. In light of these affidavits, the Court is satisfied that Taiwan is available to Plaintiffs as an alternative forum. See Moletech Glob. Hong Kong Ltd. v. Pojery Trading Co., 2009 WL 3151147, at *4 (N.D. Cal. Sept. 25, 2009) (finding defendants' agreement to "waive any Taiwanese statute of limitations" was "sufficient to establish that Taiwan is an adequate alternative forum"); see also Stromberg v. Marriott Int'l, Inc., 256 Fed. App'x. 359, 360 (D.C. Cir. 2007) (holding district court did not abuse its discretion in finding Mexico an adequate forum because "[a]ppellees agreed to accept service in Mexico and waived any statute-of-limitations defenses"); In re Disaster, 540 F. Supp. at 1145 (finding that alternative forums can be "created by the defendants' consent"). To the extent that Plaintiffs assert that the Court should "consider" Defendants' "shift" in position regarding their willingness to waive statute-of-limitations claims, see Opp. at 28, this argument can be easily disregarded. As noted above, the Court's prior Opinion explicitly invited Defendants to waive such defenses and then to "renew their request for an FNC dismissal." Wang II, 322 F.R.D. at 26. It would be Janus-faced to now punish them for doing so.

Finally, to the extent that concerns remain regarding Plaintiffs' ability to re-file in Taiwan, the Court will give them the opportunity to request that additional reasonable conditions be imposed on dismissal.

b. Adequacy

Having now established that the courthouse door in Taiwan is open to Plaintiffs, the Court must next resolve whether that forum provides an adequate alternative for their claims. Although the "adequacy qualification" under FNC "allows the court some room to make discretionary judgments as to the viability" of alternative forums, the Supreme Court has stated that only in "rare circumstances" should such inadequacy be found. See In re Disaster, 540 F. Supp. at 1145 (citing Piper, 454 U.S. at 254 n.22). A forum fails the adequacy prong only "where the remedy offered by the alternative forum is clearly unsatisfactory" such that "there is . . . danger that [Plaintiffs] will be deprived of any remedy or treated unfairly." Piper, 454 U.S. at 254 n.22. The Executors argue that this case presents that rare instance for a number of reasons.

i.      Defendants' Waiver

They initially focus on the scope of Defendants' waivers. Plaintiffs assert that Taiwan is an inadequate forum because, although Defendants consented to service of process and waived statute of limitations, they "have not waived a myriad of other issues decided in Plaintiffs' favor." Opp. at 28. This argument falls well short of demonstrating inadequacy. Although the Executors may be correct that Defendants will "seek to relitigate" certain questions if this case is re-filed abroad, this is no barrier to dismissal under FNC. Id. The fact that issues already determined here may be back on the table in Taiwan does not reflect any fatal shortcoming of the alternative forum, but instead only a shift in governing law. See El-Fadl, 75 F.3d at 678 ("A foreign forum is not inadequate merely because it has less favorable substantive law [or] because

14

it employs different adjudicative procedures.") (internal citation omitted); <u>Borden, Inc. v. Meiji Milk Prods. Co.</u>, 919 F.2d 822, 829 (2d Cir. 1990) (stating that "unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate"). Dismissal under FNC may put Plaintiffs in the unenviable position of having to re-hash a few questions already addressed by this Court, and Taiwan's law may (or may not) be less favorable to their claims, but the specter of relitigation does not render a foreign forum an inadequate alternative.

ii.    Corruption

Plaintiffs next concentrate their fire on their "*bona fide* concern that a Taiwan court would decide this case upon extrajudicial considerations." Opp. at 28. They "believe they will never obtain a fair trial against these Defendants in Taiwan," <u>id.</u> at 30, a conviction based on the "substantial power" wielded by members of the "Third Family" and their allegedly close affiliation with Taiwan government officials. <u>Id.</u> at 29. According to Plaintiffs, these ties have the potential to influence the Taiwan judiciary. In support of this fear, they point to a State Department Report noting that "some political commentators and academics publicly question[] the impartiality of judges and prosecutors involved in high-profile and politically sensitive cases." ECF No. 42-24 (2016 Human Rights Report) at 4.

The Court does not deny that Y.C. and his progeny may have myriad connections to the economy and elite spheres of Taiwan. <u>See</u> ECF 49-21 (Christian Luthi Aff.), ¶¶ 11, 22 (stating that Susan Wang, Y.C.'s daughter, is a senior executives a FPG, which generates over 13% of Taiwan's GDP); ECF 49-1 (Daniel Weinberger Decl. III), ¶ 22 (Susan Wang member of business delegation to U.S. headed by former Taiwan Vice President). Yet Plaintiffs have provided no evidence that the Third Family's influence would lead to judicial corruption in this case. <u>See</u>

Warter v. Boston Sec., S.A., 380 F. Supp. 2d 1299, 1311 (S.D. Fla. 2004) ("Only evidence of actual corruption in a particular case will warrant a finding that an alternate forum is inadequate.") (emphasis omitted).  The record thus does not support their assertion that its "power," even if substantial, renders Taiwan an inadequate alternative forum.  See El-Fadl, 75 F.3d at 678 (foreign forum not inadequate "because of general allegations of corruption in the judicial system"); Eastman Kodak Co. v. Kavlin, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) (noting that argument that "[t]he 'alternative forum is too corrupt to be adequate' . . . does not enjoy a particularly impressive track record") (collecting cases).  Indeed, Taiwan has repeatedly been held to be an adequate forum by federal courts.  See, e.g., Moletech, 2009 WL 3151147, at *4; In re Air Crash Over Taiwan Straits on May 25, 2002, 331 F. Supp. 2d 1176, 1181-88 (C.D. Cal. 2004); Lee Yu-Ge v. Johnson & Johnson, 2011 WL 3566859, at *2 (N.D. Ohio Aug. 12, 2011) (noting that "a number of other courts have deemed Taiwan to be an adequate alternate forum").

Plaintiffs also cannot rely on the State Department Report as objective support for their corruption concerns.  A closer examination of that document reveals that while "some political commentators and academics" may have speculated as to the partiality of the judiciary, the Report also states that Taiwan has "an independent and impartial" civil system.  See State Dep't Rep. at 5.  Especially in light of this conclusion, the vague concerns mentioned in the Report are not sufficient to show that Taiwan is an inadequate forum.  See El-Fadl, 75 F.3d at 678 (finding reliance on State Department Report expressing "concern about the impartiality" of Jordanian court system insufficient to demonstrate forum's inadequacy).  In sum, the evidence does not support the conclusion that Taiwan's legal system is "so fraught with corruption . . . and bias as to provide 'no remedy at all.'"  Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1179 (9th

Cir. 2006). The Court therefore finds unavailing Plaintiffs' position that they would be denied a fair trial because of Defendants' alleged influence over Taiwanese courts.

### iii.    Evidentiary concerns

Plaintiffs next assail the shortcomings of Taiwan's power to compel the production of evidence and order discovery. According to them, "[B]ecause of Taiwan's lack of international status," its courts have "no power to compel the production of evidence from any non-party witnesses outside Taiwan." Opp. at 29. Their legal expert asserts that this suit, if re-filed, will therefore be "cut off at [its] inception . . . because the Taiwan courts are not cloaked with the sovereign authority of a fully recognized independent nation." ECF No. 39-1 (Chen Decl. II), ¶ 152. Plaintiffs dispute that discovery under 28 U.S.C. § 1782(a), which provides that a "district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign . . . tribunal," would provide any "meaningful solution to these concerns," as Defendants are likely to "vigorously oppose[]" any such requests. See Opp. at 30. Defendants reply that Taiwan's lack of international status is irrelevant to the FNC analysis, and that discovery under § 1782 is "unquestionably available," even if "properly objected to." Reply at 16. They note, moreover, that Plaintiffs would also have letters rogatory at their disposal – a method by which they could obtain evidence and testimony from abroad. Id.

The Court agrees with Defendants that Taiwan is not rendered an inadequate forum because of Plaintiffs' evidentiary concerns. As it addresses in greater depth below, the use of either forum may place certain witnesses and evidence beyond the reach of compulsory discovery. Yet "a foreign forum's restrictive discovery or procedural rules do not render that forum inadequate." Marra v. Papandreou, 59 F. Supp. 2d 65, 73 (D.D.C. 1999); see In re Air

Crash, 331 F. Supp. 2d at 1187 (finding that plaintiffs' arguments "regarding the availability of . . . pretrial discovery . . . do not warrant a finding that Taiwan's procedural safeguards are inadequate for *forum non conveniens* purposes").  If compelled to re-file in Taiwan, moreover, Plaintiffs will still be able to request discovery through § 1782, which provides for the production of evidence located in the United States "upon the application of any interested person."  28 U.S.C. § 1782(a) (evidence may be produced "pursuant to a letter rogatory issued[] or request made" by foreign tribunal or interested party).  The availability of such discovery further assures the Court that Taiwan is a viable alternative forum.  See Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp., 421 F. Supp. 2d 741, 769 (S.D.N.Y. 2006) ("When evaluating a motion for dismissal pursuant to *forum non conveniens* . . . the availability of letters rogatory is relevant to a court's analysis.").

iv.     Remedies

Last, the Executors contend that Taiwan courts will be unable to order an adequate remedy even if they succeed.  They argue that because Taiwan "do[es] not recognize claims in equity or provide equitable remedies" and because they "will be unable to enforce any judgment obtained against Defendants," that country is an inadequate alternative forum to hear this suit. See Opp. at 30.  Defendants rejoin that the potential for Plaintiffs to obtain less-favorable remedies in the alternative forum "does not render Taiwan inadequate."  Reply at 17.

On this point, the precedent again supports Defendants' position.  The Supreme Court has established that only when "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all," can the district court conclude that "dismissal would not be in the interests of justice."  Piper, 454 U.S. at 254.  That bar was not met, the Court held, when plaintiffs were unable to rely on a particular legal theory in the

alternative forum, or when their potential damages award would be limited.  Id. at 254-55.  Here,

too, the evidence does not show that Plaintiffs will be deprived of any "remedy at all."  As

discussed below, their claims revolve around alleged violations of Taiwan's Civil Code.  They

do not suggest that the Code provides no remedy for their suit, but instead that "equitable

remedies" will not be available.  The Court can hardly deem meaningless the remedies Taiwan

has chosen to provide for such infractions in its own courts.  See Huertas v. Kingdom of Spain,

2006 WL 785302, at *2 (D.D.C. Mar. 27, 2006) ("[A] remedy will not be considered inadequate

merely because the plaintiff's potential award will be smaller."); In Re Disaster, 540 F. Supp. at

1145-46 (potentially smaller damage award and inability to rely on particular theory of liability

do not render forum inadequate).  Indeed, when a New Jersey district court dismissed Plaintiffs'

nearly identical claims on FNC grounds, it reached the same conclusion on this issue.  As the

court there held, "It would be illogical, to say the least, to believe that a Taiwanese court is

unable to provide an adequate remedy for a violation of its own laws."  DNJ Action, 2016 WL

6080199, at *8.

　　　　Plaintiffs' argument that Taiwan is inadequate because they may be unable to enforce a

judgment in U.S. courts is similarly unavailing.  Enforceability of a foreign judgment is not a

necessary condition for FNC dismissal; it is instead one of the factors that may be considered in

the balancing of the private interests at stake.  See Gulf Oil Corp v. Gilbert, 330 U.S. 501, 508

(1947).  Whether or not the Executors could enforce a favorable Taiwanese judgment thus does

not determine the threshold question of the forum's adequacy to address the dispute at hand.  See

Windt, 544 F. Supp. 2d at 418 (foreign forum inadequate when it "completely prohibit[s] any

meaningful litigation of the subject matter disputed") (quotation marks omitted).  The one case

cited by Plaintiffs in support of their argument, Nemariam v. Fed. Democratic Republic of

Ethiopia, 315 F.3d 390 (D.C. Cir. 2003), is not to the contrary. Nemariam did not address the enforcement of remedies, but instead involved circumstances in which the plaintiff had no personal right to any remedy in the alternative forum. Id. at 395. Plaintiffs' alleged inability to enforce a favorable judgment therefore does not establish that Taiwan is an inadequate alternative forum.

Although the facts of this case may be unusual, its legal underpinnings do not present the "rare circumstance" in which an alternative forum is not a viable option. The Court, consequently, finds that Taiwan is an available and adequate forum for this suit and that Defendants thus clear the first hurdle to obtaining FNC dismissal.

2. *Balancing of Interests*

Next up is a determination of whether the private and public interests at stake tip "strongly" in favor of dismissal. See Lans v. Adduci Mastriani & Schaumberg L.L.P., 786 F. Supp. 2d 240, 293 (D.D.C. 2011). Before proceeding to those enumerated interests, however, the Court addresses one initial matter – the appropriate level of deference due to Plaintiffs' choice of forum. See Windt v. Qwest Commc'ns Int'l, Inc., 544 F. Supp. 2d 409, 416 (D.N.J.), aff'd, 529 F.3d 183 (3d Cir. 2008) (noting that courts "conduct their balancing in light of the degree of deference the plaintiff's choice of forum deserves").

a. Deference

There is ordinarily a strong presumption in favor of a plaintiff's chosen forum, but such deference "applies with less force" when the plaintiff is foreign. Sinochem, 549 U.S. at 430 (quoting Piper, 454 U.S. at 255-54). As the Supreme Court has explained,

> [W]hen the home forum has been chosen, it is reasonable to assume this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the

> trial is convenient, a foreign plaintiff's choice deserves less
> deference.

Piper, 454 U.S. at 255-56.

Here, Plaintiffs, who are all citizens of Taiwan, acknowledge that they have filed suit

outside their home forum. Yet they nonetheless assert that their selection of D.C. should be

"granted a high degree of deference" because it was "made for legitimate reasons and evinces

genuine convenience." Opp. at 31. In support, the Executors point to the fact that all named

Defendants are located in the District and that there are "*bona fide* connections" between the

controversy and the forum. Id. at 32 (alteration omitted). Relying on their allegations that

Defendants created the D.C.-based trusts for the purpose of receiving and holding over $2 billion

of Y.C.'s estate in violation of Yueh-Lan's spousal rights, and that Defendants "continue to hold

billions of dollars" in the District, Plaintiffs assert that this forum has a "substantial relation to

the action." Id. at 32-33. Finally, they contend that they "never had a choice to sue in any other

forum," as Defendants were not amenable to process in Taiwan. Id. at 32. The fact that

Defendants have now consented to such foreign jurisdiction "does nothing," Plaintiffs argue, "to

alter the fact that the forum choice" was based on "genuine jurisdictional convenience." Id.

Defendants counter that the Executors' forum choice should not, in fact, be accorded a

"high degree of deference." Noting that the "genuine convenience" test for evaluating that

choice has not been adopted by this Circuit, Defendants contend that lesser deference is due. See

Reply at 13-14. And, with respect to Plaintiffs' assertion that the suit has a "substantial relation"

to the forum, Defendants respond that the underlying claims "predominantly concern[] Taiwan

law and Taiwan policy issues." Id. at 14.

The Court agrees that Plaintiffs' choice of forum should, in this case, be given less

deference than is normally due when considering dismissal under *forum non conveniens*. As an

initial matter, it notes that this Circuit has not yet addressed the relevance of whether a foreign defendant's forum choice was motivated by "legitimate reasons" or "genuine convenience." Plaintiffs instead import these considerations from a line of Second Circuit cases. See, e.g., Iragorri v. United Techs. Corp., 274 F.3d 65, 73 (2d Cir. 2001) (holding that foreign plaintiff's forum choice given "greater deference . . . to the extent that it was motivated by legitimate reasons, including the plaintiff's convenience"); Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 157 (2d Cir. 2005) (granting "substantial deference" to foreign plaintiff's forum choice when informed by "genuine convenience") (internal quotation marks omitted); In re Herald, 540 F. App'x 19, 26-27 (2d Cir. 2013) (affirming "very limited deference" given to foreign plaintiffs' choice not motivated by "genuine convenience"). So, too, with Plaintiffs' reliance on the suit's alleged "*bona fide*" connections with the District. See, e.g., Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 71 (2d Cir. 2003) (level of deference given to foreign plaintiff's choice of forum "depends on the *bona fide* connection the plaintiff has with that forum"); Iragorri, 274 F.3d at 71–72 (deference given to foreign plaintiff's choice depends, in part, on degree of "plaintiff's or the lawsuit's *bona fide* connection . . . to the forum of choice").

By contrast, this Circuit has not relied on any such considerations when determining the level of deference given to a foreign plaintiff's forum choice. Instead, it has approvingly cited the standard established by the Supreme Court – namely, that a foreign plaintiff's choice of forum is entitled to "less deference." Friends for All Children, Inc. v. Lockheed Aircraft Corp., 717 F.2d 602, 605 n.5 (D.C. Cir. 1983) (internal quotation marks omitted); see also Pac. Mar. Ass'n v. NLRB, 905 F. Supp. 2d 55, 60–61 (D.D.C. 2012) ("[T]he plaintiff's choice of forum is afforded great deference . . . [but] that choice is conferred less deference by the court when a

plaintiff's choice of forum is not the plaintiff's home forum."); Irwin v. World Wildlife Fund, Inc., 448 F. Supp. 2d 29, 33 (D.D.C. 2006) ("Although there is a strong presumption in favor of the plaintiff's choice of forum, plaintiff's choice is entitled to less deference if she is a citizen and resident of a foreign state."); In re Disaster, 540 F. Supp. at 1144 ("presumption in favor of the initial forum choice applies with less than maximum force when the real parties in interest are foreign").

Following this guidance, the Court will not grant Plaintiffs in this case the benefit of any "strong presumption" in favor of their forum choice. Instead, their selection carries "less weight" as the Court proceeds in its analysis under *forum non conveniens*.

### b. Private Interests

The private interests include (1) the "relative ease of access to sources of proof"; (2) the "availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses"; and (3) the catch-all consideration of "all other practical problems that make trial of a case easy, expeditious and inexpensive." Gulf Oil Corp, 330 U.S. at 508. The Court focuses its analysis on the first two considerations, as those are the ones most discussed and disputed by the parties.

### i. Access to Proof

At the outset, an obvious and substantial obstacle impedes access to relevant evidence in the District of Columbia – the language barrier. This case involves complex questions of Taiwanese law, the resolution of which depends at least in part on the interpretation of various Chinese-language documents and the testimony of non-English-speaking witnesses. See Mot. at 44-45 (listing documents already in record that have required translation); Opp. at 40. Indeed, even at this stage in litigation, the parties dispute the English meaning of certain pieces of

evidence, including a 2010 Taiwanese Tax Settlement Agreement regarding the distribution of Y.C.'s estate. See ECF Nos. 37-2, 38-5 (differing translations). According to Defendants, this Agreement states that Yueh-Lan Wang, Yang Chiao-Wang, and P.C. Lee were "in fact the spouses of Mr. Y.C. Wang." ECF No. 42-25 (Su Sur-Reply Decl.), ¶ 14. According to Plaintiffs, the correct translation of the Agreement is that the three women only "emotionally," "sentimentally, or "with their emotions" recognized that they were Y.C.'s wives, not that they were legally so. See ECF Nos. 18-2 (Decl. of Tsung-Fu Chen I), ¶ 53; 39-1 (Chen Decl. II), ¶ 77; 37-1, Exh. J (Decl. of Xin Min Liu). Lacking any familiarity with Mandarin, this Court has no ability to determine which version should prevail. And that is precisely the point: a U.S. court is an inconvenient forum for a case in which substantial decisions may rise or fall on the interpretation of a given Chinese phrase. See MBI Grp., Inc. v. Credit Foncier Du Cameroun, 616 F.3d 568, 576 (D.C. Cir. 2010) (upholding dismissal under FNC when "district court concluded that the private interests clearly favored a Cameroonian forum" in part due to the "complexity of the French-to-English translation necessary for taking evidence and testimony"); Irwin, 448 F. Supp. 2d at 35 (necessity of translating documents and testimony from French to English created "administrative difficulties of trying the case in the District of Columbia" that "weigh in favor of dismissal"). Concerned that this case could become lost in translation, the Court concludes that this issue weighs in favor of dismissal.

Although neither side disputes the language difficulties (nor could they in good faith, given the extant record), they sharply diverge as to which forum would provide greater access to critical witnesses, documents, and other evidence. According to Plaintiffs, much of this information is located "in the U.S., or outside of Taiwan." Opp. at 34. Specifically, they assert that evidence regarding the "purpose, formation, and functioning" of New Mighty Trust, the

"transfer of Marital Assets to Defendants," and Y.C.'s "ownership interests in the assets" are all located in the United States. Id. at 34-36 (describing individuals and documents here). The Executors have submitted a declaration listing eighteen witnesses and entities that, upon information and belief, are located in the United States and "are likely to possess documents and information relevant to the claims and facts alleged in the [Second Amended Complaint]." ECF No. 49-1 (Decl. of Daniel Weinberger), ¶ 4. Although certain of these enumerated witnesses would seem more crucial than others, see id., (listing legal assistant "who notarized documents relating to this matter" and "close personal friend" of Y.C.), the Court has no reason to doubt that at least some of them possess relevant information.

Defendants also have a list. Indeed, they contend that "the real parties in interest are principally located in Taiwan" and go on to describe the many witnesses who reside in that country. See Mot. at 35-37. These individuals include the four NM-US trust managers, the persons who "direct" the operations of NMF, the Executor-Defendants themselves, Y.C.'s alleged spouse P.C. Lee, the children of his alleged spouse Yang Chiao, and those involved in negotiating the Tax Settlement Agreement. Id. at 36-39. As with Plaintiffs, however, Defendants also include certain individuals whose connections to the instant suit seem, at this stage, somewhat tenuous. See Mot. at 40 (listing Yueh-Lan's housekeeper and medical professionals); 42 (listing general director of FPG Museum and "other museum staff"). Regardless, the Court does not doubt that "witnesses with knowledge of [relevant] matters are located in Taiwan." Mot. at 42.

Just as the parties dispute the geographic distribution of the relevant proof, they also diverge as to the ease of access to such evidence. Plaintiffs assert that Defendants have failed to demonstrate that they will be deprived of necessary evidence if the case is not dismissed. See

Opp. at 40. Noting that Defendants will be able to use letters rogatory to obtain evidence located in Taiwan and that they have "essentially limitless resources," Plaintiffs contend that Defendants will face no great burden in obtaining proof from abroad. Id.; ECF No. 49-35 (Chen Opp. Decl.), ¶¶ 72-74 (discussing procedures for obtaining evidence in Taiwan pursuant to letters rogatory); Sayles v. Pac. Engineers & Constructors, Ltd., 2009 WL 791332, at *4 (W.D.N.Y. Mar. 23, 2009) (discussing particulars and requirements of letters rogatory under Taiwanese law). Defendants rejoin that they are, in fact, likely to face evidentiary obstacles if this case remains in D.C. They assert that letters rogatory are not a sufficient substitute for trying this case in Taiwan, and that they will therefore be deprived of necessary sources of proof. See Reply at 16 (citing Chang v. Baxter Healthcare Corp., 599 F.3d 728, 735 (7th Cir. 2010), for statement that letters rogatory are not a "very satisfactory means of obtaining evidence from Taiwan").

At this point in the litigation, the precise evidentiary contours of this case remain somewhat murky. What is clear is that whether this suit is brought in D.C. or Taiwan, a certain amount of relevant proof is likely to be located outside the forum. On balance, however, it appears that Defendants have a somewhat stronger argument regarding the location of relevant sources of proof and individuals critical to this action, as is perhaps unsurprising given that the central figures in this case are Taiwanese. The Court therefore concludes that this issue weighs slightly in favor of dismissal.

### ii. Obtaining Witnesses

As with the question of where the relevant witnesses are located, the parties split as to which forum would be better able to compel and procure testimony from these individuals. According to Plaintiffs, "[T]o the extent there are relevant Taiwan witnesses," they consist

almost entirely of "employees, agents, and affiliates" of Defendants, thus "obviating any concern that [it] will be difficult to procure" access to them in the United States.  See Opp. at 39. Plaintiffs contend, moreover, that evidence from any "remaining unwilling witnesses" can be obtained by this Court through letters rogatory or unspecified "other powers."  Id. at 40.  By contrast, they assert (albeit while incorrectly suggesting that this Court would transfer, rather than dismiss, this case under FNC) that "none of the non-Taiwan witnesses will be subject to compulsory process if the case is transferred to Taiwan."  Id.

Defendants respond that, if the case is not dismissed, they will face significant challenges in compelling evidence for use in trial.  Taiwan, as they note, is not a party to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, and there is no ability to compel witnesses in Taiwan to appear in-person in U.S. courts.  See Mot. at 42; Chang v. Baxter Healthcare Corp., 599 F.3d 728, 735 (7th Cir. 2010) (finding that "Taiwanese law makes it difficult to gather evidence for use in a trial in a foreign country because Taiwan is not a party to the Convention"); see also Warter v. Boston Sec., S.A., 380 F. Supp. 2d 1299, 1312 (S.D. Fla. 2004) (noting that if case proceeded in U.S., defendants' only means of compelling testimony and evidence would be "foreign letters rogatory process," while if filed in Argentina, "Plaintiffs could use the Argentine rules of procedure . . . [and] could compel testimony and documents from unwilling U.S. witnesses pursuant to [§ 1782]") . Defendants also dispute that they have meaningful control over the "numerous Taiwanese witnesses" such that it would not be difficult to procure their testimony for trial.  See Mot. at 42.  Finally, Defendants note that "many" of their potential witnesses are elderly, and thus the inconvenience of their travel to the United States would be "significant and substantial, if not impossible."  Id. at 43; see DNJ Action, 2016 WL 6080199, at *10 n.22 (finding that "P.C. is currently 81 years old, resides in Taiwan, and

does not speak English" and that Plaintiffs "essentially concede[] that Taiwan is a more convenient forum for P.C.").

On this factor, as with the location of sources of proof, the Court finds that both sides present viable arguments in favor of their preferred forum. Whether this case proceeds in D.C. or in Taiwan, there will be legal and logistical hurdles to compelling witnesses and obtaining testimony. See DNJ Action at *14 (finding that "whether the matter is litigated in Taiwan or in New Jersey," either forum will be "unable to compel documents or witnesses who may be relevant to many issues in this case"). The Court thus concludes that this factor hangs in equipoise.

On the whole, therefore, the private interests tilt somewhat toward dismissal.

### b. Public Interests

The considerations governing the public-interest analysis, conversely, include (1) the "local interest in having localized controversies decided at home"; (2) the interest in having the trial in a forum that is "at home" with the law that must govern the action; (3) the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and (4) the unfairness of burdening citizens in the current forum with jury duty. See Gulf Oil Corp, 330 U.S. at 508-09. Assessing each of these factors, the Court concludes that the public interest in this case tips sharply in favor of dismissal.

### i. Local Interest

Plaintiffs contend that "the citizens of D.C. and the U.S. have a strong interest in this litigation." Opp. at 42. They maintain that "substantial culpable conduct occurred" in the District, "including the receipt of property and the establishment of the New Mighty U.S. Trust structure itself." Id. at 41. Pointing to the fact that Defendants are incorporated and located in

this country, they argue that "Defendants and their affiliates have benefited substantially from U.S. laws" and thus "cannot now complain of the burden . . . [that] results from this Court's jurisdiction." Id. at 43. Defendants rejoin that this emphasis on local and U.S. interests is but a smokescreen for the real dispute underlying this case – the correct interpretation of Taiwan's Civil Code regarding marriage and inheritance. They posit that there "is little to no local interest in the claims asserted," and that the "resolution of this Taiwan-law based action is unlikely to have any impact in the District of Columbia." Mot. at 32.

Defendants have the better position. The central question here is whether Yueh-Lan, a lifelong resident and citizen of Taiwan, was denied certain spousal rights under Taiwanese inheritance law. Indeed, each count in the Second Amended Complaint is in some way premised on her claimed entitlement to her full share of Y.C.'s marital estate. See SAC, ¶¶ 71-118. Whichever way this case comes out in the end, its legal impact will be far greater in Taiwan than in the District of Columbia – a forum that would very rarely confront issues of Taiwanese marital law. Although the District may have a weak interest in this dispute given Defendants' local incorporation and business operations, the central claims plainly implicate Taiwanese concerns. See DNJ Action, 2016 WL 6080199, at *13 (noting that "citizens of Taiwan likely have a strong interest in the distribution of the estate of one of its wealthiest citizens"). Indeed, resolving this case would implicate questions of that country's social policies and family law – hardly the "local interests" of a federal court located an ocean away. See, e.g. ECF Nos. 49-35 (Chen Opp. Decl.), ¶¶ 78-81 (discussing history of bigamy in Taiwan); 39-1 (Chen Decl. II), ¶¶ 52-55, 72-73 (discussing definition of marriage in Taiwan); 42-25 (Su Sur-Reply Decl.) (discussing determination of relative spousal contributions to a marriage). Just as federal courts may decline to decide diversity-jurisdiction cases involving domestic relations, the subject matter at issue

here is particularly ill-suited for determination in the current forum.  See, e.g. Ellison v. Sadur, 700 F. Supp. 54, 55 (D.D.C. 1988) ("Federal courts generally will not accept jurisdiction over a case that involves the resolution of a marital dispute[.]").  In light of these concerns and the strong Taiwanese interests at stake, this factor tips sharply in favor of dismissal.

ii.   Applying Foreign Law

The Court next considers "the interest in having the trial in a forum that is at home with the law that must govern the action" and the potential for "unnecessary problems in conflicts of laws or in the application of foreign law."  On this issue, Plaintiffs contend that "while some issues of Taiwan law exist in this case, D.C. law will also apply."  Opp. at  44.  Yet their attempt to equate the relevance of Taiwanese and D.C. law is belied by their Second Amended Complaint.  That pleading alleges five substantive counts under different sections of Taiwan's Civil Code (as compared to four common-law counts), see SAC, ¶¶ 66-101, and the D.C. claims are, at least in part, contingent upon these foreign-law allegations.  Without engaging in a full conflicts analysis, it appears that the merits of Plaintiffs' D.C.-law claims likely depend upon the viability of their arguments under Taiwan's Civil Code.  See id., ¶¶ 102-110 (counts for conversion and unjust enrichment under D.C. law require, respectively, "unlawful" control over another's personal property and "unjust" retention of benefit by defendant); cf. Piper, 454 U.S. at 251 (stating that "the public interest factors point towards dismissal where the court would be required to untangle problems in conflict of laws, and in law foreign to itself") (internal quotation marks and citations omitted); Lans, 786 F. Supp. 2d at 300 (finding that "[w]hile the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action") (internal quotation marks and citation omitted).  Plaintiffs' contention that this case involves only "some issues" of Taiwanese

law is thus somewhat disingenuous. Instead, the Court agrees with Defendants that at the core of this suit lie claims under Taiwanese law.

The Court notes, moreover, that Plaintiffs brought many of the same Taiwanese and common-law claims in their New Jersey suit. See DNJ Action, 2016 WL 6080199, at *8 n.19 (discussing Taiwanese causes of action and identifying New Jersey causes of action as "conversion," "unjust enrichment, "constructive trust," "accounting" and "civil conspiracy"). In dismissing that case under FNC, the court there found that "the New Jersey claims are seemingly contingent on . . . Taiwanese law." Id. at *8. "[T]o succeed on any of the New Jersey claims," that court held, "Plaintiffs first need to prove an underlying violation of Taiwanese law." Id. at *8 n.19. So, too, do the D.C. claims at issue here seem to rise or fall with Plaintiffs' allegations under Taiwan's Civil Code. The Court therefore concurs with the New Jersey court's determination that "[t]he dispute here rests entirely on the application of Taiwanese law." Id. at *12.

There is no doubt that this Court is "empowered to resolve questions of foreign law," Mot. at 32, and that the need to do so does not compel dismissal under FNC. See Cruise Connections Charter, 764 F. Supp. 2d at 163–64 (need to apply foreign law "alone is not sufficient to warrant dismissal"). Although "showing that another jurisdiction's law will apply is not alone sufficient to refuse retention of a case if the court will not have any difficulty applying [such] law," this is not such a case. See Lans, 786 F. Supp. 2d at 300. This Court readily acknowledges that it will have some degree of difficulty in interpreting the numerous provisions of Taiwan's Civil Code at issue here. See Moletech, 2009 WL 3151147, at *6 (finding that application of Taiwan's law "would be an arduous task as the Court is unfamiliar with Taiwanese law, and this factor weighs heavily in favor of dismissal of this action"); In re Air

Crash, 331 F. Supp. 2d at 1211 ("Because Taiwanese law is likely to apply to these actions, and because the court is unfamiliar with Taiwanese law, this public factor . . . weighs in favor of dismissal on *forum non conveniens* grounds."). As the record makes clear, this is no straightforward task here. See Su Decl. I, ¶¶ 78 (noting that no Taiwanese court has previously addressed allocating spousal share among multiple wives); ¶¶ 149-51 (discussing meaning of Settlement Agreement); Chen Decl. II, ¶ 117 (noting that Taiwanese courts have never considered application of relevant Civil Code provisions "to the situation of multiple spouses"). Parsing and applying the relevant Civil Code provisions will require this Court to gain a significant level of expertise regarding foreign family and inheritance law, and to resolve a number of questions of first impression arising under Taiwanese law. In light of such challenges, the Court concludes that this factor weighs strongly in favor of dismissal.

### iii. Burden on D.C. Citizens

In addition to taxing the foreign expertise of this Court, there is also the concern that a trial in this case would "unfairly" burden citizens of the District with jury duty. When assessing motions to dismiss under FNC, courts seek to "avoid[] the imposition of jury duty on people of a community which has no relation to the litigation." Wye Oak Tech., Inc. v. Republic of Iraq, 941 F. Supp. 2d 53, 58 (D.D.C. 2013) (internal quotation marks and citation omitted). While this suit has some relation to the District – Defendants are D.C.-based entities and Plaintiffs bring claims under D.C. law – the gravamen of the case, as discussed above, involves Taiwan's Civil Code. Fairness to a future D.C. jury therefore counsels in favor of dismissal. See BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz, 828 F. Supp. 92, 99–100 (D.D.C. 1993) (finding that "the District of Columbia's relatively minor interest in the outcome of the dispute does not justify submitting its citizens to the rigors of sitting as jurors"); In re Air Crash, 331 F.

Supp. 2d at 1206 (stating that "it is clear [], given Taiwan's significant connection to the actions, and California's minimal one, requiring California citizens to serve as jurors in these cases would be an unfair burden").

## IV.     Conclusion

Bearing in mind that flexibility is the "watchword" and convenience the "central focus" of the *forum non conveniens* inquiry, the Court concludes that the private interests tip slightly in favor of dismissal and the public interests come out strongly in support of that result.  Because it also finds that Taiwan is an available and adequate alternative forum, it will ultimately grant Defendants' Motion to Dismiss under *forum non conveniens*.  The Court will, however, condition such dismissal upon Defendants' continued submission to Taiwan's jurisdiction and waiver of their statute-of-limitations defenses.  Recognizing, moreover, that Plaintiffs may have remaining concerns regarding their ability to re-file in Taiwan, the Court will provide them the opportunity to request additional conditions subsequent to the issuance of this Opinion. Defendants will in turn have the chance to respond to any such requests, and the Court will determine if any further constraints to dismissal are warranted.  A contemporaneous Order so stating shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  February 12, 2018