# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHIN-TEH HSU, *et al*.,

     Plaintiffs,

        v.

                          Civil Action No. 10-1743 (JEB)

NEW MIGHTY U.S. TRUST, *et al*.,

     Defendants.

## MEMORANDUM OPINION

Anna Karenina famously opens: "All happy families are alike; each unhappy family is unhappy in its own way." The intestate death of Taiwanese billionaire and plastics magnate Yung-Ching (Y.C.) Wang, who was involved with three women simultaneously and the father of nine children, has resulted in an unhappy family indeed. This case concerns one of the many disputes amongst his partners and progeny over the proper distribution of his fortune. Specifically, the estate of Y.C.'s first wife Yueh-Lan Wang brings this suit alleging that immediately preceding her husband's death, Y.C. transferred money and property out of his estate and into various trusts controlled by children of another romantic partner in order to prevent Yueh-Lan from claiming her rightful inheritance.

After years of pursuing jurisdictional arguments, Defendant Trusts now move to dismiss Plaintiffs' Second Amended Complaint on the ground that none of the counts therein (most of which are brought under Taiwanese law) state a plausible claim for relief. Depending largely on its parsing of Taiwanese law, the Court finds that while some of Plaintiffs' claims merit dismissal, a select few pass the bar necessary for proceeding to the next stage of litigation. The

Court will therefore grant the Motion in part, while letting the core claims of the Complaint proceed.

## I.  Background

### A.  Factual Background

The Court has previously set forth the "lengthy and colorful history of this case" in its many prior Opinions.  See Chin-Ten Hsu v. New Mighty U.S. Tr., 288 F. Supp. 3d 272, 276 (D.D.C. 2018) (Wang III), rev'd sub nom. Shi v. New Mighty U.S. Tr., 918 F.3d 944 (D.C. Cir. 2019) (Wang Appellate Decision II); see also Yueh–Lan Wang *ex rel.* Wong v. New Mighty U.S. Tr. (Wang I), 841 F. Supp. 2d 198, 200–201 (D.D.C. 2012), rev'd sub nom. Wang by & through Wong v. New Mighty U.S. Tr. (Wang Appellate Decision I), 843 F.3d 487 (D.C. Cir. 2016); Yueh–Lan Wang by & through Winston Wen–Young Wong v. New Mighty U.S. Tr. (Wang II), 322 F.R.D. 11, 15–16 (D.D.C. 2017).

As it must, the Court draws the following facts from the Second Amended Complaint. See ECF No. 45.  In 1935, Y.C., a citizen of Taiwan, married Yueh-Lan, also a Taiwanese citizen, who was then sixteen years old.  Id., ¶¶ 12, 16, 25.  "Perhaps presaging the advice given Dustin Hoffman's eponymous character in the 1967 movie The Graduate, Y.C. went into plastics, founding the Formosa Plastics Group in 1954."  Wang Appellate Decision I, 843 F.3d at 488 (footnote omitted).  This enterprise proved extraordinarily successful — FPG became one of Taiwan's biggest manufacturing conglomerates with annual sales of over $60 billion.  See SAC, ¶ 17.  In 2008, the year of Y.C.'s death, Forbes magazine ranked him as the 178th wealthiest person in the world, "with an estimated net worth of up to $6.8 billion."  Id., ¶ 18. Plaintiffs suggest that his net worth actually exceeded $9 billion at that time.  Id.

Although Y.C. remained married to Yueh-Lan for the entire 72-year period between their nuptials and his death, he also fathered children outside the marriage during that time. Y.C. was responsible for what Plaintiffs refer to as a "Second Family" with Wang Yang Chaio, with whom he had five children, and a "Third Family" with Pao Chu Lee, with whom he had four children. Id., ¶ 26. Yueh-Lan had no biological children. She did, however, assist in raising Dr. Winston Wong, Y.C.'s eldest son (and a member of the Second Family), and she named him as her sole heir. Id., ¶ 14. Weaving yet another thread into this intricate inheritance web, Y.C. died without a will. Id., ¶ 16.

The death of this self-made billionaire and father of nine children has, perhaps predictably, produced a great deal of strife. Related suits have been filed in Taiwan, Bermuda, New Jersey, Hong Kong, and this Court. See Wang III, 288 F. Supp. 3d at 277. Under Taiwanese law, Yueh-Lan was entitled to half of the property acquired by either member of the couple during their marriage. See SAC, ¶ 2. At the time of Y.C.'s death, however, only (a mere) $1.7 billion in assets (the "Taiwan Assets") was identified as belonging to the marital estate. Id., ¶ 34. The Taiwan Assets were distributed to Y.C.'s heirs (including Yueh-Lan) in accordance with Taiwanese law and pursuant to a Tax Settlement Agreement agreed to by the relevant parties. Id., ¶ 36. These funds do not figure in the current dispute.

According to Plaintiffs, however, the Taiwan Assets represented "only a portion of the property that should have been accounted for and distributed." Id. The relevant chain of events dates back to 1978, when Y.C. directed a business associate to form two Liberian companies (Creative Holding Corporation and Creative Corporation) for the purpose of holding Y.C.'s equity in Formosa Plastics Corporation (FPC), USA. Id., ¶¶ 40–41. Y.C. retained beneficial ownership over these two corporations, which held hundreds of thousands of shares of FPC USA

stock. Id., ¶ 41. Next, in 1991, Y.C. directed his associate to form yet another Liberian company (Sound International Investment Corporation) to hold Y.C.'s equity (about 64,000 shares) in a corporation called Inteplast. Id., ¶¶ 42–43. The plot now thickens. Members of Y.C.'s Third Family served on the boards of all three of these corporations. Id., ¶¶ 41, 44. In 2005, however, the three Liberian corporations were redomiciled in the British Virgin Islands. Id., ¶ 46. Once redomiciled, Y.C. allegedly orchestrated the transfer of the assets held by those companies to Defendant New Mighty U.S. Trust, with Defendant Clearbridge, LLC acting as trustee. Id., ¶¶ 45–51. This transfer of assets into the New Mighty U.S. Trust allegedly extinguished Y.C.'s beneficial ownership of those assets, resulting "in the purported reduction of Yueh-Lan's share of the Marital Estate." Id., ¶¶ 52–53. Clearbridge subsequently authorized the distribution of hundreds of millions of dollars from New Mighty U.S. Trust to Defendant New Mighty Foundation. Id., ¶ 57. Both Clearbridge and the Foundation are linked to members of the Third Family. See Wang III, 288 F. Supp. 3d at 277.

In sum, before his death, Y.C. allegedly transferred marital assets to various entities controlled by the "Third Family," depriving Yueh-Lan (and now her estate) of her rightful 50% spousal share. Such a maneuver — the deliberate sheltering of marital assets in order to withhold property from an inheriting spouse — is prohibited by Taiwanese law. Although Plaintiffs cannot ascertain the exact value of what they deem to be the "actual" marital estate, they assert that it is "greater than double the value" of the Taiwan Assets. See SAC, ¶ 5.

B. Procedural History

Dr. Winston Wong (by way of reminder, technically of the Second Family but with legal and emotional connections to the First) brought this suit in October 2010 in his capacity as Yueh-Lan's attorney-in-fact and legal guardian. Id., ¶ 13. Defendants are New Mighty U.S. Trust

4

(declared under the laws of and with its principal place of business in D.C.); its trustee, Clearbridge (same); and the beneficiary of the trust, New Mighty Foundation (formed under the laws of Delaware and with its principal place of business in D.C.). See SAC, ¶¶ 19–21, 53.

The case has taken "many twists and turns" before reaching the present stage. See Wang III, 288 F. Supp. 3d at 275. First, Defendants moved to dismiss, and this Court granted that motion on the ground that it lacked jurisdiction because the parties were not diverse. See Wang I, 841 F. Supp. 2d at 206–08. In 2015, while the case was on appeal, Yueh-Lan died, and the D.C. Circuit held the appeal in abeyance pending the outcome of Taiwanese death and probate proceedings. See Wang Appellate Decision I, 843 F.3d at 489. Ultimately, the Taiwan Supreme Court appointed Chin-Teh Hsu, Tong-Schung Tai, and Robert Shi as joint executors of Yueh-Lan's will. See SAC, ¶ 15. Next, the Circuit yet again held the appeal in abeyance pending a Supreme Court decision that concerned the citizenship test for a real-estate trust, an issue critical to this Court's determination on the question of diversity jurisdiction. See Wang Appellate Decision I, 843 F.3d at 489 n.6 (citing Americold Realty Trust v. ConAgra Foods, Inc., 136 S. Ct. 1012 (2016)). The D.C. Circuit ultimately reversed this Court's jurisdictional determination, relying on Americold in holding that complete diversity of citizenship existed among the parties. Id. at 495–96. In doing so, the Circuit granted the executors' motion to substitute themselves in place of Yueh-Lan as Plaintiffs. Id. at 496.

With their case resuscitated by the Court of Appeals, Plaintiff Executors filed a Motion for Leave to File a Second Amended Complaint in this Court, which was granted. See Wang II, 322 F.R.D. at 32. Defendants then again moved to dismiss. The Court granted that motion on forum non conveniens grounds, holding that D.C. was an inappropriate forum for the suit given that, inter alia, the dispute presented substantial issues of Taiwanese law and the District had a

relatively weak interest in it.  Wang III, 288 F. Supp. 3d at 281–93.  The D.C. Circuit disagreed, holding that this Court had abused its discretion in dismissing the case.  See Wang Appellate Decision II, 918 F.3d at 948–53.  In so doing, the Circuit explained that "the District of Columbia's interest in this litigation is not weak" because "Y.C. Wang and his associates are alleged to have reached into the District of Columbia to establish the Trusts, transferring assets to the Trusts and thereby availing themselves of the benefits of District of Columbia law on trusts." Id. at 952.

The Second Amended Complaint continues to serve as the operative pleading.  The nine counts asserted therein implicate trusts, shell companies, and bank accounts managed by disparate parties and located across the globe.  Making matters still more complicated, at least five counts are brought under the law of Taiwan.  Yet, "[m]indful of [its] position in the hierarchy of the federal judiciary," the Court "take[s] a deep breath and proceed[s] with this heady task.  Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1316 (9th Cir. 1995).

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted."  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted).  In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted) (quoting Schuler v. United States, 617 F.2d 605, 608

(D.C. Cir. 1979) (citing Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164)).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation" nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Even at the Rule 12(b)(6) stage, a court can review "documents attached as exhibits or incorporated by reference in the complaint" or "documents upon which the plaintiff's complaint necessarily relies."  Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation marks and citations omitted).

Because Plaintiffs bring claims under Taiwan's Civil Code, this case also implicates Federal Rule of Civil Procedure 44.1, which governs considerations of foreign law.  Under that Rule, "a court's determination of foreign law 'must be treated as a ruling on a question of law.'" Animal Sci. Prods., Inc., v. Hebei Welcome Pharm. Co., 138 S. Ct. 1865, 1873 (2018) (quoting Fed. R. Civ. P. 44.1).  "Most often, foreign law is established through 'written or oral expert testimony accompanied by extracts from foreign legal material.'"  Estate of Botvin v. Islamic Republic of Iran, 873 F. Supp. 2d 232, 240 (D.D.C. 2012) (quoting Ganem v. Heckler, 746 F.2d 844, 854 (D.C. Cir. 1984)).  "Such expert testimony is intended to aid the court in determining the content of the law, not in applying that law to the facts of the case."  Id.

In support of their Motion to Dismiss and Opposition, respectively, the parties have submitted declarations from their experts on Taiwanese law.  Plaintiffs offer the Declaration of Professor Tsung-Fu Chen, a member of the Faculty of Law at the National Taiwan University who teaches courses on Taiwan's Civil Code and frequently serves as an arbitrator.  See ECF No. 66-25 (8/13/2019 Declaration of Professor Tsung-Fu Chen), ¶ 2.  Defendants counter with the Declaration of Professor Yeong-Chin Su, a Professor of Law at the National Chengchi

University College of Law in Taipei, Taiwan, and a "former Grand Justice of the Constitutional Court of Taiwan, which is the highest court in Taiwan." ECF No. 62-3 (6/14/2019 Declaration of Professor Yeong-Chin Su), ¶ 1.

The Court, however, is not limited to the parties' characterizations of Taiwanese law. In addition, it may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. It, therefore, "need not uncritically accept . . . expert testimony and may 'engage in its own research . . . [or] reexamine and amplify material that has been presented by counsel in partisan fashion.'" Estate of Botvin, 873 F. Supp. 2d at 240 (quoting Fed. R. Civ. P. 44.1. (advisory committee note)).

## III.    Analysis

As Defendants move to dismiss all nine counts, the Court looks at each separately, combining two when they are sufficiently related.

### A.  Counts I and III

Plaintiffs bring their first claim under Article 1030-1 of the Civil Code of Taiwan. That provision states:

> Upon dissolution of the statutory marital property regime, the remainder of the property acquired by the husband or the wife in marriage . . . shall be equally distributed to the husband and the wife.

ECF No. 62-4 (Civil Code of Taiwan) at 1–2. In support of this count, Plaintiffs assert that because of the transfer of Y.C.'s assets to Defendants, Yueh-Lan never received 50% of the "full value" of the estate, thereby violating her inheritance right established by Article 1030-1. See SAC, ¶ 70.

Defendants' expert explains, however, that under Taiwanese law, this Article "only gives rise to a claim <u>against (a) a spouse or (b) the heirs of a deceased spouse</u> in circumstances where the spouse has not, or a deceased spouse's heirs have not, distributed the remainder of the marital property in accordance with the provisions of Article 1030-1." Su Decl., ¶ 30. Plaintiffs bring Count I not against Y.C. or any of his heirs but instead against the Trust, its Foundation, and the Trustee. Therefore, if Defendants are correct in their proffered interpretation of Article 1030-1, this claim would appear to be foreclosed.

Plaintiffs' expert does not disagree with Defendants' assessment as to the viability (or rather lack thereof) of this count. Professor Chen asserts that Article 1030-1 merely enumerates rights of a surviving spouse that can form the basis for <u>other</u> claims. Id., ¶ 22. Plaintiffs, for their parts, do not even defend Count I as a stand-alone claim in their Opposition. The Court will therefore consider it conceded that this count merits dismissal. See Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz, 82 F. Supp. 3d 344, 351 (D.D.C. 2015) ("Plaintiffs do not respond to this argument in their Opposition, and the Court considers it conceded.").

For similar reasons, the Court dismisses Count III, brought under Article 1146 of Taiwan's Civil Code. This Article provides: "Where the right to inherit has been infringed upon, the injured party or his statutory agent may claim its restitution." Taiwan Civil Code at 2. The parties' experts agree for a second time: A claim can arise under Article 1146 only where the defendant has challenged the plaintiff's "status <u>as an heir</u>." Su Decl., ¶ 39; ECF No. 39-1 (6/2/17 Prior Declaration of Professor Tsung-Fu Chen), ¶ 131; <u>see also</u> Def. MTD at 17 (quoting 53 Tai-shang No. 1928 (1964) (Taiwan Constitutional Court decision stating that Article 1146 is applicable only where claim is brought against person who challenges plaintiff's status as heir)).

Defendants argue that because the SAC is bereft of allegations that they have, in fact, challenged Yueh-Lan's status as an heir, this claim cannot proceed. That is not quite accurate. According to the SAC, Plaintiffs are entitled to relief under Article 1146 because the Defendants have "infringed upon Yueh-Lan's right of inheritance," in part by "asserting that Yueh-Lan was not the only spouse of Y.C." SAC, ¶ 86. In prior rounds of this litigation, Defendants did pursue the theory that Y.C.'s other romantic partners were also <u>legally</u> married to him and thus entitled to their own portions of the estate. Making matters more streamlined, however, Defendants have now abandoned that particular defense (perhaps because Taiwan does not permit bigamy). As it is undisputed that Defendants are no longer challenging Yueh-Lan's status as an heir and because Plaintiffs appear to have also conceded this count in their Opposition papers, the Court will also dismiss Count III.

B. <u>Count II</u>

Plaintiffs' Count II, brought under Article 1030-3 of the Civil Code of Taiwan and referred to as the "central claim of the SAC," fares better. <u>See</u> ECF No. 66 (Pl. Opp.) at 22. The reader will recall that Article 1030-1 of Taiwan's Civil Code guarantees an equal distribution of property between a husband and wife (or their respective estates) upon the dissolution of a marriage. Article 1030-3 further provides, in relevant part:

> If the husband or the wife, in order to reduce the other's share of distribution of the remainder [of the property], disposed his or her property acquired in marriage within five years before the termination of the relationship over the statutory regime, this property shall be counted into, and deemed as the remainder of the property acquired in marriage, except [if] the disposition was a proper gift for performing a moral obligation.
>
> In the preceding paragraph, where one who is obligated to pay the share of distribution [of the remainder of the property] could not pay off those the other is entitled to receive, the one who is entitled to

receive may claim to the third party for restituting the shortness of the share to the extent that the third party is benefited.

Taiwan Civil Code at 1.

According to Plaintiffs' expert, to state a claim under Article 1030-3, a plaintiff "must allege that the disposing spouse: (1) disposed of his or her property acquired in marriage to a third party, (2) within five years before termination of the marriage, (3) in order to reduce the other spouse's share, and (4) that the transfer was not a proper gift for performing a moral obligation." Chen Decl., ¶ 23. If the non-disposing spouse can establish each of these elements, the value of the disposed assets will be deemed "part of" the marital estate to which the surviving spouse is entitled to under Article 1030-1. Id., ¶¶ 21, 24. She can then bring a claim against a third party who "received the disposed property from the disposing spouse within five years after dissolution of the marriage" to recover the amount by which her spousal share has been "shorted." Id., ¶ 24.

The crux of their suit indeed is that Y.C. orchestrated the transfer of the shares in FPG and Interplast from the redomiciled BVI corporations into the New Mighty U.S. Trust, which extinguished his legal and beneficial ownership of that property, while simultaneously granting effective ownership to members of his Third Family. See SAC, ¶¶ 51–55. These distributions were made "without the consent of Yueh-Lan and for the purpose of and with the result of reducing Yueh-Lan's share of the Marital Estate." Id., ¶ 76. They were "not 'proper gifts for performing a moral obligation,'" and Plaintiffs are therefore entitled to "restitution from Defendants in the amount of the shortness of Yueh-Lan's share." Id., ¶¶ 77, 80. This amount, they claim, constituted "no less than $2.162 billion." Id., ¶ 53.

Defendants offer a slew of arguments to defeat Plaintiffs' 1030-3 claim, most of which they have trotted out previously and none of which this Court finds convincing. First, they

contend that because Yueh-Lan participated in the distribution of the $1.7 billion in "Taiwan Assets" available upon her husband's death, she relinquished any claim she might have pursued regarding the "shorted" additional funds under 1030-3.  Defendants do not offer any legal support for this theory, basing it entirely upon their expert's unsubstantiated assertion that Yueh-Lan "should not have agreed to the terms of the Settlement Agreement" if she felt she was not receiving the full value of her entitled share.  See Su Decl., ¶ 129.  As Plaintiffs argue, this simply amounts to uncorroborated conjecture as to why Yueh-Lan entered into the Tax Settlement Agreement.  In any event, that Agreement did not act as a global settlement or expressly preclude the pursuit of other assets.  (In fact, given that this lawsuit has already lasted for ten years, including the remainder of Yueh-Lan's life, it seems wise in retrospect for Yueh-Lan to have accepted her share of whatever was available to her in 2008.)  The Court therefore finds no reason to conclude that her participation in the Tax Settlement Agreement forfeited her (or her estate's) right to pursue this action.

Defendants next argue that Plaintiffs have failed to establish the third element of an Article 1030-3 claim — that is, that Y.C. transferred funds "in order to reduce" (or, as Defendants' characterize the element, "with the specific intent" of reducing) Yueh-Lan's share.  As Defendants' expert states, "[T]he mere transfer of ownership of marital assets to a third party within five years prior to the termination of the marriage is not sufficient to give rise to a claim under Article 1030-3."  Su Decl., ¶ 52.  Instead, the disposing spouse must have made the transfer "for the specific purpose of" shielding assets from the inheriting spouse.  Id.  Professor Su claims that there are no allegations in the SAC to support the existence of a "motive" on the part of Y.C. Wang to deprive Yueh-Lan of her rightful spousal share.  Id.  Plaintiffs counter that

they have indeed made such allegations, and that, in any event, Taiwanese law does not recognize the concept of specific intent, as distinct from intent generally.

As a threshold matter, this disagreement over the proper interpretation of Taiwanese law is not one that can be resolved at this early stage of litigation, when Plaintiffs have provided plausible expert testimony to the contrary. See 9A Wright & Miller, Federal Practice and Procedure § 2444 (3d ed. 2019) ("If the proof before the district court on a summary judgment motion is not harmonious or is unpersuasive or inconclusive, the court should request a further showing by counsel, or engage in its own research, or direct that a hearing be held, with or without oral testimony, to resolve the issue.") (emphasis added); see also id. (noting that "pretrial discovery inquiries [can] serve to define or narrow the scope of a foreign-law issue"). Additionally, when a court considers a question of foreign law, "expert testimony is intended to aid the court in determining the content of the law, not in applying that law to the facts of the case." Estate of Botvin, 873 F. Supp. 2d at 240.

Whether one conceives of the inquiry as one of "intent" or "specific intent," Plaintiffs have satisfied their burden at this stage. The Court has already expressed skepticism of Defendants' argument on the issue of Y.C.'s state of mind, and Defendants have given it no reason to reverse that prior intuition here. See Wang II, 322 F.R.D. at 26–27 (stating Court's difficulty in following Defendants' objections to Count II because "whether or not . . . eventually borne out by the evidence," Count II was neither "facially implausible" nor "unsupported . . . by appropriate factual allegations in the SAC"). The SAC alleges that Y.C. "secretly . . . directed and/or permitted" the transfer of his properties held by the BVI corporations to New Mighty Trust (an entity controlled by members of his Third Family) during the "waning years of his life" in order to reduce Yueh-Lan's spousal share. See SAC, ¶¶ 51–54. Plaintiffs also highlight New

Mighty U.S. Trust's Declaration of Trust, which specifically provides that no distribution from the trust may be made to a member of Y.C.'s legal family.  Id., ¶ 52.

From these allegations one could reasonably infer that Y.C. intended to shield some of his assets from Yueh-Lan upon his death, redirecting them toward his Third Family.  The facts provided by the SAC and the inferences that may be drawn therefrom are clearly sufficient to withstand a motion to dismiss, no matter the requisite state of mind.   See, e.g., Consumers United Ins. Co. v. Smith, 644 A.2d 1328, 1358–59 (D.C. 1994) (stating that "'[t]he question of fraudulent intent is a question of fact and not of law,'" and explaining that although defendant "also may have had non-fraudulent motives[,] . . . the simple fact that it transferred the building to keep it out of [plaintiff's] reach is a sufficient ground for an unassailable conclusion that [defendant] had fraudulent intent") (quoting D.C. Code § 28-3101); see also Weiss v. Nat'l Westminster Bank PLC, 768 F.3d 202, 211 (2d Cir. 2014) ("We are . . . lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact.") (emphasis added and internal quotation marks omitted); Azzam v. Rightway Dev. Inc., 789 F. Supp. 2d 110, 118–19 (D.D.C. 2011) ("[T]he intent or recklessness of the defendant — is normally a factual question for the jury."); Estate of Klieman v. Palestinian Auth., 424 F. Supp. 2d 153, 167 (D.D.C. 2006) ("The Court cannot determine defendants' intent in allegedly committing the attack in the context of a motion to dismiss; that is a question for trial or, at a minimum, for summary judgment.").

Finally, and for similar reasons, the Court rejects Defendants' arguments predicated on other disputed issues of Taiwanese law.  These include that: (a) the share transfers qualify for Article 1030-3's exception for "proper gifts for performing a moral obligation," a statement that Plaintiffs contest with their own expert testimony and citation to Taiwan caselaw; (b) a beneficial

interest in shares does not constitute "property" for the purposes of Article 1030-3, again forcefully rebutted by Plaintiffs, see Pl. Opp. at 34 (citing expert testimony); and (c) all claims should be dismissed against Defendant New Mighty Foundation because Article 1030-3 does not grant a spouse a claim against a successive transferee. See Chen Decl., ¶¶ 139–143; but see Su Decl., ¶ 137 (attesting to opposite conclusion). Plaintiffs have provided plausible expert declarations on these issues, and Defendants have not carried their burden of displacing them.

C. Counts IV and V

Counts IV and V are predicated on Plaintiffs' "alternative theory" of events. By way of reminder, Count II is grounded on the assumption that the transfers terminated Y.C.'s interest in the disputed assets, requiring Plaintiffs to "claw back" the property from Defendants pursuant to Article 1030-3. Without the benefit of discovery, however, Plaintiffs remain unsure as to whether the share transfer from the BVI companies to New Mighty Trust actually extinguished Y.C.'s beneficial interest. They also offer the possibility that Y.C. "did not authorize or consent to the irrevocable transfer of his beneficial interests," Pl. Opp. at 44, which would call into question the legal basis for Defendants' continued possession of the assets.

Plaintiffs bring Count IV under Article 767 of the Civil Code of Taiwan. This provision provides:

> The owner of a thing has the right to demand its return from anyone who possesses it without authority or who seizes it. Where his ownership is interfered, he is entitled to claim the removal of the interference; and where the ownership might be interfered, he is entitled to claim the prevention of such interference.

SAC, ¶ 89. The experts agree that in order to plead a claim under Article 767, a plaintiff must allege that: (1) the plaintiff is the present legal owner of the thing sought to be returned; and (2) the thing sought to be recovered has been seized or is possessed by another without the legal

owner's authority.  See Su Decl., ¶¶ 100–02.  Plaintiffs' theory appears to be that if "it is determined that the legal effect of these transfers did not dispose of Y.C.'s beneficial interest in the property," then the shares belonged to Y.C. at the time of his death, and they should have been distributed as part of the marital estate.  See SAC, ¶ 56.  As Plaintiffs' expert put it in a submission from a few years ago, if Y.C. maintained his beneficial interest in the transferred shares at the time of his death, "Yueh-Lan . . . is the present owner of those properties" and is entitled to "demand [their] return."  ECF No. 39-1 (6/2/17 Prior Declaration of Professor Tsung-fu Chen), ¶¶ 128–30.

Defendants mount an attack on several fronts, including that Plaintiffs have failed to plead facts to support their assertion that Yueh-Lan is the "present legal owner" of the disputed assets.  Plaintiffs offer nothing in the way of a response.  Indeed, they neglect to defend their Article 767 claim at all, declining to even mention it in their Opposition or in their most recent expert report.  Given that they thus appear to have abandoned this claim — and have offered almost nothing in the way of factual support for it — the Court will dismiss Count IV.

Next up is Count V, which is predicated on a twist in Plaintiffs' alternative theory.  Here, they cite Article 179 of the Taiwan Civil Code, which provides:

> A person who acquires interests without any legal ground and prejudice to the other shall be bound to return it.  The same rule shall be applied if a legal ground existed originally but disappeared subsequently.

Taiwan Civil Code at 1.  This count is based on their as-yet undeveloped assertion that Y.C. "did not authorize or consent to the irrevocable transfer of his beneficial interests."  Pl. Opp. at 44.  If the shares were transferred without his knowledge or consent, then the Trusts acquired these "interests without any legal ground" and remain "bound to return [them]."  Taiwan Civil Code at 1.  In support of their theory that Y.C. did not authorize the transfers, Plaintiffs point not to their

own Complaint but instead to facts asserted in a February 2018 pleading in the Bermuda Action

(brought by Dr. Winston Wong and asserting that certain assets held by Bermuda Trusts belong

to the marital estate).  See Pl. Opp. at 8–9.  These facts include that the Trust documents were

written in English, a language that Y.C. could not understand, and that there is to date "no

disclosed evidence that Y.C. was ever shown or made aware of the full terms of any of the Trust

documents."  Id.  Defendants, for their part, counter that the allegations in the Complaint are

inconsistent with Plaintiffs' "alternative theory" because they "affirmatively confirm that

Clearbridge had a firm legal basis to receive and own the shares."  Def. MTD at 25.

Defendants' argument in some ways misses the point: Plaintiffs may maintain alternative

theories of recovery that are "inconsistent" with one another.  See Fed. R. Civ. P. 8(d)(3) ("A

party may state as many separate claims or defenses it has, regardless of consistency.").

Regardless, their Complaint does not offer sufficient factual support for their alternative theory.

Indeed, they appear to have excised allegations that could have supported an Article 179 claim in

order to "frame the litigation."  ECF No. 36-3 (Defense Exhibit) at 2; see also Wang II, 322

F.R.D. at 28 ("[A]lthough Plaintiff's First Amended Complaint indicated that the financial

transfers to Defendants had been made without Y.C.'s knowledge, discovery in a separate action

in Bermuda has since uncovered evidence that Y.C. may in fact have been aware of the shares

being placed in the Trust prior to his death.").  While Plaintiffs highlight potentially relevant

facts in their Opposition, "it is axiomatic that a complaint may not be amended by the briefs in

opposition to a motion to dismiss."  Hajjar-Nejad v. George Washington Univ., 802 F. Supp. 2d

166, 175 (D.D.C. 2011) (quotation marks and alteration omitted).  With Plaintiffs offering only

conclusory statements in support, such as that "the SAC states a claim under . . . Article 179 of

the Taiwan Civil Code," Pl. Opp. at 36, their Count V cannot withstand Defendants' Motion to Dismiss.

The Court, however, is sympathetic to Plaintiffs' argument that new facts have recently come to light, and that the case has developed in a way they could not have predicted prior to filing their Second Amended Complaint. For example, the revelations from the Bermuda litigation were made known to the Executors a year after the filing of their Second Amended Complaint as this case was winding its way through various appeals and remands. The Court will thus dismiss the counts based on the alternative theory without prejudice to Plaintiffs' ability to seek leave to file a Third Amended Complaint down the road, particularly in the event of revelations during discovery here or in the Bermuda action. See Van De Berg v. Soc. Sec. Admin., No. 08-765, 2009 WL 10697643, at *2 (D.D.C. Jan. 23, 2009) (court should dismiss action without leave to replead only where "repleading could not possibly correct the defects in the party's claim") (quoting 6 Wright & Miller, Federal Practice and Procedure § 1483 at 587).

D.  Count VII

Having concluded its tour of Taiwanese law, the Court may now cross the Pacific and consider whether Plaintiffs' common-law claim of unjust enrichment can proceed under the law of the District of Columbia. While Plaintiffs believe that D.C. law provides the appropriate standard, Defendants counter that this claim is also subject to the law of Taiwan, a country that, helpfully for them, does not recognize such a cause of action.

1.  *Choice-of-Law Principles*

A brief primer is first in order on choice of law. "A federal court sitting in diversity applies the conflict of law rules of the forum in which it sits" — in this case, the District of Columbia. See City of Harper Woods Emps.' Ret. Sys. v. Olver, 589 F.3d 1292, 1298 (D.C. Cir.

2009).  "The District of Columbia follows a modified 'interest analysis' approach to choice of

law.  Under this approach, the first step is to determine whether a 'true conflict' exists — that is,

whether more than one jurisdiction has a potential interest in having its law applied and, if so,

whether the law of the competing jurisdictions is different."  Chambers v. NASA Fed. Credit

Union, 222 F. Supp. 3d 1, 8 (D.D.C. 2016) (quoting GEICO v. Fetisoff, 958 F.2d 1137, 1141

(D.C. Cir. 1992)).  If no conflict exists, the Court's work is done: District of Columbia law

applies.  Id.

    If there is a "true conflict" between jurisdictions, however, the Court must go further

down the rabbit hole and determine which substantive law applies.  In making this determination,

"District of Columbia courts blend a 'governmental interests analysis' with a 'most significant

relationship' test."  Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 842 (D.C. Cir. 2009)

(quoting Hercules & Co., Ltd. v. Shama Rest. Corp., 566 A2.d 31 40–41 (D.C. 1989)).  Under

the "governmental interests" analysis, a court "must evaluate the governmental policies

underlying the applicable laws and determine which jurisdiction's policy would be most

advanced by the application of its law to the facts of the case under review."  Id. (quoting

Hercules & Co., 566 A.2d at 41).  Under the "most significant relationship" test, the Court must

"consider the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145."

Id.  These are:

> a) the place where the injury occurred;
> b) the place where the conduct causing the injury occurred;
> c) the domicil[e,] residence, nationality, place of incorporation
>    and place of business of the parties; and
> d) the place where the relationship . . . between the parties is
>    centered.

Id. (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)).  "In any given case,

these considerations may point in opposite directions and raise difficult questions concerning

how each should be weighted." Id. Further complicating matters, District of Columbia courts need not decide all issues under a single jurisdiction's law. See Logan v. Providence Hosp., Inc., 778 A.2d 275, 280 (D.C. 2001). Instead, "different law may apply to different issues in a lawsuit." Id.

### 2. *Application to Unjust Enrichment*

Count VII's unjust-enrichment claim alleges that "Defendants have directly and indirectly benefited from the improper acquisition and improper use of property . . . [that] was part of the Marital Estate upon which Yueh-Lan is entitled to her statutory share." SAC, ¶ 109. As an initial matter, the parties agree that a "true conflict" exists here between the laws of Taiwan and D.C. as to this count. As Plaintiffs' own expert frames the conflict, Taiwan, a civil-law country, "does not recognize equitable claims," such as unjust enrichment. See Chen Decl., ¶ 62. Instead, such claims are subsumed under analogous provisions in Taiwan's Civil Code. Id. Each jurisdiction, morover, clearly has at least some interest in the matter, given that Plaintiffs are citizens and residents of Taiwan, while Defendants are entities all with their principal place of business in the District of Columbia.

Weighing the interests involved, the Court ultimately finds that District of Columbia law applies here. First, while the Court may have previously taken a more limited view of D.C.'s interest in this matter, the Circuit has confirmed the District's significant connection. Contrary to Defendants' assertion that "D.C.'s interests are not implicated by the pleadings," Def. MTD at 32, the Circuit explained that "Y.C. Wang and his associates are alleged to have reached into the District of Columbia to establish the Trusts, transferring assets to the Trusts and thereby availing themselves of the benefits of District of Columbia law on trusts." Wang Appellate Decision II, 918 F.3d at 952. The lawsuit "exists only because Y.C. Wang and his associates utilized U.S.

legal structures to devise their alleged tax and estate avoidance scheme," and the Trusts can "hardly complain now that they are burdened by being sued in their home jurisdiction when Y.C. Wang specifically bestowed upon the District of Columbia an interest in this case by establishing the Trusts here." Id. While the Circuit provided this explanation in the context of its *forum non conveniens* analysis, its conclusion as to the District's "interest" in the litigation bears forcefully on this Court's conflicts decision.

Given the appellate court's position, Defendants' arguments in support of the primacy of Taiwan's interest do not prevail. They simply assert that Taiwan maintains a "distinct interest in upholding its statutory laws and ensuring that any violations thereof are remedied in accordance with its own Civil Code" and that the law of a "plaintiff's domicile" should generally be applied in a conflicts analysis. See Def. MTD at 31. Not only do these assertions ignore the multi-pronged test this Court is bound to employ in undertaking a conflicts analysis, it is tantamount to a claim that a Taiwanese resident can never bring claims under D.C. law. To be sure, Taiwan maintains an interest in a dispute that relates to a marriage between two of its citizens. As explained above, however, this case ultimately implicates not the validity of their marriage itself but instead the potentially illegal use of trusts established in the District — the sort of maneuvering it maintains a distinct interest in combatting and that runs directly contrary to its public policies.

Moving from interests to significant relationship, the Court acknowledges that the four Restatement factors — place of injury, place of conduct causing injury, domicile or place of business of the parties, and place the parties' relationship is centered — point in different directions. See Restatement (Second) of Conflict of Laws § 145. The injury likely occurred in Taiwan, where Yueh-Lan was denied property rights, but the conduct that allegedly caused the

injury — the transfer of assets extinguishing Y.C.'s beneficial interest — likely occurred in the District.  Additionally, in the context of unjust-enrichment claims, the Restatement itself states that "the place where the benefit or enrichment was received" — here, the District — "will usually be [the contact] of greatest importance with respect to most issues in situations where the claim to restitution does not stem from any relationship between the parties."  Id. § 221 cmt. d.

Third, although Plaintiffs are residents of Taiwan, Defendants' place of business is this city.  Finally, the parties do not appear to have a relationship beyond this dispute over the funds. "In any event, the District of Columbia Court of Appeals has instructed that the mere counting of contacts is not what is involved when applying the Restatement factors."  Intelect Corp. v. Cellco P'ship GP, 160 F. Supp. 3d 157, 179 (D.D.C. 2016).   Instead "[t]he weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale."  Id.  The gravamen of Plaintiffs' Complaint is that Y.C. orchestrated the creation of Trusts in the District of Columbia to shield assets from his wife.  That is, he took advantage of American legal structures to illegally divert funds from his wife to the family of his other romantic partner.

With D.C.'s substantial interest in this dispute established and the Restatement Factors in rough equipoise, the Court's analysis points toward the application of District law.  Any remaining doubts, moreover, are dispelled by the procedural posture of the case.  "The District of Columbia Court of Appeals has instructed that 'any uncertainty' with respect to choice of law questions at the motion to dismiss stage should be resolved in favor of the plaintiff, and, furthermore, that if the court 'cannot determine from the pleadings which jurisdiction has a greater interest in the controversy' the court 'must apply the law of the forum state' —  in this case the District of Columbia."  Intelect Corp., 160 F. Supp. 3d at 179 (quoting Washkoviak v. Sallie Mae, 900 A.2d 168, 182 (D.C. 2006)).  The Court will thus apply D.C. law.

That, of course, is still just the preamble.  There remains the close question of whether, even under D.C. law, Plaintiffs have successfully pled an unjust-enrichment claim.  Unjust enrichment "is based not on a contractual duty" but on "the common law concept of quasi-contract," which reflects "the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another."  Bregman v. Perles, 747 F.3d 873, 878 (D.C. Cir. 2014) (internal quotation marks and citations omitted).   Under D.C. law, "[u]njust enrichment occurs when a person retains a benefit . . . which in justice and equity belongs to another."  Braud & Margulies, P.C. v. Fireman's Fund Ins. Co., 468 F. Supp. 2d 190, 199 (D.D.C. 2007).  It occurs when: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  News World Commc'ns, Inc. v. Thompson, 878 A.2d 1218, 1222 (D.C. 2005).  In support of this claim, Plaintiffs assert that Defendants have been "unjustly enriched by the receipt and retention" of the property belonging to the marital estate (and therefore to Yueh-Lan), which was unlawfully conveyed to them.  See SAC, ¶¶ 109–10.

While Defendants rejoin that Y.C., not Yueh-Lan, "confer[red] the benefit on the defendant," in certain circumstances, "[a] plaintiff alleging an unjust enrichment may . . . seek[] to recover a benefit . . . which was transferred to the Defendant by a third party.'"  In re Lorazepam & Clorazepate Antitrust Litig., 295 F. Supp. 2d 30, 51 (D.D.C. 2003); see also Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 130 F. Supp. 3d 236, 256 (D.D.C. 2015) ("[A] benefit indirectly conferred on a defendant can support an unjust enrichment claim.").   Courts, moreover, have interpreted this element "liberally, finding that a plaintiff 'confers a benefit' upon a defendant if it 'in any way adds to the other's security or advantage . . . [or] adds to the property or another . . . [or] saves the other from expense of loss.'"  Fed.

Deposit Ins. Corp. v. Bank of Am., N.A., 308 F. Supp. 3d 197, 203–04 (D.D.C. 2018) (quoting Bregman, 747 F.3d at 878). And crucially, courts have emphasized that an unjust-enrichment claim requires a fact-intensive inquiry: "[The claim is] determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next." U.S. *ex rel.* Westrick v. Second Chance Body Armor, Inc., 685 F. Supp. 2d 129, 141 (D.D.C. 2010).

Plaintiffs allege that Y.C. unlawfully transferred portions of the marital estate (that is, the Executors' property) within five years of his death to Defendants, and that Defendants continue to retain this benefit despite Yueh-Lan's entitlement to these assets. These transfers were made "without Yueh-Lan's knowledge and consent" and at the direct expense of her "right to receive her one half share." Pl. Opp. at 38–39. It is possible that these claims will not be borne out — *viz.*, that Yueh-Lan had no legal entitlement to these shares at any time, that the transfers were not unlawful, or that perhaps Y.C. did not participate in the share transfer at all (as Plaintiffs' alternative theory would seem to imply). At this early stage, however, Plaintiffs have met their pleading burden.

E. Count VI

Count VI, Plaintiffs' conversion claim, does not require a conflicts analysis because it would not succeed under the law of either jurisdiction. Both parties agree that Taiwanese law does not recognize the common-law claim of conversion. As Defendants put it, under D.C. law, "Plaintiffs' purported common law claims [including their conversion claim] are distinct claims which in theory could be pursued alongside [their] primary liability claims," whereas under Taiwanese law, Plaintiffs cannot supplement their claims under the Taiwan Civil Code with such counts. See Def. MTD at 30.

Even if District of Columbia law applies here, however, Plaintiffs have failed to state such a claim in their Second Amended Complaint. The tort of conversion involves "an unlawful exercise of ownership, dominion and control over the personalty of another in denial or repudiation of his right to such property." Blanken v. Harris, Upham & Co., Inc., 359 A.2d 281, 283 (D.C. 1976). Plaintiffs describe their conversion claim as the common-law analogue of their Article 179 claim, which is premised on the SAC's "alternative theory" of liability, "where Y.C. did not authorize or consent to the irrevocable transfer of his beneficial interests in the property transferred to New Mighty Trust." Pl. Opp. at 44. As explained above, Plaintiffs have not included sufficient facts in their Complaint in support of this theory, and thus their conversion claim, like those brought under Taiwanese law and also predicated on the same theory, cannot go forward.

F. Counts VIII and IX

Rounding the final turn, the Court can make quick work of Plaintiffs' two remaining counts. Count VIII requests that "[a] constructive trust . . . be imposed upon all property held, possessed, owned and/or controlled by Defendants . . . in order to ensure that Plaintiffs receive Yueh-Lan's statutory share of the Marital Estate." SAC, ¶ 116. Count IX asks for "an accounting of all of the assets, monies and property owned, held, or maintained by or for the benefit of Y.C. prior to his death, or distributed or disposed of by Y.C. in the five years before his death, so that Yueh-Lan's share . . . may be calculated." Id., ¶ 119

In labeling these separate counts, Plaintiffs put the cart before the horse. Neither a constructive trust nor an accounting constitutes a free-standing claim. They instead supply potential remedies that might be available to Plaintiffs (and only under District of Columbia law) should they ultimately prevail. It is well established that a constructive trust is "not an

independent cause of action," but instead provides "'a remedy that a court devises after litigation.'" <u>Macharia v. United States</u>, 238 F. Supp. 2d 13, 31 (D.D.C. 2002), <u>aff'd</u>, 334 F.3d 61 (D.C. Cir. 2003) (quoting <u>United States v. BCCI Holdings</u>, 46 F.3d 1185, 1190 (D.C. Cir. 1995)). Similarly, an accounting, "a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation," may be obtained at the close of litigation if (and only if) a plaintiff succeeds on some independent claim. <u>See</u> <u>Bates v. Nw. Human Servs., Inc.</u>, 466 F. Supp. 2d 69, 103 (D.D.C. 2006); <u>see also</u> <u>Wilson v. On the Rise Enterprises, LLC</u>, 305 F. Supp. 3d 5, 19–20 (D.D.C. 2018) (same); <u>Haynes v. Navy Fed. Credit Union</u>, 52 F. Supp. 3d 1, 10 (D.D.C. 2014) ("An accounting is an extraordinary remedy that is only appropriate, if at all, after liability has been determined.").

This litigation remains many leagues from the finish line. It would therefore be premature for the Court to opine as to the hypothetical availability of these equitable remedies. <u>See, e.g.</u>, <u>Hickey v. Scott</u>, 738 F. Supp. 2d 55, 61 (D.D.C. 2010) (declining to determine whether imposing constructive trust would be appropriate before end of litigation). The Court thus dismisses these as freestanding counts, but it does so without prejudice to Plaintiffs' ultimately seeking them as remedies in the event they prevail.

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss as it pertains to Counts II and VII of Plaintiffs' Complaint but will grant it with regard to all other counts. A separate Order consistent with this Opinion shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: <u>February 6, 2020</u>